**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**Lara Shalov Mehraban**
**Sheldon L. Pollock**
**Alistaire Bambach**
**David Stoelting**
**Kristin M. Pauley**
**Lindsay S. Moilanen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0174 (Stoelting)**
**stoeltingd@sec.gov**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | 21 Civ. _____ (     ) |
| -against- | |
| **GPB CAPITAL HOLDINGS, LLC; ASCENDANT CAPITAL, LLC; ASCENDANT ALTERNATIVE STRATEGIES, LLC; DAVID GENTILE; JEFFRY SCHNEIDER; and JEFFREY LASH,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants GPB Capital Holdings, LLC ("GPB Capital"), Ascendant Capital, LLC ("Ascendant

Capital"), Ascendant Alternative Strategies, LLC ("AAS"), David Gentile, Jeffry Schneider, and

Jeffrey Lash, alleges as follows:

## SUMMARY

1.      This case concerns a long-running and multi-faceted fraudulent scheme perpetrated by GPB Capital, a registered investment adviser; its owner and CEO, Gentile; AAS, a registered broker-dealer, and its branch office, Ascendant Capital; Schneider, the owner and CEO of Ascendant Capital; and Lash, a former managing partner of GPB Capital.

2.      GPB Capital describes itself as a New York-based alternative asset management firm that acts as a general partner and fund manager for limited partnership funds.  The limited partnership funds invest in various businesses with a focus primarily on automotive retail, waste management, and healthcare (collectively, the "Portfolio Companies").  Since its founding in 2013, GPB Capital has raised in excess of $1.7 billion for at least five limited partnership funds from approximately 17,000 retail investors nationwide, approximately 4,000 of whom are seniors.  Nearly all of the $1.7 billion raised is still at risk:  in 2018 GPB Capital suspended all redemptions and distributions and, according to a recent regulatory filing, GPB Capital's assets are far below its obligations to the investors.

3.      To existing and prospective investors in the limited partnership funds, GPB Capital projected an aura of success, touting that it consistently made an 8% annualized distribution payment to investors, as well as periodic "special distributions" ranging from 0.5 to 3%.  GPB Capital, Gentile, AAS, Ascendant Capital, and Schneider (collectively, the "GPB and Ascendant Defendants") stressed in the offering and marketing materials for the limited partnership funds that GPB Capital made the distribution and special distribution payments exclusively with funds from operations of the Portfolio Companies.

4.      But the aura of success portrayed by the GPB and Ascendant Defendants was an illusion.  In reality, GPB Capital used investor funds to cover the shortfall between funds from operations of the Portfolio Companies and the amount needed to make an annualized 8%

distribution payment.  GPB Capital and Gentile, with substantial assistance from Lash, also manipulated the financial statements for two of the limited partnership funds in the early years of the offering to give the false appearance to prospective investors and investors that the Portfolio Companies were generating sufficient income to cover the distribution payments to investors.

5.      In addition, GPB Capital and Ascendant Capital made material misrepresentations and omissions to prospective investors and investors in offering and marketing materials concerning millions of dollars in fees and other compensation received by Gentile, Schneider, and Ascendant Capital.  GPB Capital and Gentile also failed to disclose Gentile's and Schneider's inherent conflict of interest in acquisition-related decisions on account of the undisclosed fees they received in connection with those acquisitions.

6.      The fraudulent scheme continued for more than four years in part because GPB Capital kept investors in the dark about the limited partnership funds' true financial condition.  GPB Capital has not delivered audited financial statements for the limited partnership funds to investors for more than four years and is more than three years delinquent in registering two of the limited partnership funds with the Commission, as required by Section 12(g) of the Securities Exchange Act of 1934 (the "Exchange Act").

7.      Lastly, in addition to the foregoing violations, GPB Capital included language in certain of its separation and consulting or transition agreements to impede former employees from communicating directly with the Commission and retaliated against a known whistleblower, in violation of Section 21F of the Exchange Act.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws, as follows:

9.      Defendant GPB Capital:

a.      Violated Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), (2) and (4)] and Rules 206(4)-2 and 206(4)-7 thereunder [17 C.F.R. §§ 275.206(4)-2 and 206(4)-7];

b.      Violated Sections 17(a)(1), (2), and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; and

c.      Violated Sections 10(b), 21F and 12(g) of the Exchange Act [15 U.S.C. §§ 78j(b), 78u-6, and 78l(g)], and Rules 10b-5(a), (b) and (c), and 21F-17(a) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c), and 240.21F-17(a)].

10.      Defendant Ascendant Capital:

a.      Violated Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; and

b.      Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b)  and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].

11.      Defendant AAS:

a.      Violated Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; and

b.      Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].

12.      Defendant Gentile:

a.      Violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)];

b.      Violated Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; and

      c.      Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; or

      d.      In the alternative, violated Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting GPB Capital's violations of Sections 206(1) and 206(2) of the Advisers Act  [15 U.S.C. §§ 80b-6(1) and (2)], Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].

13.    Defendant Schneider:

      a.      Violated Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)]; and

      b.      Violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)]; or

      c.      In the alternative, violated Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting GPB Capital's, Ascendant Capital's, or AAS's violations of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)].

14.    Defendant Lash:

      a.      Aided and abetted violations of Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (2) and (3)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b) and (c)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

15.     Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

16.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

17.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Section 20(d)(5) [15 U.S.C. § 78u(d)(5)] and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7); (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

19.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

20.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Defendants may be found in, are inhabitants of, or transact business in the Eastern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including investor meetings held in, and payments received from businesses residing in, the Eastern District of New York. In addition, venue is proper in this district because GPB Capital held an office in this district, and both Defendant Gentile and numerous investors in the limited partnership funds reside in this district.

## DEFENDANTS[1]

21.     **GPB Capital**, a Delaware limited liability company, has its principal place of business in New York, New York. Defendant Gentile is the founder, owner, and CEO of GPB Capital. GPB Capital has been registered with the Commission as an investment adviser since April 2014. GPB Capital's December 10, 2020, Form ADV ("ADV") reported that it had approximately $238,637,198 in assets under management.

22.     **Ascendant Capital**, a Delaware limited liability company, has its principal place of business in West Lake Hills, Texas. Ascendant Capital serves as the placement agent for GPB Capital.

23.     **AAS**, a Delaware limited liability company, has its principal place of business in New York, New York. AAS has been registered with the Commission as a broker-dealer since March 2017. Since that time, offers and sales of the interests in GPB Capital limited partnership funds

---

[1]     The Commission has tolling agreements with GPB Capital and Gentile for the period February 7, 2019 through February 10, 2021; with Ascendant Capital and Schneider for the period March 1, 2019 through February 10, 2021; and with Lash for the period March 1, 2019 through February 10, 2021.

have been sourced through AAS.  Ascendant Capital is a branch office of AAS.

24.     **Gentile**, age 54 is a resident of Manhasset, New York, and Clearwater, Florida.  He is the founder, owner, and CEO of GPB Capital.  Gentile is also an indirect, minority owner of AAS.  Gentile is a CPA and worked for approximately 25 years at an accounting firm based in Garden City, New York.

25.     **Schneider**, age, 52, is a resident of West Lake Hills, Texas.  Schneider is a minority owner of AAS and the sole owner and CEO of Ascendant Capital.  Schneider holds Series 7, 24, 63, and 65 licenses.  Schneider was the subject of regulatory inquiries by the State of Illinois and the National Association of Securities Dealers (NASD) in 2006 and 2004, respectively, both of which he settled.  Eight of Schneider's customers have also filed Financial Industry Regulatory Authority (FINRA) arbitrations or complaints against him, relating to suitability, excessive trading, and unauthorized trading.  Schneider settled six of the eight claims through payments to the customers; one claim was denied; and one claim was withdrawn.

26.     **Lash**, age 51, resides in Naples, Florida.  From 2013 through early 2018, Lash served as a managing partner of GPB Capital, responsible for formulating GPB Capital's automotive retail strategy.

## OTHER RELEVANT ENTITIES

23.     **GPB Automotive Portfolio, LP ("Automotive Portfolio")** is a Delaware limited partnership with its principal place of business in New York, New York.  Automotive Portfolio is a private investment fund formed to acquire and operate automotive dealerships.  GPB Capital serves as the general partner and investment manager for Automotive Portfolio.  Automotive Portfolio engaged in an unregistered offering beginning in July 2013, raising approximately $675 million.  Automotive Portfolio has been closed to new investors since June 2018.

24.     **GPB Holdings, LP / GPB Holdings Qualified, LP ("Holdings Qualified")**

**(collectively, "Holdings I")** is a Delaware limited partnership with its principal place of business

in New York, New York.  Holdings Qualified is an entity formed for certain U.S. tax-exempt

purchasers and invests all of the net proceeds received into GPB Holdings, LP.  Holdings I is a

private investment fund formed primarily to acquire and operate automotive retail, managed IT

services and life sciences companies.  GPB Capital serves as the general partner and investment

manager for Holdings I.  Holdings I engaged in an unregistered offering beginning in March 2013,

raising approximately $193 million.  Holdings I has been closed to new investors since December

2015.

25.     **GPB Holdings II, LP ("Holdings II")** is a Delaware limited partnership with its

principal place of business in New York, New York.  Holdings II is a private investment fund

formed primarily to acquire and operate automotive retail and managed IT services companies, and

to pursue other special situations and debt strategies.  GPB Capital serves as the investment manager

for Holdings II.  Holdings II engaged in an unregistered offering beginning in April 2015, raising

approximately $680 million.  Holdings II has been closed to new investors since June 2018.

26.     **GPB Waste Management, LP ("Waste Management")** is a Delaware limited

partnership with its principal place of business in New York, New York.  Waste Management is a

private investment fund formed primarily to acquire and operate waste management companies.

GPB Capital serves as the general partner and investment manager for Waste Management.  Waste

Management engaged in an unregistered offering beginning in June 2016, raising approximately $163

million through December 31, 2018.  Waste Management has been closed to new investors since

July 2018.

27.     **GPB Cold Storage, LP ("Cold Storage")** is a Delaware limited partnership with its

principal place of business in New York, New York.  Cold Storage is a private investment fund

formed primarily to acquire a freezer warehouse and the accompanying real estate.  GPB Capital

serves as the general partner and investment manager for Cold Storage.  Cold Storage engaged in an

unregistered offering beginning in July 2015, raising approximately $57 million.  Cold Storage has

been closed to new investors since July 2016.

28.     **Broker-Dealer 1** is a Delaware corporation and a broker-dealer registered with the

Commission since June 1990.  Prior to March 2017, offers and sales of the interests in the limited

partnership funds managed by GPB Capital were sourced through Broker-Dealer 1.  Ascendant

Capital was a branch office of Broker-Dealer 1 before becoming a branch office of AAS in March

2017.

**FACTS**

## I.     OVERVIEW

29.     During the period April 2014 through December 2018, GPB Capital served as the

general partner and/or manager for the following limited partnership funds:  Automotive Portfolio,

Holdings I, Holdings II, Waste Management, and Cold Storage (each, a "Fund," and collectively, the

"Funds").  The principal purpose of each Fund is to acquire interests, whether equity, debt or

otherwise, in income-producing, middle-market private companies (the "Portfolio Companies") and

to provide managerial and operations assistance to the Portfolio Companies.

30.     Investments in the Funds (in the form of limited partnership interests) are primarily

governed by two documents:  a private placement memorandum ("PPM"), which describes the

terms of the offering, and an agreement of limited partnership ("LPA").  GPB Capital has revised

the PPMs and LPAs for each Fund numerous times since 2014.

31.     GPB Capital marketed its investments exclusively through Ascendant Capital and

AAS (and, prior to March 2017, Broker-Dealer 1), which, in turn, promoted the investments to

dozens of broker-dealers nationwide (the "downstream broker-dealers").

32.     Investors in the Funds paid substantial fees and expenses, specifically, 11% in selling fees (i.e., commissions, due diligence fees, placement fees, wholesaling fees), and annual fees including a 2% management fee, 1.25% in organizational expenses, a 1.75% - 2.875% acquisition fee, and an undisclosed amount of partnership expenses.

33.     In total, from August 2013 to March 2019, the Funds had recorded approximately $79 million in management fees paid and payable to GPB Capital.  Investors paid $599,000 in acquisition fees to GPB Capital and $26 million in acquisition fees to Broker-Dealer 1 and AAS. Finally, Ascendant Capital, its affiliated broker-dealers (i.e., AAS and Broker-Dealer 1), and the downstream broker-dealers received approximately $187 million in selling fees.

## II.     DEFENDANTS ENGAGED IN A PONZI-LIKE SCHEME BY USING INVESTOR FUNDS TO PAY DISTRIBUTIONS BACK TO INVESTORS

34.     The GPB and Ascendant Defendants endeavored to attract retail investors to invest in the Funds by including as a key component of their marketing pitch a promised 8% per annum distribution paid monthly to investors in the Funds.

35.     To further entice prospective investors, GPB Capital also touted that it made periodic "special distribution" payments to investors in the Funds on top of the annualized 8% distributions.  These special distributions ranged in amounts from 0.5% to 3% between 2013 and 2017.

### A.     The GPB and Ascendant Defendants' False and Materially Misleading Statements Concerning the Source of the Distribution Payments

36.     The GPB and Ascendant Defendants represented in both written materials and during in-person and telephonic GPB Capital due diligence and marketing events attended by the downstream broker-dealers, and prospective investors and investors in the Funds, that the source of the distributions would be funds from operations of the Portfolio Companies.

37.     The GPB and Ascendant Defendants' representations in the PPMs concerning the

source of the distribution payments varied over time and on a Fund-by-Fund basis:

        a.      The PPMs for Automotive Portfolio dated prior to June 2016 represented that "we will make distributions based on cash flow we have received from [Portfolio Companies]" and that "distributions could be more, less or none at all, depending on cash flow."

        b.      The PPMs for Holdings I dated prior to December 2016 stated that investors "will receive current distributions out of cash" or that Holdings I will "make distributions of cash" and that "distributions could be more, less or none at all, depending on cash flow."

        c.      The PPM for Holdings II dated prior to March 2016 stated "We will make cash distributions when determined by GPB in its discretion" and "GPB intends for us to make distributions of cash, if any, to the LPs beginning three months after their subscription at annual return rates targeted to be 8.0%."

        d.      GPB Capital revised the PPMs for Holdings II beginning March 2016, for Automotive Portfolio beginning June 2016, for the then-newly formed Waste Management dated August 5, 2016, and for Holdings I beginning December 2016 to state that "GPB intends to make distributions of cash, if any, to the LPs beginning on the fifteenth day of the third month following a subscription for units"; "We can provide no assurance that we will be able to continue to generate cash flow sufficient to make distributions to LPs"; and that "while we have no present plans to do so, we could include LPs' invested capital in amounts we distribute to LPs."

        38.      In addition, during the entire April 2014 through December 2018 period, the GPB and Ascendant Defendants represented in marketing and due diligence materials distributed to the downstream broker-dealers and to prospective investors and investors in the Funds that the distribution payments were "100% funds from operations" and "based off cash flow from portfolio companies targeted at 8%"; that the Funds had generated "returns" in excess of 8% per annum; and that "as excess cash flow from operations is generated, GPB will pay additional distributions (known

as 'special distributions')."

39.    Emails sent during this period to downstream broker-dealers and to prospective investors and investors in the Funds from Ascendant Capital sales team members and registered representatives at AAS also stated that the distributions had been "fully covered with funds from operation since inception."  The GPB and Ascendant Defendants represented the same in GPB Capital due diligence materials and at in-person and telephonic marketing and due diligence meetings held nationwide.

40.    The fact that the Portfolio Companies generated sufficient cash to consistently make an annualized 8% distribution payment was important to prospective investors and investors in the Funds because it showed that the underlying investments were doing well.  If investors knew that, because the Portfolio Companies were underperforming, distributions were being paid with other investors' capital instead of funds from operations of the Portfolio Companies, they could and would have redeemed earlier and thereby avoided the losses that investors are now facing.

**B.    The True Source of GPB Capital's Distribution Payments**

41.    As explained in more detail below, beginning as early as August 2015, GPB Capital was unable to fund distributions from operations.  GPB Capital could have reduced or suspended distributions under the terms of its offering documents at any point in time.  Instead, to maintain the appearance of success needed for the GPB and Ascendant Defendants to continue to attract new investors, the Funds consistently paid an 8% annualized distribution payments to investors up to and including October 2018 (except Holdings I, which reduced its distribution to 4% annualized in April 2018), for a total of, including the "special distributions," approximately $262 million.

42.    GPB Capital used investor funds to cover the shortfall between the funds from operations of the Portfolio Companies and the amounts needed for the distribution payments, as described in the below chart:

| Fund | Amount of Distribution Payments through October 2018 | Portion Paid with Investor Funds | Date When Began Using Investor Funds |
|---|---|---|---|
| Automotive Portfolio | $94 million | $67 million (71%) | August 2015 |
| Holdings I | $67 million | $27 million (40%) | September 2015 |
| Holdings II | $86 million | $30 million (36%) | March 2017 |
| Waste Management | $15 million | $13 million (83%) | October 2016 |

43.     GPB Capital also used investor funds to pay the following "special distributions":
December 2015 for Automotive Portfolio; April 2017 for Holdings II; and August 2017 for Waste
Management.

**C.      The GPB and Ascendant Defendants Acted with Scienter**

44.     The GPB and Ascendant Defendants recognized the importance from a marketing
perspective of being able to represent that the distributions were fully covered with funds from
operations of the Portfolio Companies.

45.     Beginning in or about August 2015, the GPB and Ascendant Defendants knew or
were reckless in not knowing that the Portfolio Companies' operations were not generating
sufficient cash to meet the Funds' distribution obligations.  For example, in emails dated September
15 and October 7, 2015, the former Chief Financial Officer of GPB Capital and another member of
GPB Capital's accounting department informed both Gentile and the former managing director of
Ascendant Capital, and Schneider's right-hand person, that GPB Capital had been forced to use
investor funds to make distribution payments to investors in Automotive Portfolio and Holdings I
for the distribution payments in August 2015 and September 2015, respectively.

46.     In fact, the GPB and Ascendant Defendants carefully tracked what they called the
"coverage ratio," or the extent to which the distributions were "covered" by funds from operations
of the Portfolio Companies.

47.     They tracked the "coverage ratio" through having GPB Capital employees maintain spreadsheets that tracked the amounts paid out in the form of distributions as compared to the income generated by the Portfolio Companies. These spreadsheets were updated periodically and emailed to various GPB Capital employees, including Gentile, and to Ascendant Capital employees and registered representatives of AAS, including Schneider.  The spreadsheets similarly revealed that, for example, beginning in August 2015 for Automotive Portfolio, September 2015 for Holdings I, and August 2017 for Holdings II, the funds from operations of the Portfolio Companies did not cover the amounts needed to make the promised distribution payments and that investor funds were used to cover the shortfall.

48.     Waste Management also began making distributions to investors in October 2016, paying approximately $220,000 (using investor funds) in distributions during the last quarter of 2016, even though – as the GPB and Ascendant Defendants knew – it did not even acquire its first Portfolio Company until January 2017 and suffered a net loss of approximately $985,000 for 2016.

**D.      GPB Capital Overstated Funds' Income**

49.     GPB Capital and Gentile, with substantial assistance from Lash, also manipulated certain of the Funds' financial statements to give the false appearance that the income earned by the Funds from the Portfolio Companies was greater than it was and thus closer to covering the distribution payments, again with the goal of projecting success and attracting new investors for the Funds.

50.     The false financial statements were distributed by the GPB and Ascendant Defendants to both the downstream broker-dealers, as well as to prospective investors and investors in the Funds, who relied on them in deciding whether to recommend an investment in the Funds or to purchase or continue to hold interests in the Funds, respectively.

## Holdings I – 66% Overstatement of Net Income - 2014

51.     Two Volkswagen dealerships owned by Holdings I suffered net operating losses totaling $536,201 for the year ended December 31, 2014.

52.     In order to obscure these losses from investors, GPB Capital and Gentile caused Holdings I to record income from the dealerships.  Specifically, Gentile instructed GPB Capital representatives to prepare and execute back-dated "performance guarantees" in March 2015 whereby Lash "guaranteed" a minimum profit of $600,000 for the year ended December 31, 2014, from these Volkswagen dealerships, which meant that Lash would pay the dealerships for the losses plus an additional $600,000, which would be distributable to Holdings I.

53.     Based on the guarantees, the dealerships booked revenue and a receivable from Lash totaling $1,136,201 (*i.e.*, $600,000 plus $536,201).

54.     Lash never paid the amount allegedly owed under the "performance guarantees." Indeed, the "debt" was eventually forgiven by GPB Capital and Gentile as a part of a settlement with Lash in November 2018 in connection with a lawsuit filed against GPB Capital and Gentile.

55.     The overstated dealership financial statements were used to calculate the fair market value and the unrealized gains from the dealerships on Holdings I's financial statements as of December 31, 2014.

56.     The fraudulent guarantees had the effect of overstating net income by a total of 66% as reported by Holdings I for the period ended December 31, 2014.

57.     Had it not been for the fraudulent "performance guarantees," Holdings I would have reported net investment income of approximately $1.49 million and net income of approximately $594,000 for the period ended December 31, 2014.  During this period, Holdings I paid a total of $2.6 million in distributions to investors.

**Automotive Portfolio – 38% Overstatement of Net Income – 2015**

58.     A General Motors dealership owned by Automotive Portfolio reported distributable net income of approximately $589,000 for the period ended December 31, 2015.

59.     Gentile and GPB Capital, however, caused Automotive Portfolio to record additional fictitious income from the dealership of approximately $1.4 million in order to maintain the appearance that the Portfolio Companies were generating sufficient income to cover distributions to investors.

60.     In or about April 2016, GPB Capital and Gentile instructed GPB representatives to prepare and execute a "performance guarantee" back-dated to January 1, 2015, whereby Lash personally "guaranteed" in excess of $2 million from the dealership for 2015.  This resulted in an overstatement of approximately $1.4 million (43% of net investment income and 28% of reported net income).

61.     GPB Capital also caused Automotive Portfolio to improperly accrue $500,000 as income from a Buick dealership owned by Automotive Portfolio for the same period.  However, the amount was related to a construction incentive received in 2016 and should have been reflected in the 2016 financial statements.

62.     These two misstatements had the combined effect of overstating income for Automotive Portfolio by 38% for the period ended December 31, 2015.

63.     Without these two misstatements totaling approximately $1.9 million, Automotive Portfolio would have reported net investment income of approximately $1.4 million for the period ended December 31, 2015.  During this period, Automotive Portfolio paid a total of approximately $4.7 million in distributions to investors.

## III.    SELF-DEALING BY GENTILE, SCHNEIDER AND ASCENDANT CAPITAL

64.      GPB Capital, Ascendant Capital, Gentile, and Schneider also failed to disclose

certain conflicts of interest and made material misrepresentations and omissions about fees and other compensation received by Gentile, Schneider, and Ascendant Capital.

### A.     Acquisition Fees

65.     Automotive Portfolio, Holdings I, Holdings II, and Waste Management each paid acquisition fees ranging from 1.75% to 2.875% of the total acquisition cost (or, in some cases, the "total value") of a Portfolio Company to either Broker-Dealer 1 (in 32 payments from June 2014 to April 2017) or to AAS (in 64 payments from June 2017 – December 2018), for a total of approximately $26 million.

66.     As summarized in the below chart, from June 2014 to April 2017, Broker-Dealer 1 kept approximately 5 – 10% of each acquisition fee and distributed the majority of the remainder to Schneider or Ascendant Capital.  During June 2014 to December 2016, Schneider, in turn, paid a portion of the amounts he received to one of two different Gentile-owned entities.  After AAS was formed, AAS kept approximately 5 – 10% of each acquisition fee and distributed the remainder to Schneider or Gentile.

| Time Period | Total Acquisition Fees Paid by Investors | Acquisition Fees Received by Ascendant Capital or Schneider | Acquisition Fees Received by Gentile |
|---|---|---|---|
| June 2014 – December 2016 | $8.8 million | $8.3 million | $875,000 |
| January 2017 – April 2017 | $1.5 million | $1.41 million | $0 |
| June 2017 – December 2018 | $16 million | $5.9 million | $7.5 million |

67.     However, GPB Capital, Ascendant Capital, Gentile, and Schneider failed to accurately disclose in the PPMs and LPAs which parties would receive the acquisition fees, as described below:

     a.     Each of the PPMs for Automotive Portfolio dated prior to June 2016, and

for Holdings I dated prior to December 2016, falsely represented that the acquisition fees would be paid to "qualified third parties."  To the contrary, no "qualified third party" has ever received any portion of an acquisition fee paid by Automotive Portfolio or Holdings I.

       b.      The PPM for the later-formed Holdings II, dated April 2015, and the revised PPM for Automotive Portfolio dated June 2016, stated that "We presently anticipate paying [acquisition fees to] one third party (who is a member of the Selling Group)," which could include Broker-Dealer 1, AAS, Ascendant Capital, and Schneider.  However, those PPMs failed to disclose that Gentile would also receive portions of the acquisition fees.

       c.      The PPM for Waste Management, dated August 2016, stated that acquisition fees "will be paid to qualified third parties, including members of the Selling Group," which could include Broker-Dealer 1, AAS, Ascendant Capital, and Schneider.  However, the PPM failed to disclose that Gentile would also receive portions of the acquisition fees.

       d.      In December 2016, GPB Capital revised the PPMs for Automotive Portfolio, Holdings I and Holdings II to state that GPB Capital "presently anticipates [the Fund] paying Acquisition Fees to [Broker-Dealer 1]," of which Ascendant Capital is a branch office.  However, the December 2016 PPMs for Automotive Portfolio, Holdings I, and Holdings II failed to mention that Gentile would receive portions of acquisition fees.

68.      It was not until May 2017 that GPB Capital issued a "Supplement" to the PPMs for Automotive Portfolio, Holdings I, and Holdings II, which disclosed that Gentile was an indirect, minority owner of AAS and that GPB Capital "presently anticipates the Fund paying Acquisition Fees . . . to AAS and/or its owners. . . ."

69.      Cold Storage also paid an acquisition fee of 1.875% of the total acquisition cost of an acquired asset.  According to the PPMs for Cold Storage dated July 2 and 24, 2015, "up to 50% of [an acquisition fee] may be paid to qualified third parties, including members of the Selling Group."

The "Selling Group" was defined in the PPMs to include the broker-dealers selling, and investment advisers recommending, interests in Cold Storage; it does not include GPB Capital or Gentile.

70.     Yet, contrary to the disclosure in the Cold Storage PPMs, Cold Storage paid acquisition fees totaling approximately $599,000 to GPB Capital on or about December 23, 2015 and July 12, 2016, in connection with acquisitions made during 2015 and 2016.  GPB Capital diverted $250,000 of the fee received from Cold Storage on or about December 23, 2015 to an entity owned by Gentile the next day, on or about December 24, 2015.

71.     The fact that Gentile or Schneider would – or, in fact, had been – receiving a portion also hid from investors their conflict of interest in making acquisition decisions and determining acquisition costs.

72.     Specifically, Gentile was one of six members of the acquisition committee at GPB Capital, but has, at all times, dominated the investment and financial decision-making for GPB Capital and the Funds, including decision-making relating to acquisitions by the Funds.  Schneider likewise played an integral role in acquisition decisions, although he was not officially a member of the GPB Capital acquisition committee.

73.     This meant that Gentile and Schneider determined the terms of any acquisition, including what the total cost or value of that acquisition would be.  Because the amount of acquisition fee was dependent upon the total cost or value of the acquisition, Gentile and Schneider were incentivized to overpay for an acquisition, so that the acquisition fee they would ultimately receive would be a larger amount.

**B.      Warranty Contract Proceeds, Board Stipends and Finance Manager Compensation**

74.     Gentile and Schneider fraudulently misappropriated $2.9 million earned by Portfolio Companies owned by Automotive Portfolio and Holdings I during the period June 2013 to December 2016 in the form of warranty contract proceeds, board stipends, and finance manager

compensation, as detailed below:

      a.     LSG Auto Wholesale LLC, which is 100% owned by Gentile, received proceeds generated through the sale of warranty contracts by the automotive dealerships owned by Automotive Portfolio and Holdings I, in connection with the purchase of a new or used car. The warranty contracts were purchased by the automotive dealerships and the proceeds from the sale of those contracts should have been received by the dealerships, and ultimately by the investors in Automotive Portfolio and Holdings I. Gentile and Schneider had no legitimate claim to these proceeds. Thirty-three payments totaling approximately $1.5 million were made from dealerships owned by Automotive Portfolio and Holdings I via AP NJ Holdings to LSG Auto Wholesale LLC in or about June 2014 through November 2016. From those funds, LSG Auto Wholesale LLC paid expenses on behalf of or otherwise transferred approximately $529,000 to Gentile and approximately $362,000 to Schneider.

      b.     Gentile and Schneider received "board stipends" from Portfolio Companies owned by Automotive Portfolio and Holdings I. Specifically, twelve of the dealerships held by Automotive Portfolio and Holdings I diverted "board stipends" totaling approximately $1,085,000 to Jachirijo Inc. and Jachirijo Realty Holdings LLC (both 100% owned by Gentile) for the benefit of Gentile and $472,000 to JS Board Stipend LLC (100% owned by Schneider) for the benefit of Schneider. There was no "board" on which Gentile and Schneider participated and they had no legitimate claim to these payments. Nor did Gentile or Schneider perform any additional work in connection with these payments, and the dealerships expensed the stipends, which reduced their overall profitability.

      c.     From May 2015 through December 2016, JD Financial Management Services, LLC, which is 100% owned by Gentile through another entity, received 20 payments totaling $716,660 in "finance manager compensation" from a Portfolio Company owned by

Holdings I.  The amounts were split by four individuals, including Gentile and Schneider who received approximately $308,000 and $64,000, respectively.  Again, Gentile and Schneider did not perform any additional work to earn these fees, which were expensed by, and reduced the overall profitability of, the dealerships, thereby reducing the amount of cash available to the Funds and investors therein.

75.     The payments by the Portfolio Companies that Gentile and Schneider received, as described in paragraph 74, were not disclosed in or otherwise authorized by the PPMs or LPAs for Automotive Portfolio or Holdings I.

76.     Although the PPMs and LPAs state that approval of any related party transactions was required by the Funds' "Advisory Committees," the receipt of these payments by Gentile and Schneider was not disclosed to the Advisory Committees.  Nor were these payments disclosed in the marketing and due diligence materials provided to the downstream broker-dealers, or to prospective investors or investors in the Funds by the GPB and Ascendant Defendants.

## IV.     CUSTODY RULE AND REGISTRATION REQUIREMENTS

77.     Investors have lacked critical insight into the Funds' financial condition because GPB Capital has failed to deliver audited financial statements for the Funds for more than two years and is more than three years delinquent in registering two of the Funds with the Commission.

78.     In each of its Forms ADV filed with the Commission since March 2015, GPB Capital claims custody over client assets.

79.     The custody rule promulgated under the Advisers Act (the "Custody Rule") required GPB Capital to either engage an independent public accountant to conduct a surprise examination once per year, or to circulate audited financial statements to investors within 120 days of the end of its fiscal year.  GPB Capital did neither with respect to Automotive Portfolio, Holdings I, and Holdings II for the fiscal years 2017, 2018, and 2019, and, with respect to Waste Management, for

the fiscal years 2018 and 2019.

80.     The firm that conducted audits for Holdings I and Automotive Portfolio for the year ended December 31, 2016, also withdrew its audit report and resigned in October 2018.

81.     The firm that conducted audits for Holdings I and Automotive Portfolio for the period ended December 31, 2015, was not subject to regular inspection by the Public Accounting Oversight Board (PCAOB), and therefore was not qualified to issue an audit opinion under the Custody Rule.

82.     Section 12(g) of the Exchange Act also required GPB Capital to register a class of securities with the Commission with respect to any issuer with more than $10 million total assets or more than 2,000 holders of a class of its equity securities.  After the registration statement takes effect, other reporting obligations are triggered.  Automotive Portfolio and Holdings II exceeded the investor threshold as of August 3, 2016, and February 3, 2017, respectively.  Yet, GPB Capital has failed to file a registration statement for those two Funds.

83.     Because of GPB Capital's failures to comply with the Custody Rule and to register Automotive Portfolio and Holdings II in accordance with Section 12(g) of the Exchange Act, investors in Automotive Portfolio, Holdings I, Holdings II, and Waste Management have lacked critical information concerning those Funds' financial performance and position for more than three years.

## VI.     WHISTLEBLOWER VIOLATIONS

### A.     The Separation and Termination Agreements with Employee 1 and Employee 2

84.     GPB Capital also executed separation and transition or consulting agreements with two former senior-level employees that violated provisions of the Exchange Act.

85.     Specifically, a Transition Agreement and General Release dated January 17, 2017, between a senior GPB Capital employee ("Employee 1") and GPB Capital contained confidentiality

provisions that did not carve out any exceptions for communications with the Commission.  In full, the confidentiality provision stated "You shall not, without the prior written consent of [GPB Capital] or as required by law, use or disclose or enable anyone else to use or disclose any Confidential Information of [GPB Capital]."

86.     Prior to entering into this agreement, Employee 1 had raised concerns internally about GPB Capital's use of investor funds to make distribution payments to investors.

87.     A Separation Agreement and General Release dated April 26, 2018, between a senior GPB Capital employee ("Employee 2") and GPB Capital likewise stated that if Employee 2 was "contracted by any regulatory agency or authority, including, but not limited to, the Securities and Exchange Commission or Financial Industry Regulatory Authority," Employee 2 had to "immediately notify GPB."

88.     Prior to entering into this agreement with Employee 2, GPB Capital was involved in a private lawsuit which included allegations related to GPB Capital's use of investor funds to make distribution payments to investors.  In addition, by this time GPB Capital had missed its deadline to file a registration statement with the Commission.

89.     Employee 2's agreement was the first time GPB Capital included such language in a termination agreement; it did not include such language in contemporaneous agreements.

90.     Employee 2's agreement was signed by Gentile on behalf of GPB Capital.

91.     The provisions in Employee 1's and Employee's 2 agreements with GPB Capital constitute action to "impede an individual from communicating directly with the Commission staff about a possible securities law violation" under Exchange Act Rule 21F-17.

**B.     Retaliation Against Employee 3**

92.     In addition, GPB Capital engaged in retaliation against Employee 3 in violation of Exchange Act Section 21F's anti-retaliation provisions.

93.    Employee 3, a senior employee working in automotive operations, was terminated in September 2019.  Prior to his termination, Employee 3 faced adverse employment actions.

94.    During the months prior to his termination, Employee 3 raised numerous concerns internally, including about GPB Capital's use of investor funds to make distribution payments to investors, to GPB Capital management, including Gentile, as well as the board of directors of the automotive operations ("Automile Board") and the Funds' outside auditor.[2]

95.    Employee 3 also filed a whistleblower claim with the Commission and provided original, useful information to the Commission in connection with its investigation concerning the GPB and Ascendant Defendants.  Employee 3 notified GPB Capital management, including Gentile, and the Automile Board about his whistleblower claim.

96.    Specifically, in 2017, GPB Capital and Employee 3 entered into an agreement whereby GPB Capital purchased an equity stake in automotive dealerships owned by Employee 3. Employee 3 remained the dealer-operator of those dealerships, and the "key man" on agreements with manufacturers.  The "key man" provisions meant that manufacturers specifically relied on Employee 3's status as a dealer-operator in agreeing to provide their vehicles.

97.    In January 2019, GPB Capital issued a press release touting recognition Employee 3 received in the automotive industry.

98.    In May 2019, Employee 3 was asked by GPB Capital's auditors to submit a "related party questionnaire" ("RPQ").  Employee 3 completed this and submitted it directly to the auditors. In this questionnaire, Employee 3 set forth concerns about performance guarantees and possible misstatements to investors.

99.    GPB Capital, through counsel, informed Employee 3 his submission of the RPQ

---

[2]    Employee 3 was a member of the Automile Board.

directly to the auditors was improper.

100.    Later in May 2019, GPB Capital hired a new member of the board of directors ("Board Member 1") of the automotive operations "as a contingency plan on [Employee 3]."

101.    On June 4, 2019, Employee 3 made a presentation to the Automile Board detailing his support for the statements made in the RPQ.

102.    After hearing the presentation, GPB Capital's then-CCO stated he was treating Employee 3 as a whistleblower under GPB Capital's policies.

103.    Also immediately after the presentation, Board Member 1 began interviewing members of Employee 3's team and taking over aspects of Employee 3's role overseeing certain auto dealerships.

104.    On June 11, 2019, through counsel, Employee 3 submitted his board presentation to the Commission; counsel for GPB Capital was cc'd on the email submission. Employee 3 later directly made GPB Capital's COO and Gentile aware of his submission.

105.    On June 18, 2019, GPB Capital sent Employee 3 a letter stating that Board Member 1 was providing "managerial assistance and oversight" going forward. Some of the authority granted to Board Member 1 was in contravention of certain agreements with manufacturers.

106.    On June 27, 2019, Employee 3 learned of a text message from Lash stating Board Member 1 was Employee 3's "replacement."

107.    In August 2019, GPB Capital sought direct access to the books and records of all of Employee 3's dealerships in which they had an equity stake, purportedly to assist with the audit. Employee 3 was not comfortable granting direct access, but sought to work with GPB Capital's auditors to ensure they were receiving records they needed in an appropriate time.

108.    GPB Capital then improperly began to exclude Employee 3 from meetings of the Automile Board. Pursuant to certain operating agreements, Employee 3 had a right to participate in

board affairs. Despite this, meetings were held without his knowledge or presence, and decisions were made by the Automile Board to limit Employee-3's authority.

109.    On September 13 2019, GPB Capital's then-CCO told Gentile: "To the extent that [Employee 3] revealed information to auditors . . . that was confidential but otherwise truthful . . . I think this would be an important deterrent in moving forward with a plan to terminate him as it would be viewed as Retaliatory by [the Commission]."

110.    Despite that, Employee 3 was terminated three days later, on September 16, 2019. On the same day, GPB Capital announced Board Member 1 as Employee 3's replacement.

111.    In the days immediately after Employee 3's termination, GPB Capital received communications from multiple manufacturers stating Employee 3's termination was in violation of the dealer agreements given his "key man" status.

## VI.    GPB CAPITAL'S INADEQUATE POLICIES AND PROCEDURES

112.    GPB Capital's 2015 and 2017 Compliance Manuals included certain policies and procedures with respect to, among other things, advisory fees, custody and conflicts of interest. However, GPB Capital's policies and procedures were inadequate and failed to reflect GPB Capital's business practices and the risks relevant to its business.

113.    Specifically, the 2015 and 2017 Compliance Manuals merely state that advisory fees should be "accurate described in the Form ADV and other offering documents," the substance of the Custody Rule and that GPB Capital provides audited financial statements; and that GPB Capital "identifies" and "discloses" any conflicts of interest. However, these policies were inadequate as they were not reasonably designed to prevent violations of the Advisers Act, as detailed above.

**FIRST CLAIM FOR RELIEF**
**Violations of, and Aiding and Abetting Violations of,**
**Section 17(a) of the Securities Act**
**(GPB Capital, Ascendant Capital, AAS, Gentile and Schneider)**

114.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 76.

115.    Each of the GPB and Ascendant Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (i) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (ii) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

116.    The GPB and Ascendant Defendants violated Section 17(a) by, among other things, engaging knowingly, recklessly or negligently in a long-running scheme designed to deceive the Funds' investors and making material misstatements concerning (a) the profitability of the Portfolio Companies and GPB Capital's ability to pay the distribution payments through funds from operations; and (b) millions of dollars in acquisition fees and other forms of compensation received by Gentile and Schneider and their inherent conflict of interest in acquisition-related decisions.

117.    By reason of the foregoing, each of the GPB and Ascendant Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

118.    In the alternative, Gentile and Schneider, directly or indirectly, provided knowing and substantial assistance to GPB Capital, and Schneider, directly or indirectly, provided knowing and substantial assistance to Ascendant Capital and/or AAS, who, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly or recklessly have

(i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

119.    By reason of the foregoing, Gentile and Schneider aided and abetted, and unless enjoined, will again aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

**SECOND CLAIM FOR RELIEF**
**Aiding and Abetting Violations of**
**Section 17(a) of the Securities Act**
**(Lash)**

120.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33 and 49 through 63.

121.    As alleged above, GPB Capital and Gentile violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] by manipulating the financial statements for Holdings I for the year ended December 31, 2014, and for Automotive Portfolio for the year ended December 31, 2015.

122.    Lash knowingly or recklessly provided substantial assistance to GPB Capital and Gentile with respect to their violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

123.    By reason of the foregoing, Lash is liable pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)] for aiding and abetting GPB Capital's and Gentile's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and, unless enjoined, Lash will again aid and abet these violations.

### THIRD CLAIM FOR RELIEF
**Violations of, and Aiding and Abetting Violations of,**
**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(GPB Capital, Ascendant Capital, AAS, Gentile and Schneider)**

124.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 76.

125.    Each of the GPB and Ascendant Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

126.    The GPB and Ascendant Defendants violated Section 10(b) and Rule 10b-5 thereunder by, among other things, engaging knowingly or recklessly in a long-running scheme designed to deceive the Funds' investors and making material misstatements concerning (a) the profitability of the Portfolio Companies and GPB Capital's ability to pay the distribution payments through funds from operations; and (b) millions of dollars in acquisition fees and other forms of compensation received by Gentile and Schneider and their inherent conflict of interest in acquisition-related decisions.

127.    By reason of the foregoing, each of the GPB and Ascendant Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

128.    In the alternative, Gentile and Schneider, directly or indirectly, provided knowing and substantial assistance to GPB Capital, and Schneider, directly or indirectly, provided knowing

and substantial assistance to Ascendant Capital and/or AAS, who, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

129.    By reason of the foregoing, Gentile and Schneider aided and abetted, and unless enjoined, will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of**
**Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
**(Lash)**

130.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33 and 49 through 63.

131.    As alleged above, GPB Capital and Gentile violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder by manipulating the financial statements for Holdings I for the year ended December 31, 2014, and for Automotive Portfolio for the year ended December 31, 2015.

132.    Lash knowingly or recklessly provided substantial assistance to GPB Capital and Gentile with respect to their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

133.    By reason of the foregoing, Lash is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting GPB Capital's and Gentile's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and, unless enjoined, Lash will again aid and abet these violations.

**FIFTH CLAIM FOR RELIEF**
**Violations of Sections 206(1) and (2) of the Advisers Act**
**(GPB Capital and Gentile)**

134.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33 and 64 through 76.

135.    At all relevant times, GPB Capital and Gentile were investment advisers under Section 202(11) of Advisers Act [15 U.S.C. § 80b-2(11)].

136.    GPB Capital and Gentile, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly have: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

137.    GPB Capital and Gentile violated Sections 206(1) and (2) of the Advisers Act by, among other things, knowingly, recklessly, or negligently misusing Fund assets and operating the Funds in a manner that was inconsistent with the PPMs and LPAs.

138.    By reason of the foregoing, GPB Capital and Gentile, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

139.    In the alternative, Gentile directly or indirectly, provided knowing and substantial assistance to GPB Capital, who, directly or indirectly, singly or in concert, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly has: (i) knowingly or

recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

140.     By reason of the foregoing, Gentile aided and abetted, and unless enjoined, will again aid and abet violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], in violation of Sections 209(d) and 209(f) of the Advisers Act [15 U.S.C. §§80b-9(d) and 80b-9(f)].

### SIXTH CLAIM FOR RELIEF
### Violations of Section 206(4) of the Advisers Act
### and Rule 206(4)-2 Thereunder
### (GPB Capital)

141.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33 and 77 through 83.

142.     At all relevant times, GPB Capital was an investment adviser, under Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

143.     GPB Capital, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative by providing investment advice to clients and failing to take certain enumerated steps to safeguard client assets over which it has custody.

144.     By reason of the foregoing, GPB Capital, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 [17 C.F.R. § 275.206(4)-2].

## SEVENTH CLAIM FOR RELIEF
### Violations of Section 206(4) of the Advisers Act
### and Rule 206(4)-7 Thereunder
### (GPB Capital)

145.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1through 33 and 112 through 113.

146.     At all relevant times, GPB Capital was an investment adviser, under Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)].

147.     GPB Capital, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative by providing investment advice to clients and failing to adopt and implement written policies and procedures reasonably designed to prevent violations, by it or its supervised persons, of the Advisers Act and the rules that the Commission has adopted under the Advisers Act.

148.     By reason of the foregoing, GPB Capital, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 [17 C.F.R. § 275.206(4)-7)].

## EIGHTH CLAIM FOR RELIEF
### Violation of Section 12(g) of the Exchange Act
### (GPB Capital)

149.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33 and 77 through 83.

150.     GPB Capital, as an issuer engaged in interstate commerce, in a business affecting interstate commerce, or whose securities are traded by use of the mails or any means or instrumentality of interstate commerce, failed to within 120 days after the last day of its first fiscal year ended on which GPB Capital has total assets exceeding $10,000,000 and a class of equity security held of record by either 2,000 persons or 500 persons who are not accredited investors

register such security by filing with the Commission a registration statement with respect to such security.

151.    By reason of the foregoing, GPB Capital, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)].

## NINTH CLAIM FOR RELIEF
### Violations of Section 21F of the Exchange Act
### and Rule 21F-17(a)
### (GPB Capital)

152.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 33 and 84 through 111.

153.    GPB Capital took action to impede individuals from communicating directly with the Commission staff about possible securities law violations, including enforcing, or threatening to enforce, a confidentiality agreement with respect to such communications and by retaliating against an individual known to be a whistleblower with the Commission.

154.    By reason of the foregoing, GPB Capital, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Section 21F of the Exchange Act [15 U.S.C. § 78u-6], and Rule 21F-17(a) thereunder [17 C.F.R. § 240.21F-17(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants from committing, aiding and abetting or otherwise engaging in conduct that would make them liable for the violations of the federal securities laws alleged in this complaint.

**II.**

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Section 20(d)(5) [15 U.S.C. § 78u(d)(5)] and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7).

**III.**

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)].

**IV.**

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  New York, New York
February 4, 2021

/s/ Richard R. Best
RICHARD R. BEST
REGIONAL DIRECTOR
Lara Shalov Mehraban
Sheldon L. Pollock
Alistaire Bambach
David Stoelting
Kristin M. Pauley
Lindsay S. Moilanen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0174 (Stoelting)
stoeltingd@sec.gov