UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------
SECURITIES AND EXCHANGE COMMISSION,

                          Plaintiff,                              **MEMORANDUM & ORDER**
                                                                 21-CV-583 (MKB) (VMS)
              v.

GPB CAPITAL HOLDINGS, LLC, ASCENDANT
CAPITAL, LLC, ASCENDANT ALTERNATIVE
STRATEGIES, LLC, DAVID GENTILE, JEFFRY
SCHNEIDER, and JEFFREY LASH,

                          Defendants.

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

         Plaintiff Securities and Exchange Commission (the "SEC") commenced the above-

captioned action on February 4, 2021, against Defendants GPB Capital Holdings, LLC ("GPB"),

Ascendant Capital, LLC ("Ascendant Capital"), Ascendant Alternative Strategies, LLC

("Ascendant Strategies"), David Gentile, Jeffry Schneider, and Jeffrey Lash (the "Individual

Defendants").  (*See* Compl., Docket Entry No. 1.)  The SEC alleged claims (1) against GPB,

Ascendant Capital, Ascendant Strategies, Gentile, and Schneider for violations of the Securities

Act, 15 U.S.C. § 77q(a); (2) against Gentile, Schneider, and Lash for aiding and abetting

violations of the Securities Act, 15 U.S.C. § 77q(a) as controlling persons pursuant to 15 U.S.C.

§ 77o(b); (3) against GPB, Ascendant Capital, Ascendant Strategies, Gentile, and Schneider for

violations of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; (4) against

Gentile, Schneider, and Lash for aiding and abetting violations of 15 U.S.C. § 78j(b) and 17

C.F.R. § 240.10b-5 pursuant to 15 U.S.C. § 78t(e); (5) against GPB and Gentile for violations of

the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2); (6) against Gentile for aiding and abetting

violations of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2) pursuant to 15 U.S.C. §§ 80b-9(d) and 80b-9(f); and (7) against GPB for violations of the Advisers Act, 15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-2, 15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-7, 15 U.S.C. § 78l(g), and 15 U.S.C. § 78u-6 and 17 C.F.R. § 240.21F-17(a).[1]  (*See id.*)

On February 12, 2021, the Court appointed a monitor, Joseph T. Gardemal III (the "Monitor"), to oversee GPB, (Order Appointing Monitor (the "Order"), Docket Entry No. 23), and on April 14, 2021, on consent of the SEC and GPB, the Court amended the Order (the "Amended Order"), (Am. Order, Docket Entry No. 39).  On May 31, 2022, Gentile moved for relief from the Amended Order, and on June 13, 2022, the SEC cross-moved to convert the monitorship into a receivership and impose a litigation injunction.

Currently before the Court is a report and recommendation dated July 28, 2023, from Magistrate Judge Vera M. Scanlon recommending that the Court (1) grant the SEC's application to convert the monitorship into a receivership and impose a litigation injunction, and (2) deny Gentile's motion as moot (the "R&R").  (R&R 33, Docket Entry No. 157.)  On September 8, 2023, Schneider and Ascendant Capital filed an objection to the R&R, and Gentile filed a separate objection.  On September 22, 2023, the SEC and GPB filed responses in support of the R&R, and on September 29, 2023, Gentile, Schneider, and Ascendant Capital filed replies.

For the reasons discussed below, the Court grants the SEC's motion, adopts the Amended Proposed Order, and denies Gentile's motion as moot.

---

[1]  The SEC alleged that Defendants perpetrated a fraudulent scheme in which they used investor funds to satisfy an annualized 8% distribution to investors, while representing to the investors that the distributions represented profits from the companies GPB invested in; failed to deliver audited financial statements; failed to register two funds with the SEC; impeded former employees from communicating with the SEC; and retaliated against a whistleblower.  (*See* Compl. ¶¶ 1–7.)

## I.   Background

### a.   Factual and procedural background

GPB is a Delaware limited liability company with a principal place of business in New York, New York, which holds approximately $238,637,198 in assets under management. (Compl. ¶ 21.)  Ascendant Strategies is a Delaware limited liability company with a principal place of business in New York, New York, and since March of 2017, "offers and sales of the interests in GPB Capital limited partnership funds have been sourced through [Ascendant Strategies]."  (*Id.* ¶ 23.)  Ascendant Capital is a Delaware limited liability company with a principal place of business in West Lake Hills, Texas, and serves as the placement agent for GPB.  (*Id.* ¶ 22.)  Ascendant Capital is a branch office of Ascendant Strategies.  (*Id.* ¶ 23.) Gentile is the founder, owner, and former CEO of GPB.[2]  (*Id.* ¶ 24.)  Schneider is a minority owner of Ascendant Strategies and the sole owner and CEO of Ascendant Capital.  (*Id.* ¶ 25.) Lash served as managing partner of GPB from 2013 to early 2018 and was responsible for formulating GPB's automotive retail strategy.  (*Id.* ¶ 26.)

The SEC alleged in the Complaint that between April of 2014 and December of 2018, GPB served as the general partner and/or fund manager in five limited partnership funds: Automotive Portfolio, Holdings I, Holdings II, Waste Management, and Cold Storage (the "Funds").  (*Id.* ¶ 29.)  GPB marketed its investments exclusively through Ascendant Capital, and Ascendant Strategies promoted the investments to dozens of broker-dealers nationwide.  (*Id.* ¶ 31.)  Investors in the Funds paid significant fees and expenses, including $79 million in

---

[2]   On February 5, 2021, Gentile resigned as CEO and sole manager of GPB and appointed Rob Chmiel as interim CEO and sole manager.  (Decl. of Joseph T. Gardemal III ("Gardemal Decl.") ¶ 10, Docket Entry No. 90.)  On July 1, 2021, GPB officially named Chmiel as CEO. (*Id.*)

management fees to GPB, $26 million in acquisition fees to Ascendant Strategies and another

broker-dealer, and $187 million in selling fees to Ascendant Capital and other broker-dealers.

(*Id.* ¶ 33.)  To attract investors, GPB promised an 8% per annum distribution as well as

additional "special distributions."  (*Id.* ¶¶ 34–35.)  GPB represented that the source of the

distributions would be profits from operations of the Funds' portfolio companies.  (*Id.* ¶ 36.)

Starting "as early as August 2015," instead of paying distributions based on operations of the

portfolio companies, GPB used investor funds to cover the shortfall between the profits from

operations of the Funds' portfolio companies and the amounts needed for the distribution

payments.  (*Id.* ¶¶ 41–42.)  The Individual Defendants[3] "manipulated certain of the Funds'

financial statements to give the false appearance that the income [was being] earned by the

Funds" rather than inform investors that the Funds were not performing as projected.  (*Id.* ¶ 49.)

---

[3] On February 4, 2021, Gentile, Schneider, and Lash were publicly charged in a criminal action in the Eastern District of New York (the "Criminal Action").  *See* Indictment, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Feb. 4, 2021). The indictment alleges, among other things, that Gentile, Schneider, and Lash "together with others, engaged in a scheme to defraud investors and prospective investors" relating to GPB and its Funds.  *See id.*  On July 26, 2023, Lash pleaded guilty to one count of wire fraud.  *See* Order Accepting Guilty Plea, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. July 26, 2023). Gentile and Schneider are scheduled to proceed to trial on June 3, 2024.  *See* Minute Entry, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Apr. 17, 2023).  On November 9, 2021, Schneider filed an action in Delaware Chancery Court against GPB and related entities, seeking advancement of legal expenses for the various actions pending against himself, including the criminal prosecution in the Eastern District of New York (the "Delaware Action").  (*See* Schneider & Ascendant Capital's Objs. to the R&R ("Schneider's Objs.") 4, Docket Entry No. 167.)  The Delaware Action resulted in an order granting summary judgment, (*see* Final Order Granting Summ. J., annexed to Decl. of Glenn C. Colton ("Colton Decl.") as Ex. A, Docket Entry No. 167-2), and two orders regarding advancement, one of which sets forth specific procedures for the evaluation and then advancement of attorneys' fees and other expenses (the "*Fitracks* Order").  (*See* Schneider's Objs. 4; *Fitracks* Order, annexed to the Colton Decl. as Ex. B, Docket Entry No. 167-3; Judicial Action Form, annexed to the Colton Decl. as Ex. C, Docket Entry No. 167-4.)  On December 20, 2021, Gentile filed a similar action in Delaware Chancery Court, which granted a similar advancement order.  (*See* Stipulation and Advancement Order, annexed to the Decl. of Jonathan R. Jeremias ("Jeremias Decl.") as Ex. 10, Docket Entry No. 168-11.)

In addition, Gentile and Schneider engaged in conflicted transactions, including overpaying for acquisitions to inflate their own acquisition fees and otherwise inflating their own compensation without disclosing these conflicted transactions to investors.  (*Id.* ¶¶ 71–73, 74.)  Finally, the SEC alleged that GPB failed to comply with the applicable regulatory requirements, including by failing to deliver audited financial statements, (*id.* ¶¶ 77–81), failing to register certain of its Funds, (*id.* ¶¶ 82–83), requiring employees to sign termination agreements that restricted their ability to report misconduct at GPB, (*id.* ¶¶ 84–91), and retaliating against whistleblowers, (*id.* ¶¶ 92–111).

On February 12, 2021, the Court appointed the Monitor, and on April 14, 2021, amended the Order.  (*See* Order; Am. Order.)  On May 31, 2022, Gentile moved for relief from the Amended Order, arguing that the Monitor had completed his work and therefore the scope of his duties should be narrowed.[4]  (*See* Gentile's Relief Mem. 6, 25.)  In support of his motion, Gentile argued that GPB, its interim management, and the Monitor had "steadfastly blocked" his repeated efforts to assist the company and benefit its investors.  (*Id.* at 16.)  He contends that he saw "no other option . . . [than] to appoint new managers" in order to "carry out GPB's business plan, instead of merely liquidating assets."  (*Id.* at 24.)

On June 13, 2022, the SEC moved for an order to show cause why the monitorship should not be converted into a receivership.[5]  (SEC's Mot.)  The SEC alleged that on or about

---

[4]  (Gentile's Not. of Mot. for Relief ("Gentile's Relief Mot."), Docket Entry No. 79; Gentile's Mem. in Supp. of Gentile's Relief Mot. ("Gentile's Relief Mem."), Docket Entry No. 80.)

[5]  (SEC's Mot. for an Order to Show Cause ("SEC's Mot."), Docket Entry No. 88; SEC's Mem. in Supp. of SEC's Mot. ("SEC's Mem."), Docket Entry No. 89; Gentile's Mem. in Opp'n to SEC's Mot. ("Gentile's Opp'n"), Docket Entry No. 102; SEC's Reply in Supp. of SEC's Mot. ("SEC's Reply"), Docket Entry No. 103.)

May 27, 2022, Gentile advised GPB's CEO and sole manager, Rob Chmiel, that he had

appointed three new managers.  (SEC's Mem. 5.)  Gentile directed GPB's CEO to cooperate

with his newly-installed managers and "seek consensus" with them regarding GPB's future

course.  (*Id.* at 5.)  In addition, the SEC alleged that Gentile and the new managers modified

GPB's Operating Agreement[6] so that it provided (1) Gentile and the new managers expanded

information rights, (2) compensation packages for the new managers of up to $400,000 per year,

(3) Gentile with the ability to unilaterally amend the Operating Agreement, (4) mandatory tax

distributions to Gentile, (5) exclusive jurisdiction to the Delaware Chancery Court for all actions

related to the Operating Agreement, and (6) advancement of expenses.  (*Id.* at 5; *see also*

Gardemal Decl. ¶ 21.)  The SEC argued that Gentile's "distortion of the factual record" in an

effort to gain control of GPB "require[d] that a receiver be appointed to take exclusive

managerial control over [GPB] and the GPB Funds . . . for the benefit of investors."  (SEC's

Mem. 7.)  The SEC also argued that Gentile's actions constituted a breach of the Amended Order

and a separate basis for converting the monitorship to a receivership.  (*See id.* at 5 n.6; SEC's

June 2, 2022 Letter 1–2, Docket Entry No. 85.)  In addition to its motion, the SEC filed a

proposed order that detailed its proposed terms of the receivership (the "Proposed Order").  (*See*

Proposed Order, annexed to the Decl. of Neal Jacobson as Ex. 1, Docket Entry No. 91-1.)

By report and recommendation dated July 28, 2023, Judge Scanlon recommended that the

Court (1) grant the SEC's application to convert the monitorship into a receivership and impose a

litigation injunction, and (2) deny Gentile's motion as moot.  (R&R 33.)  Judge Scanlon also

directed the SEC to submit a revised order that included certain minor revisions and

---

[6] (Limited Liability Company Agreement of GPB Capital Holdings, LLC ("Operating
Agreement"), annexed to the Decl. of David Gentile as Ex. A, Docket Entry No. 82-1.)

clarifications, which the SEC filed on August 2, 2023 (the "Amended Proposed Order").  (*See* R&R 30; Am. Proposed Order, annexed to the SEC's Aug. 2, 2023 Letter, Docket Entry No. 161-2.)

On September 8, 2023, Schneider and Ascendant Capital filed an objection to the R&R, and Gentile filed a separate objection (collectively, the "Objectors").  (*See* Schneider's Objs.; Gentile's Objs. to the R&R ("Gentile's Objs."), Docket Entry No. 168.)  On September 22, 2023, the SEC and GPB filed responses urging the Court to adopt the R&R.[7]  (*See* SEC's Resp. 18; GPB's Resp. 23.)  On September 29, 2023, Gentile, Schneider, and Ascendant Capital filed replies.[8]  (*See* Gentile's Reply; Schneider's Reply.)

> **b.   The R&R**

Judge Scanlon recommended that the Court grant the SEC's motion to convert the monitorship to a receivership and impose a litigation injunction, subject to certain clarifications and amendments,[9] and deny as moot Gentile's motion for relief from the Amended Order. (R&R 33.)

---

[7]  (SEC's Resp. to Defs.' Objs. ("SEC's Resp."), Docket Entry No. 170; GPB's Resp. to Defs.' Objs. ("GPB's Resp."), Docket Entry No. 171.)

[8]  (Gentile's Reply in Supp. of Objs. to the R&R ("Gentile's Reply"), Docket Entry No. 175; Schneider & Ascendant Capital's Reply in Supp. of Objs. to the R&R ("Schneider's Reply"), Docket Entry No. 176.)

[9]  Judge Scanlon also recommended that the SEC provide clarification regarding "the relationships among the proposed receivership entities, particularly as to the 'GPB Funds,'" due to inconsistency in the Proposed Order as to whether there are eight or ten receivership entities, and "[i]f an amendment to the Proposed Order is needed, [the SEC] should submit the proposed revised text."  (R&R 4 n.3.)  In addition, Judge Scanlon recommended that the Proposed Order be amended to add the final sentence: "Any person or entity may seek leave of this Court to proceed against the Receiver, in such capacity; the Retained Personnel, in such capacity; the Ordinary Course Professionals, in such capacity; the Receivership Estate; the Receivership Entities; and the Receivership Assets."  (R&R 33.)  On August 2, 2023, the SEC filed a letter

Judge Scanlon found that by (1) appointing three new managers to direct GPB and thus expanding the number of managers from one to four, (2) amending the Operating Agreement of the company to provide new compensation for non-employee managers, and (3) failing to take curative action when notified that he had violated the terms of the Amended Order, Gentile caused GPB to breach the terms of the Amended Order. (*Id.* at 13–14.) She found that under the terms of the Amended Order, a breach "authorizes the Court to convert the monitorship to a receivership." (*Id.* at 20.) Judge Scanlon then considered whether "recent events require the additional step of converting the monitorship to a receivership," (*id.* at 23), and concluded that Gentile's actions had caused "a fracture in GPB's leadership that is irremediable without [c]ourt intervention," (*id.* at 26). She noted that "[o]n one hand, GPB, under the purview of the Monitor, has been working to address the state in which Mr. Gentile left it and move forward in a manner that is productive to its investors," while "[o]n the other hand, GPB is in the precarious position of operating with three new 'purported' managers and a 'purportedly' amended [Operating] Agreement, both of which may actively undermine the aforementioned efforts." (*Id.* at 26.) She concluded that "[t]he uncertainty of GPB's position is creating significant consequences, which are damaging its financial health and, by extension, the finances of its investors" and therefore recommended that the Court convert the monitorship into a receivership. (*Id.* at 33.)

In addressing the litigation injunction, Judge Scanlon concluded that it was "warranted in this case." (*Id.* at 29.) She found *SEC v. Wencke*, 622 F.2d 1363, 1371, 1373 (9th Cir. 1980), and *Liberte Cap. Grp. v. Capwill*, 462 F.3d 543, 551–52 (6th Cir. 2006) "persuasive" as applied to the facts of this case given that "GPB and its [F]unds face a number of complicated litigations

---

providing such clarification and submitted an amended proposed order. (SEC's Aug. 2, 2023 Letter, Docket Entry No. 161; Am. Proposed Order.)

that threaten to delay distributions to investors." (*Id.* at 30.) Judge Scanlon determined that a litigation injunction "is necessary to centralize all claims to the assets before this Court" and "prevent potentially disparate actions in different courts that could affect the receivership assets subject to this Court's jurisdiction and control." (*Id.* (quoting SEC's Mem. 13).)

### c.   Objections to the R&R

Gentile objects to the R&R on the grounds that (1) the legal standard for appointing a receiver sets an "[e]xtremely [h]igh [b]ar" which has not been met by the circumstances of this case, (Gentile's Objs. 5–20; *see also* Gentile's Reply 5–8); (2) the litigation injunction would "run afoul" of rulings made in the Delaware Action and impose an "extreme burden" on the Court, (Gentile's Objs. 23–24; *see also* Gentile's Reply 10–11); and (3) the receiver should not be empowered to waive privilege, (Gentile's Objs. 24–25.) In support of his argument that the legal standard for appointing a receiver has not been met in this case, Gentile argues that (1) his actions did not cause an "imminent danger" to GPB or its assets, (Gentile's Objs. 7–9; *see also* Gentile's Reply 6–8); (2) the conversion of the monitorship to a receivership "[t]hreatens to [d]isrupt the [s]tatus [q]uo" and will not conserve GPB's assets, (Gentile's Objs. 9–11); (3) the appointment of a receiver is not necessary to protect GPB's investors' interests and is an improper remedy to reach a distribution plan, (*id.* at 11–15); (4) there are less drastic alternative remedies available, (*id.* at 15–16); (5) Judge Scanlon did not properly analyze the likelihood of success on the merits and did not identify any allegedly fraudulent conduct by Gentile, (*id.* at 16–20); and (6) the probability of harm to Gentile outweighs the harm to GPB and its investors, (*id.* at 20–21).

Schneider and Ascendant Capital raise the same objections as Gentile with respect to whether the facts of this case warrant converting the monitorship into a receivership under the

applicable legal standard.  (Schneider's Objs. 9–18.)  Schneider and Ascendant Capital also argue that the Court lacks subject matter jurisdiction to impose a receivership over property that is not the subject of the Complaint.  (*Id.* at 19–21.)  Finally, Schneider and Ascendant Capital argue in the alternative that if the Court converts the monitorship into a receivership, the Court should hold an evidentiary hearing to determine whether the SEC has met its burden and should not empower the receiver to waive privilege.  (*Id.* at 21–25; *see also* Schneider's Reply 7–8.)

In opposing Gentile's objections, the SEC argues that they "are contradicted by the record," (SEC's Resp. 3; *see also* GPB's Resp. 3–10), a record that supports Judge Scanlon's recommendation that "appointment of a receiver is the appropriate remedy for Gentile's violations of the Amended Order," and her independent recommendation that "appointment of a receiver and the imposition of a litigation injunction is warranted here to remedy violations of the federal securities laws," (SEC's Resp. 4–18).  The SEC also argues that, as Judge Scanlon noted regarding Gentile's violations of the Amended Order, "[i]t is not clear that Gentile or Schneider even have standing to object to the appointment of a receiver as a remedy for violations of the Amended Order."  (*Id.* at 2 n.3.)  In addition, the SEC argues that Schneider's jurisdictional argument is without merit because "the SEC clarified that all of the entities that would be subject to the receivership are GPB itself, are affiliates of or are controlled by GPB, and thus are the proper subject of the receivership."  (*Id.* at 16.)  GPB raises many of the same arguments as the SEC and also argues that Judge Scanlon did not err by recommending a receivership without holding an evidentiary hearing.  (*See* GPB's Resp. 11–22.)

In response to the SEC's and GPB's submissions, Gentile reiterates many of his original objections, including that "the SEC has failed to meet its high burden of showing that appoint[ment] of a receivership is warranted," (Gentile's Reply 5–6), there was no threat of

imminent financial harm to GPB because of Gentile's appointment of managers, (*id.* at 6–7), and appointment of a receiver and an imposition of a litigation injunction would be "an extraordinary imposition on this Court's time and resources," (*id.* at 10).  In addition, Gentile argues that there is no basis for the assertions by the SEC and GPB that Gentile's actions "(i) disrupted the operations of GPB and its ability to begin the distribution process by causing 'uncertainty in [its] corporate authority,' or (ii) caused the expenditure of 'substantial resources to determine which actions could be taken with or without manager authority,'" (*id.* at 7 (quoting SEC's Resp. 3); *see also* GPB's Resp. 6, 8–9, 13–16), and that appointment of a receiver cannot be "predicated on a belief that . . . Gentile may act similarly in the future if one is not appointed," (Gentile's Reply 8–10).  Schneider and Ascendant Capital similarly reiterate their original objections.  (*See* Schneider's Reply.)

## II.  Discussion

### a.  Standard of review

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected.  *Id.*; *see also United States v. Romano*, No. 15-CR-992, 2022 WL 402394, at *3 (2d Cir. Feb. 10, 2022) (citing *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015)).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  *See S.J. v. N.Y.C. Dep't of Educ.*, No. 21-CV-240, 2022 WL 1409578, at *1 n.1 (2d Cir. May 4, 2022) (noting that the district court applied correct legal standard in conducting *de novo*

review of portions of the magistrate judge's report to which specific objections were made and reviewing portions not objected to for clear error).  The clear error standard also applies when a "party makes only conclusory or general objections, or simply reiterates his original arguments."  *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022) (quoting *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009)); *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))); Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations.").  Where, however, a party "t[akes] issue with a specific legal conclusion in the report and recommendation," a district court reviews the objected-to portions of the report and recommendation *de novo*.  *Miller*, 43 F.4th at 120–21 (concluding that the plaintiff's objection, although revisiting an issue already argued, should have been reviewed *de novo* where the plaintiff objected to a "specific legal conclusion in the report and recommendation," and noting that clear error is normally applied "when the objections are nonspecific or 'merely perfunctory responses . . . argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition'" (quoting *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (alteration in original))).

> **b.  The Court exercises its inherent equitable power to enforce a prior court order to convert the monitorship to a receivership**

"A court can take 'any reasonable action . . . to secure compliance [with a court order],' and the 'scope of a district court's equitable powers to remedy past wrongs is broad.'"  *In re Tronox Inc.*, 855 F.3d 84, 112 (2d Cir. 2017) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (alteration in original)); *Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337, 344

(S.D.N.Y. 2012) ("Courts have inherent power to enforce their orders."). "[T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order." *Hunt*, 904 F. Supp. 2d at 344 (quoting *In re Debs*, 158 U.S. 564, 594 (1895) (alteration in original)); *see also In re Lafayette Radio Elec. Corp.*, 761 F.2d 84, 93 (2d Cir. 1985) ("[A]ncillary jurisdiction is recognized as part of a court's inherent power to prevent its judgments and orders from being ignored or avoided with impunity."). "Moreover, courts have inherent power to issue orders designed to correct wrongs committed through its process." *Hunt*, 904 F. Supp. 2d at 344 (citing *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 146 (1919)); *see also Arkadelphia Milling Co.*, 249 U.S. at 145–46 ("It is one of the equitable powers, inherent in every court of justice so long as it retains control of the subject-matter and of the parties, to correct that which has been wrongfully done by virtue of its process."); *In re Lafayette Radio Elec. Corp.*, 761 F.2d at 92–93 ("[I]t is established that a federal court sitting in equity that has jurisdiction to issue a decree necessarily has ancillary and supplemental jurisdiction to enter orders and judgments designed to effectuate that decree." (first citing *Dugas v. Am. Surety Co.*, 300 U.S. 414 (1937); and then citing *Root v. Woolworth*, 150 U.S. 401 (1893))). A "court's choice of how to enforce the order is reviewed for abuse of discretion." *In re Tronox Inc.*, 855 F.3d at 112 (citing *EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 595 (2d Cir. 1991)).

### i.   Gentile's actions caused GPB to violate the terms of the Amended Order

The Court converts the monitorship into a receivership pursuant to the terms of the Amended Order based on GPB's violations of the order, caused by Gentile's actions, and GPB's failure to cure the violations.

Gentile does not dispute that he appointed new managers and altered GPB's Operating Agreement by, *inter alia*, giving compensation packages of up to $400,000 per year to these new managers.  (*See, e.g.*, Gentile's Objs. 1 (stating that Gentile's position has not changed in the time since he "sought to appoint three new managers to GPB . . . and amend certain aspects of the [c]ompany's Operating Agreement").)  Instead, he argues that "there was nothing illegal, inappropriate or untoward" in his "appointment of additional managers" because (1) the Amended Order does not govern the type of managers he appointed, and (2) the Amended Order did not divest him of his appointment authority and GPB cannot limit his appointment authority without his consent.[10]  (Gentile's Opp'n 9, 17.)  The Court is not persuaded by either of Gentile's arguments.

### 1.   There is no meaningful distinction between "management-level professionals" and "managers"

Gentile first argues that the Amended Order does not govern the type of managers he appointed, drawing a distinction between "management-level professionals," as referred to in the Amended Order, and "managers," as defined in the Operating Agreement.  (*Id.* at 9.)  Gentile argues that "[u]nder Delaware law, the 'managers' of a limited liability company such as GPB subject to the member's appointment authority are akin to corporate directors — whose appointment is not subject to approval by the Monitor — and not individuals bearing operational

---

[10]   Although Gentile has since "withdrawn" his appointment of managers and amendments to the Operating Agreement, he maintains that he has a "good faith belief that he has the right to do so," but will "refrain from taking any unilateral action regarding the management and corporate governance of GPB."  (Gentile's Objs. 12; *see also* Gentile's Aug. 28, 2023 Letter 1, annexed to the Jeremias Decl. as Ex. 7, Docket Entry No. 168-8 ("Notwithstanding Mr. Gentile's right as the sole member of GPB to make such lawful modifications and appointments to the Company's management structure and amendments to the Operating Agreement[,] . . . Mr. Gentile has withdrawn the three Manager appointments and amendments to the Operating Agreement that were made on May 27, 2022.").)

responsibilities, whose appointment *is* subject to approval by the Monitor."[11]  (*Id.*)  Given the

plain meaning of the terms of the Operating Agreement and the Amended Order and the purpose

of the appointment of the Monitor, the Court is not persuaded that there is any meaningful

distinction between the terms "manager" and "management-level professional."

 As a general rule, "words and phrases should be given their plain meaning."  *Com.*

*Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14-CV-7483, 2017 WL 3432073, at \*7 (E.D.N.Y.

Aug. 8, 2017) (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152,

157 (2d Cir. 2016)); *see also Briscoe v. City of New Haven*, No. 09-CV-1642, 2010 WL

2794231, at \*4 (D. Conn. July 12, 2010) (noting that, in response to the defendant's motion for

clarification of a prior court order, "the [c]ourt does not believe such clarification is necessary in

light of the plain language of the opinion" but nevertheless providing such clarification).

 The Operating Agreement uses the defined term "Manager."  (Operating Agreement 3

(defining "Manager" as "the Persons designated by the Members in Article VI, Section 1 hereof

to act collectively as the manager of the Company within the meaning of the Delaware Act and

shall include all successors appointed pursuant to the provisions of this Agreement").)  Black's

Law Dictionary defines a "manager" as "[s]omeone who administers or supervises the affairs of

---

[11]  Gentile cites opinions of his expert — Jack B. Jacobs, former Justice of the Delaware Supreme Court — in support of his conclusion.  (*See, e.g.*, Gentile's Opp'n 9 (citing Expert Opinion of Jack B. Jacobs ("Gentile's Expert Op.") ¶ 9, annexed to the Decl. of Daniel J. Horwitz as Ex. F, Docket Entry No. 102-7 ("A 'Manager' of an LLC, analogous to a director of a corporation, is 'a person who is named as a manager of [the LLC] pursuant to an [LLC] agreement.'" (quoting Del. Limited Liability Act, 6 Del. C. § 101(12)))); *id.* (citing Gentile's Expert Op. ¶ 16 ("The Operating Agreement contains no provision that limits or otherwise qualifies or restricts the power legally conferred upon the Members holding a majority of the Distribution Percentages to determine the number of Managers or to fill any newly created Manager positions.")); *id.* (citing Gentile's Expert Op. ¶ 17 (concluding that "Gentile . . . was the person exclusively empowered to increase the number of its Manager positions and to fill the resulting Manager vacancies by written consent, so long as he satisfied the conditions prescribed by the Operating Agreement" and that "Gentile satisfied those conditions")).)

a business, office, or other organization." *Manager*, Black's Law Dictionary (11th ed. 2019).

Notably, the Operating Agreement specifies that "[t]he *management* of the Company's business

shall be vested in its Managers." (Operating Agreement 9 (emphasis added); *see also* Gentile's

Expert Op. ¶ 13.) The Amended Order uses the term "management-level professional" without

definition. (Am. Order ¶ 6(e).) Black's Law Dictionary defines "management" as "[t]he people

in an organization who are vested with a certain amount of discretion and independent judgment

in managing its affairs" and "top management" as "[a] high level of company management at

which major policy decisions and long-term business plans are made." *Management*, Black's

Law Dictionary. Thus, the plain meaning of the terms "manager" and "management" — and the

Operating Agreement's own reference that managers are vested with the "management" of the

business — support the Court's finding that there is no textual distinction between the terms

"manager" and "management-level professional" as used in the Operating Agreement and the

Amended Order, respectively.

      Contrary to Gentile's arguments, Gentile's expert opinion does not support any textual

distinction between the terms "manager" and "management-level professional." The expert

opinion paragraphs Gentile cites either do not address this distinction, (Gentile's Expert Op.

¶¶ 16–17), or do not support such a distinction, (*id.* ¶ 9). For example, in paragraph 9, Gentile's

expert recites the definition of a "manager" under Delaware law, but he does not take a position

on whether a "manager" falls within the scope of a "management-level professional," as referred

to in the Amended Order. (*Id.*) In fact, the expert did not rely upon nor review the Amended

Order in rendering his opinion. (*Id.* ¶¶ 5, 8; *see also* R&R 18.) The expert expressly stated that

he "addressed only the application of Delaware law to the facts assumed in this specific setting

and [his opinion] is not intended to express any view on matters of federal law or the law of any

other state or jurisdiction."  (Gentile's Expert Op. ¶ 18.; *see also id.* ¶ 16 ("To the extent the

SEC's contention presents a question of federal law, this Opinion expresses no view.").)  Thus,

Gentile's expert's conclusions do not support Gentile's argument.

The purpose of the appointment of the Monitor — to protect investors — further

demonstrates that there is no textual distinction between the terms.  (*See* Order 1 ("[T]he Court

finds that . . . the appointment of a monitor in this action . . . is necessary and appropriate for the

protection of investors.").)  The SEC moved to appoint a monitor[12] to, *inter alia*, prevent Gentile

from retaining control over GPB — whether on his own or through others selected by him — at

the expense of investors.  (SEC's Emergency Mem. 2 ("Gentile and his handpicked management

team should not have unchecked authority over incoming cash that could be used to redeem

investors."); *id.* ("In short, an independent monitor . . . would provide much-needed assurances

to the investors . . . that an unbiased and qualified person who is not beholden to Gentile is

vetting any significant transactions and decisions and looking out for the interests of investors.");

*see also* SEC's June 2, 2022 Letter 1 ("Gentile's Motion seeks to curtail the authority and

powers of the Court-appointed Monitor and to have the Court retroactively approve Gentile's

installation . . . of himself and his hand-picked team as new management over GPB CH.");

GPB's Resp. 5 ("The purpose of the Monitorship was thus . . . to protect Investors' money from

the threat posed by Gentile and those associated with him.").)  To protect investors, the Court

appointed the Monitor, granting him the authority to review, approve, or disapprove material

changes that would fundamentally affect the structure, assets, or liabilities of GPB.  (Am. Order

¶ 6; R&R 17; *see also* Gentile's Opp'n 8 ("The Monitor Order extends certain powers to the

---

[12] (SEC's Emergency Mot. for an Order to Show Cause ("SEC's Emergency Mot."), Docket Entry No. 10; SEC's Mem. in Supp. of SEC's Emergency Mot. ("SEC's Emergency Mem."), Docket Entry No. 12.)

Monitor, principally authorizing him to review, approve, or disapprove certain material actions by the GPB Businesses.")).

Specifically, the Amended Order gives the Monitor "authority to approve or disapprove . . . any material change to compensation of any executive officer, affiliate, or related party of GPB, . . . [and] any retention by GPB . . . of any management-level professional or person.  (Am. Order ¶ 6(d)–(e).)  Paragraphs 6(d) and 6(e) are the only subparagraphs addressing the Monitor's authority regarding leadership of GPB and their compensation.  (*Id.* ¶ 6.)  Pursuant to Gentile's argument, the Monitor would only have authority to approve or disapprove individuals "bearing operational responsibilities," but not any GPB leadership (i.e., corporate directors).[13]  (Gentile's Opp'n 9.)  To accept Gentile's argument would require the Court to ignore the purpose of the Monitor and the repeated concerns raised by the SEC that Gentile would retain control of GPB through GPB's leadership at the expense of investors.  (SEC's Emergency Mem. 2; *see also* SEC's June 2, 2022 Letter 1.)  In view of the fact that paragraphs 6(d) and 6(e) are the only references to the Monitor's approval authority over GPB leadership, the Court finds that the Monitor must be able to exercise authority over key GPB leadership positions to prevent "Gentile and his handpicked management team [from having] unchecked authority over incoming cash that could be used to redeem investors."  (SEC's Emergency Mem. 2.)  As Judge Scanlon explained:

---

[13]  As Judge Scanlon noted, Gentile's expert's opinion does not support Gentile's assertion that "management-level professionals" are those "bearing operational responsibilities" and thus are not "managers."  (R&R 18 ("Mr. Gentile's conclusory assertion that 'management-level professionals' are those 'bearing operational responsibilities' and that, because of such unsubstantiated definition, 'management-level professionals' are not 'managers' is unaddressed and unsupported by its sole citation to the Expert's opinion.").)  As the Court noted above, Gentile's expert did not analyze nor opine on the meaning of the term "management-level professionals."

> In order for the Monitor to exercise sufficient control to support the legal and operational integrity of GPB, it is necessary and consistent with the Monitor's overall authority to bring within such authority oversight over all key leadership positions.  To permit the dilution of centralized authority without the Monitor's approval would be inconsistent with the overall structure of the Monitor's powers and responsibilities.  Mr. Gentile's view that the voting authority of the sole manager could be diluted to one quarter of its current voting power, . . . without the Monitor's approval is inconsistent with the stewardship and oversight responsibilities required of the Monitor by paragraph 6 and would undermine the entire Amended Order.

(R&R 17–18.)  Thus, based on the plain meaning of the terms of the Operating Agreement and the Amended Order and the purpose of the appointment of the Monitor, the Court finds that there is no meaningful distinction between "management-level professionals" and "managers."

### 2.   The Amended Order, not GPB, places limitations on Gentile's appointment and amendment rights

Gentile also argues that he "was duly authorized under Delaware law and the Operating Agreement to appoint additional managers and . . . [GPB] cannot limit — even in its consent to the [Amended] Order — those rights."  (Gentile's Opp'n 17; *see also id.* at 9 ("[W]ithout Mr. Gentile's consent, [GPB] has no authority to limit his appointment rights.").)  Gentile is mistaken.  The Court, not GPB, has placed limits on Gentile's right to appoint managers.  As discussed above, the Amended Order provides the Monitor with the authority to review, approve, or disapprove GPB's retention of any "management-level professional," including the three managers Gentile appointed.  (*See supra* Section II.b.i.)  Whether Gentile was permitted to appoint managers under the Operating Agreement, as Gentile's expert argues, is not the issue. The issue is whether any such appointed managers may be retained by GPB without the Monitor's approval.  (R&R 16 ("The question is not whether Mr. Gentile can appoint managers under the [Operating] Agreement, but, rather, is whether any such managers may be retained by GPB; without the Monitor's approval, the answer is no.").)  In May of 2022, Gentile appointed

the new managers and instructed GPB's CEO and sole manager to "cease any and all actions

taken or to be taken in the capacity as [m]anager, and [to] seek consensus with [the new

managers] regarding the course of GPB and any actions to be taken by the [new m]anagers,"

(Gentile's May 27, 2022 Letter 1, annexed to Gentile's Opp'n as Ex. B, Docket Entry No. 102-3;

*see also* SEC's Mem. 5; GPB's Resp. 6–7), and the new managers immediately exercised their

managerial powers by modifying the Operating Agreement upon appointment, (SEC's Mem. 5;

GPB's Resp. 6–7), all without the Monitor's approval.  As discussed above, the specific terms of

the Amended Order and the purpose of the appointment of the Monitor do not support Gentile's

conclusion that he can retain managers without the approval of the Monitor.  Therefore, the

Court finds that Gentile's actions caused GPB to violate the Amended Order when he appointed

the new managers, instructed GPB's CEO to recognize and work with the managers, and the new

managers modified the Operating Agreement, all without the approval of the Monitor.

In addition, Gentile amended the Operating Agreement to, *inter alia*, provide

compensation packages of up to $400,000 to each new purported manager.  (SEC's Mem. 5;

GPB's Resp. 1–2; *see also* Gardemal Decl. ¶ 21(b) ("GPB CH's new managers would now be

entitled to be paid between $10,000 and $35,000 per month, . . . so each of the three managers

could be paid over $400,000 per year.").)  Under the Amended Order, the Monitor has approval

authority over "any material change to compensation of any executive officer, affiliate, or related

party of GPB."  (Am. Order ¶ 6(d).)  Black's Law Dictionary defines "material" as "significant"

or "essential."  *Material*, Black's Law Dictionary.  The parties do not dispute that the creation of

an entirely new compensation package qualifies as a "material change" in compensation,

requiring approval by the Monitor under paragraph 6(d).  Thus, the Court finds that Gentile's

actions caused GPB to violate the Amended Order when he and the three new managers

20

amended the Operating Agreement to provide each new manager with a compensation package

without the Monitor's approval.

> ### ii.   GPB failed to cure the violations caused by Gentile's actions within ten business days of being notified of the violations

Without the approval of the Monitor, Gentile's actions caused GPB to violate the

Amended Order.  Under the Amended Order:

> 20. If the Monitor believes GPB is in some way not materially in compliance with the terms of this Order, upon notice of noncompliance to GPB, GPB shall have 10 business days in which to cure any claimed material noncompliance (the "Cure Period").
>
> 21. If GPB does not comply with the above provisions and does not make requested changes within the Cure Period, upon motion of the SEC resulting in a Court Order, the Monitorship shall convert to a receivership.  GPB shall be afforded an opportunity to oppose any such application by the SEC before conversion to a receivership.

(Am. Order ¶¶ 20, 21.)  Pursuant to the terms of the Amended Order, GPB's violations would

trigger the conversion of the monitorship to a receivership, upon the SEC's motion, unless cured

within ten days of being provided notice of such violations.  (*Id.* ¶ 21.)  The parties do not

dispute that GPB was provided sufficient notice.[14]  (Monitor's May 31, 2022 Letter, as annexed

---

[14]   Gentile admits that GPB "was put on notice of a purported breach of the Amended Monitor Order by the Monitor and given ten business days to cure" and that he was "copied on the Monitor's notice to GPB."  (Gentile's Reply 3.)  He nevertheless argues that he "was never given notice or an opportunity to cure by either the Monitor or the Magistrate [Judge]."  (*Id.*)  He further argues that he "was neither subject to nor could avail himself of the [Amended] Order's provisions, thus vitiating any ability for him to 'cure' under its provisions," pursuant to Judge Scanlon's April 28, 2022 Order (the "April 2022 Order").  (*Id.*)

Gentile misunderstands the April 2022 Order.  Under the April 2022 Order, Judge Scanlon ruled that neither Gentile nor any non-party to the Amended Order could avail himself of the mediation provision "as it was drafted to provide only the entity that is actually being monitored, GPB, with a method for raising disputes regarding its oversight."  (Apr. 2022 Order.)  The April 2022 Order does not prevent Gentile from taking steps to remedy a violation that *he caused* by his unilateral action.  The fact that Gentile cured his violations approximately one month after Judge Scanlon issued the R&R further undermines Gentile's argument.  (*See* Gentile's Objs. 12 ("As of August 28, 2023, Mr. Gentile informed GPB, the Monitor, and the

to Gentile's Opp'n as Ex. E, Docket Entry No. 102-6.)  At the time Judge Scanlon issued the

R&R, there was no dispute that Gentile did not take any curative action within ten days of

notification of the violations,[15] although Gentile "alone was able to do so."  (GPB's Resp. 7.)

Accordingly, GPB did not cure the violations caused by Gentile within ten days of being notified

of such violations.  Because of GPB's violations and failure to cure, the Court has authority to

convert the monitorship to a receivership pursuant to paragraph 21 of the Amended Order, and

does so for the reasons discussed.

### c.   The Court also exercises its statutory and equitable power to convert the monitorship to a receivership

"In any action or proceeding brought or instituted by the Commission under any

provision of the securities laws, the Commission may seek, and any Federal court may grant, any

equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C.

§ 78u(d)(5); *see also SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("There is no question that

district courts may appoint receivers as part of their broad power to remedy violations of federal

securities laws."); *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) ("District courts possess

broad power to remedy violations of federal securities laws." (citing *SEC v. Manor Nursing*

*Ctrs.*, 458 F.2d 1082, 1103 (2d Cir. 1972), *abrogated on other grounds by SEC v. Ahmed*, 72

---

SEC that he had withdrawn the Appointments and Amendments."); SEC's Resp. 2 n.2; GPB's
Resp. 10–11.)

   [15]  (SEC's Mem. 11 n.7 ("Upon information and belief, Gentile has failed to cure these
GPB breaches, which he caused."); Gentile's Opp'n 17 (arguing that "there was nothing illegal,
inappropriate or untoward in Mr. Gentile's appointment of additional managers"); SEC's Reply
5 ("Gentile's attempt to assert managerial control result[ed] in a serious uncured breach of the
[Amended] Order."); Order dated Apr. 28, 2023 ("April 2023 Order") (directing the parties to
file letters as to any fact-based updates); Gentile's May 8, 2023 Letter re April 2023 Order,
Docket Entry No. 141; SEC's May 8, 2023 Letter re April 2023 Order, Docket Entry No. 142;
GPB's May 8, 2023 Letter re April 2023 Order, Docket Entry No. 143; Monitor's May 8, 2023
Letter re April 2023 Order, Docket Entry No. 144.)

F.4th 379 (2d Cir. 2023))); *SEC v. Friedlander*, 49 F. App'x 358, 360 (2d Cir. 2002) (affirming the district court's appointment of a receiver where the court "carefully considered the costs of a receiver, and weighed the equities with care"); *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) (noting that although "'the appointment of . . . receivers[] should not follow requests by the SEC as a matter of course,' a district court's decision to appoint a . . . receiver may be disturbed on appeal only if the district court has abused its discretion" (quoting *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105)); *Manor Nursing Ctrs.*, 458 F.2d at 1105 (concluding that the district court "appropriate[ly] exercise[d] . . . its equity powers" to appoint a trustee and noting that "we repeatedly have upheld the appointment of trustees or receivers to effectuate the purposes of the federal securities laws" (citations omitted)); *Ferguson v. Tabah*, 288 F.2d 665, 673–74 (2d Cir. 1961) (affirming the district court's appointment of a receiver since although receivership is a "drastic remedy," it was "within the discretion of the court"); *see also Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 895 (5th Cir. 2019) ("Exercising their jurisdiction under the securities laws, federal district courts can utilize a receivership where a troubled entity, bedeviled by their violation, will be unable to satisfy all of its liabilities to similarly situated investors in its securities." (citing *Capwill*, 462 F.3d at 552–53)).  "Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 expressly vests the power to appoint receivers in the district courts, 'courts have consistently held that such power exists, where necessary to prevent the dissipation of a defendant's assets pending further action by the court.'"  *SEC v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (quoting *Am. Bd. of Trade*, 830 F.2d at 436); *Eberhard*, 530 F.3d at 131 (same); *see also Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965) ("In appointing the receiver, the district court was . . . exercising its exclusive federal jurisdiction for the purpose of enforcing the Securities Exchange Act of 1934.

While it is true that the Act does not explicitly provide for appointment of receivers, there is little

reason to doubt that equitable power to do so exists." (internal citation omitted)).

     "Receivers appointed at the SEC's request are equipped with a variety of tools 'to help

preserve the status quo while the various transactions [are] unraveled . . . to obtain an accurate

picture of what transpired.'" *Eberhard*, 530 F.3d at 131 (quoting *Manor Nursing Ctrs.*, 458 F.2d

at 1103 (alterations in original)).  "[A] federal receiver is appointed, under the district court's

broad equitable discretion, 'to restore to a defrauded entity or defrauded persons that which was

fraudulently diverted from its or their custody and control.'" *Malek*, 397 F. App'x at 713

(quoting *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005)).  Their responsibilities include,

*inter alia*, "marshal[ing] the assets" of the defendant, "prevent[ing] the dissipation of [the]

defendant's assets pending further action by the court," and, where the entity in receivership is a

corporation, "report[ing] to the SEC and conven[ing] shareholder meetings on [the corporation's]

behalf." *Eberhard*, 530 F.3d at 131–32 (first quoting *Esbitt v. Dutch-Am. Mercantile Corp.*, 335

F.2d 141, 143 (2d Cir. 1964); then quoting *Am. Bd. of Trade*, 830 F.2d at 436; and then citing

*SEC v. Koenig*, 469 F.2d 198, 202 (2d Cir. 1972) (third alteration in original)); *see also Manor*

*Nursing Ctrs.*, 458 F.2d at 1106 (affirming "the district court's decision temporarily to freeze

appellants' assets"); *Esbitt*, 335 F.2d at 143 (noting that "[a] primary purpose of appointing a

receiver is to conserve the existing estate").  "[T]he power of a securities receiver is not without

limits." *Eberhard*, 530 F.3d at 132.  The Second Circuit has "expressed strong reservations as to

the propriety of allowing a receiver to liquidate [an estate]," *id.* (quoting *Lankenau*, 350 F.2d at

63 (alteration in original)), has found that "receivership should not be used as an alternative to

bankruptcy," and has "disapproved of district courts using receivership as a means to process

claim forms and set priorities among various classes of creditors," *see id.* (citing *Am. Bd. of Trade*, 830 F.2d at 437–38).

"'[T]he appointment of a receiver is considered to be an extraordinary remedy,' and . . . should be employed cautiously and granted only when clearly necessary to protect plaintiff's interest in the property." *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997) (quoting *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988) (alterations in original)).  Even so, "[a] decision to appoint or not to appoint a receiver is committed to the sound discretion of the trial court." *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citing *Rosen*, 106 F.3d at 34).  In determining whether a receiver should be appointed, courts in this Circuit routinely consider the factors set forth in Charles A. Wright and Arthur R. Miller's treatise *Federal Practice and Procedure*, including:

> [F]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (1999) (the "Wright and Miller factors"); *Varsames*, 96 F. Supp. 2d at 365 (quoting the Wright and Miller factors); *see also Carbone v. Martin*, No. 18-CV-3509, 2023 WL 2477682, at *7 (E.D.N.Y. Mar. 13, 2023) (quoting *Varsames*, 96 F. Supp. 2d at 365); *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 859 F. Supp. 2d 602, 610 (S.D.N.Y. 2012) (quoting *Varsames*, 96 F. Supp. 2d at 365).  A court reviews these factors by a preponderance of the evidence.[16]

---

[16]  The Objectors rely on two 2020 cases, *Meisels v. Meisels*, No. 19-CV-4767, 2020 WL 7000903 (E.D.N.Y. May 21, 2020), *report and recommendation adopted by* 2020 WL 6110827 (Oct. 16, 2020), and *JDP Mortg. LLC v. Gosman*, No. 19-CV-5968, 2020 WL 8082390

The Court finds that this case is "extraordinary" under the Wright and Miller factors and Second Circuit caselaw and independently converts the monitorship into a receivership pursuant to the Court's statutory and equitable powers to enforce federal securities laws.[17]  *See* 15 U.S.C. § 78u(d)(5); *Byers*, 609 F.3d at 91; *Eberhard*, 530 F.3d at 131.

---

(E.D.N.Y. Dec. 21, 2020), *report and recommendation adopted by* 2021 WL 66290 (Jan. 7, 2021), to argue that the appropriate standard by which the Court should consider these factors is "clear and convincing evidence."  (Gentile's Objs. 5; Schneider's Objs. 9–10.)  These cases rely, in part, on *In re Oakland Lumber Co.*, a 1909 Second Circuit case reviewing an ex parte order appointing a receiver over an alleged bankrupt corporation.  174 F. 634 (2d Cir. 1909).  In *Oakland Lumber Co.*, the district court appointed a receiver based on the plaintiff's moving papers and "without notice to the bankrupt [corporation] or the assignee."  *Id.* at 635.  The Second Circuit vacated the appointment, explaining:

> The power to take from a man his property, without giving him an opportunity to be heard, is both arbitrary and drastic and should not be exercised except in the clearest cases.  Congress recognized the necessity for caution by limiting the appointment of receivers to cases where it is "absolutely necessary" for the preservation of the estate.  In other words the reason for such an interference with the rights of property must be clear, positive and certain. . . . [I]n no case should a remedy so far reaching in its effects be resorted to except upon clear and convincing proof.

*Id.* at 636–37 (quoting Act of July 1, 1898, 30 Stat. 545).  The statutory authority to appoint a receiver in *Oakland Lumber Co.* stemmed from the 1898 Bankruptcy Act, which was repealed in 1978, *see* Pub. L. No. 95-598, tit. IV, 92 Stat. 2682; *id.* at § 105(b), 92 Stat. 2555 ("[A] bankruptcy court may not appoint a receiver in a case under this title."), and not federal securities laws, *Oakland Lumber Co.*, 174 F. at 636.  The Objectors have provided no arguments or caselaw to support application of the "clear and convincing" standard in this context.  Rather, the appointment of a receiver "lies in the discretion of the court" and "the form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion."  Wright & Miller, Federal Practice and Procedure § 2983.

[17]  Schneider argues for the first time in his objections to the R&R that the Court lacks subject matter jurisdiction over most of the twenty different entities listed by the SEC as part of the "Receivership Estate" in the Proposed Amended Order because such entities were not included in the SEC's complaint.  (Schneider's Objs. 20 ("[T]he SEC's complaint alleges that Defendants defrauded investors of only six funds." (citing Compl. ¶¶ 23–27)).)  The SEC responds that it "clarified that all of the entities that would be subject to the receivership are GPB itself, are affiliates of or are controlled by GPB, and thus are the proper subject of the receivership."  (SEC's Resp. 16.)  Because the SEC submitted this list of entities in its original Proposed Order and Schneider did not object at that time, (*see* Schedule 1 of Proposed Order),

First, the Court finds that Gentile's actions and sworn testimony have raised "significant concerns about [his] credibility." *Carbone*, 2023 WL 2477682, at *7 (citing discrepancies between the defendant's assertions and prior court orders "raises significant concerns about [the d]efendant's credibility" under the first Wright and Miller factor); *see also SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) (finding that allegations of fraud in a complaint can be sufficient to warrant injunctive relief because "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations" (quoting *Manor Nursing Ctrs.*, 458 F.2d at 1100)), *rev'd on other grounds by Gabelli v. SEC*, 568 U.S. 442 (2013), *aff'd in part, rev'd in part by Gabelli v. SEC*, 518 F. App'x 32, 33 (2d Cir. 2013).  For example, the SEC stated in its reply to Gentile's opposition of appointment of a receiver that "[i]n his sworn testimony under oath before the [SEC] in February 2020, Gentile admitted that he knew that investor money, and not only money from the portfolio companies' operations, was being used to pay distributions to investors," contrary to GPB's representations to investors.[18]  (SEC's Reply 6–7; *see also* SEC's Resp. 13 (same).)

Second, the Court finds that there is an imminent risk that the assets of GPB will diminish in value — harming investors — based on Gentile's prior conduct.  "[T]he existence of any imminent danger of the diminution of the value of the propert[y] . . . is a critical factor in the

_____

the Court declines to consider Schneider's belated argument.  *See, e.g.*, *Gov. Emps. Ins. Co. v. Grody*, No. 22-CV-6187, 2023 WL 6307340, at *2 (E.D.N.Y. Sept. 28, 2023) ("Even on *de novo* review, . . . the Court 'will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the Magistrate Judge in the first instance.'" (quoting *Haynes v. Quality Mkts.*, No. 02-CV-250, 2003 WL 23610575, at *3 (E.D.N.Y. Sept. 22, 2003))); *Saada v. Golan*, No. 18-CV-5292, 2023 WL 1993538, at *2 (E.D.N.Y. Feb. 13, 2023) (stating the same).

[18]  While Judge Scanlon did not cite these facts in the R&R, the SEC did present the evidence and make arguments based on the evidence to Judge Scanlon, and thus the Court can consider it.  *Cf. Grody*, 2023 WL 6307340, at *2; *Saada*, 2023 WL 1993538, at *2.

analysis of whether to appoint a receiver." *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*,

866 F. Supp. 2d 247, 250 (S.D.N.Y. 2012) (citing *Melnick v. Press*, No. 06-CV-6686, 2007 WL

2769490, at *1 (E.D.N.Y. Sept. 21, 2007)).  Judge Scanlon found that "the actions of Mr. Gentile

and the three new managers that he purportedly appointed, as they affect GPB, have resulted in a

fracture in GPB's leadership that is irremediable without [c]ourt intervention," and the resulting

"uncertainty of GPB's position is creating significant consequences, which are damaging its

financial health and, by extension, the finances of its investors."  (R&R 26.)  In support of her

finding, Judge Scanlon cited the fact that:

> the three purported managers newly appointed by Mr. Gentile,
> without approval of the Monitor, will receive "up to $400,000 per
> year in compensation," have caused "GPB . . . and the Monitor [to]
> incur[] substantial legal expenses," and "have already attempted to
> reverse a reduction in force implemented by GPB . . . with Monitor
> consent to reduce unnecessary expense."

(*Id.* at 23.)  The attempted reversal of a reduction in force of Highline Management executives

was initiated by the three new managers Gentile appointed.  (*See* Hayes' June 30, 2022 Letter 3,

annexed to the Suppl. Decl. of Joseph T. Gardemal III ("Gardemal Suppl. Decl.") as Ex. A,

Docket Entry No. 104 ("[W]e have also learned that GPB has terminated three key executives of

Highline Management, which is directly overseen by GPB.  We do not understand . . . why GPB

would take such action during this period of transition without consultation with the newly

appointed managers. . . . We believe they should be reinstated as soon as practical . . . .").)  The

executives had aggregate salaries of more than $1.7 million per year.  (Gardemal Suppl. Decl.

¶ 14.)

Gentile argues that Judge Scanlon's finding that there is "uncertainty" regarding "GPB's

position" is factually untrue because the "Monitor is currently supervising over $1 billion of

GPB's cash equivalents" and the "April 2023 Monitor Report also reported realized values of

195%, 213%, and 134% as a result of various mergers & acquisitions and other transactions."
(Gentile's Objs. 7–8; *see also* April 2023 Monitor Report 24, 25, 27, Docket Entry No. 137.)  As
GPB clarifies, the three transactions cited in the April 2023 Monitor Report all pre-date Gentile's
appointment of the new managers and amendment of the Operating Agreement.  (GPB's Resp.
15 ("But what Gentile conveniently leaves out is that all three of the transactions cited in the
Monitor's Report *pre-date his 2022 Memorial Day weekend takeover attempt*; GPB Capital sold
the three cited-to Portfolio Companies in November 2021, December 2021, and April 2022,
respectively." (emphasis in original)).)

The Court finds that, given Gentile's previous (1) appointment of new managers, whose
collective compensation could reach over $1.2 million annually to be paid by GPB, and (2)
attempt to reinstate three terminated executives of a company directly overseen by GPB, whose
collective compensation amounts to nearly $1.7 million annually to be paid by GPB, Gentile's
actions constituted a real and imminent threat of financial harm to GPB and its investors.  (*See*
Gardemal Decl. ¶ 21(b); Gardemal Suppl. Decl. ¶ 14; Hayes' June 30, 2022 Letter 2; R&R 23,
26.)

Third, the Court finds that legal remedies are inadequate.  Because Gentile's actions
caused GPB to violate the Amended Order, the Court is not persuaded that "a further amended
monitor order . . . explicitly defin[ing] the limits of Mr. Gentile's actions vis-à-vis GPB in his
capacity as the owner and sole Member of GPB . . . [would] eliminat[e] any future action the
SEC or Monitor may deem detrimental to GPB."  (Gentile's Objs. 16.)  In addition, it is unclear
whether a financial penalty, such as one "under penalty of contempt of court" as suggested by
Schneider, (*see* Schneider's Reply 1), against Gentile would be an adequate, alternative legal
remedy.

Fourth, the Court finds that the probability of harm to the SEC, GPB, and GPB's investors by denial of the receivership would be greater than the injury to the Objectors.  Judge Scanlon found that the SEC and, by extension, GPB's investors, will obtain the benefit of having a receiver preserve the status quo, conserve the existing estate, prevent the dissipation of assets, and "protect the investors by preventing Mr. Gentile and the new purported managers from undermining GPB's finances through improper access to funds and information," (R&R 23–24), concluding that "[t]he investors' and GPB's interests outweigh Mr. Gentile's interests," (*id.* at 24).  The Objectors argue that the "R&R failed to weigh the balance of harms" by ignoring that their constitutional rights would be violated if a receiver is appointed and a litigation injunction granted, because they are entitled to have the Delaware state court orders receive full faith and credit.  (Gentile's Objs. 20–22; Schneider's Objs. 13–14; Schneider's Reply 3–4.)  Because the reimbursement procedures set forth in the Delaware state court orders are exempt from the proposed litigation injunction, (*see infra* Section II.d), any harm to the Objectors is outweighed by the harm to the SEC, GPB, and GPB's investors.

Fifth, the Court finds that the SEC's probability of success is unclear.  The Objectors are correct that an indictment is "merely a statement of charges and not itself evidence."  (Gentile's Objs. 19 (citing 1-29 Leonard B. Sand, Modern Federal Jury Instructions-Criminal, P. 3.01[1], Instruction 3-1).)  *But see Gabelli*, 653 F.3d at 61 (reversing the district court's dismissal of the SEC's request for injunctive relief "since the complaint alleges that for almost three years [defendants] intentionally aided and abetted Advisers Act violations and since 'fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations'" (quoting *Manor Nursing Ctrs.*, 458 F.2d at 1100)); *Tabah*, 288 F.2d at 675 (noting that while the arrest of virtually all high company officials on fraud allegations "was not new 'evidence' of misdeeds, it

did present a situation where there was a possible complete breakdown of the [company's] high command," a threat which the district judge found "sufficient to tip the balance in favor of a receiver"). Ultimately, at this time, the Court does not have enough information to determine the SEC's probability of success in this action. None of the individual Wright and Miller factors, however, is dispositive. *See, e.g.*, *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05-CV-5231, 2013 WL 1385013, at *13 (S.D.N.Y. Mar. 11, 2013) (appointing a receiver based on evidence of only three of the five Wright and Miller factors), *aff'd*, 639 F. App'x 752 (2d Cir. 2016).

Under these circumstances, the Court finds it appropriate to exercise its statutory and equitable power to convert the monitorship to a receivership. GPB has been under monitorship since February of 2021, during which time its more than 17,000 investors nationwide, approximately 4,000 of whom are seniors, have been unable to access their funds. (*See* SEC's Mem. 3; SEC's Resp. 1.) Accordingly, given the gravity of the allegations and that one of the Individual Defendants has already pled guilty to criminal charges, that GPB's investors have been unable to access their funds for more than thirty-four months, and that GPB's management and Gentile have proven unable to agree or work together to implement GPB's future strategy, the Court exercises its equitable authority to convert the monitorship into a receivership. *See, e.g.*, *Friedlander*, 49 F. App'x at 360 (affirming the district court's appointment of a receiver where the court gave the manager of a hedge fund accused of fraud "the benefit of the doubt initially, and only . . . appoint[ed] a receiver after he failed to act in accordance with commitments he had made to the court"); *Amerindo*, 2013 WL 1385013, at *13 (appointing a receiver "[b]ased on the [i]ndividual [d]efendants' extensive fraudulent conduct, the risk that the value of restrained assets will irreversibly dissipate, and the risk of harm to the SEC, the individual victims, and other investors"); *see also* 15 U.S.C. § 78u(d)(5); *Eberhard*, 530 F.3d at

131; *Zacarias*, 945 F.3d at 895.  The Court does not exercise its discretion to convert the

monitorship to a receivership lightly, but, given the extreme circumstances of this case, it finds

that the requested relief is merited.[19]  *See, e.g.*, *Tabah*, 288 F.2d at 674 (affirming the district

court's appointment of a receiver despite appointment of a receiver being "a drastic remedy

usually imposed only where no lesser relief will be effective").

> ### d.   Imposition of a litigation injunction is appropriate based on the facts of this case

"The Second Circuit has recognized that an anti-litigation injunction or litigation stay in a

receiver order is a valid exercise of a district court's equitable powers."  *SEC. v. Callahan*, 2 F.

Supp. 3d 427, 436 (E.D.N.Y. 2014) (quoting *SEC v. Illarramendi*, No. 11-CV-78, 2012 WL

234016, at *4 (D. Conn. Jan. 25, 2012)); *see also Byers*, 609 F.3d at 92.  Although district courts

have "broad equitable powers in the context of an SEC receivership," the power to impose a

litigation injunction is one "to be exercised cautiously."  *Byers*, 609 F.3d at 91 (noting that "the

authority of a district court to issue an order staying a non-party from bringing litigation derived

from 'the inherent power of a court of equity to fashion effective relief'" (quoting *Wencke*, 622

---

[19]   The Objectors also argue that conversion of the monitorship to a receivership is inappropriate since "appointment of a receiver will be utilized to effectuate the liquidation of [GPB]."  (Gentile's Objs. 10; *see also* Schneider's Objs. 19.)  The Court understands the Second Circuit's "strong reservations as to the propriety of allowing a receiver to liquidate [an estate]," *Eberhard*, 530 F.3d at 131 (quoting *Lankenau*, 350 F.2d at 63), and its guidance that receivership "should not be used as an alternative to bankruptcy," *id.*  The Amended Proposed Order, however, adequately addresses the Objectors' concerns.  It provides that within forty-five days of the entry of the order, the receiver will "file and serve a full report and accounting of [r]eceivership [a]ssets," (Am. Proposed Order ¶ 42), and "propose to the Court a plan to distribute available [r]eceivership [a]ssets," (*id.* ¶ 6(P)).  At that time, the Court will determine whether distribution via receivership or bankruptcy is the appropriate course.  Accordingly, the fact that the SEC and GPB contemplate the possible liquidation of GPB via receivership does not prevent or undermine the appointment of a receiver at this time.  *See Skaff v. Progress Intern., LLC*, No. 12-CV-9045, 2014 WL 5454825, at *1 (S.D.N.Y. Oct. 28, 2014) (authorizing a receiver to "take possession of [the defendant company] and all its assets and conduct a thorough accounting, but not to liquidate or distribute such assets . . . absent further [c]ourt order").

F.2d at 1369)).  "An anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership."  *Byers*, 609 F.3d at 92; *SEC v. Ahmed*, No. 15-CV-675, 2022 WL 7508962, at *2 (D. Conn. Oct. 13, 2022) (same).  "While such injunctions are to be used sparingly, there are situations in which they are entirely appropriate."  *Byers*, 609 F.3d at 92.  One such situation is where a receiver must "maintain maximum control over the assets" of a large complex entity to "prevent[] small groups of creditors from placing some entities into bankruptcy, thereby removing assets from the receivership estate to the potential detriment of all."  *Byers*, 609 F.3d at 93; *see also SEC v. Morgan*, No. 19-CV-661, 2019 WL 2385395, at *12 (W.D.N.Y. June 5, 2019) (concluding that a litigation injunction was warranted "to protect against the potential for disparate actions in other courts that could ultimately have a negative impact on the assets" in the receivership estate); *United States v. JHW Greentree Cap., L.P.*, No. 12-CV-116, 2014 WL 2608516, at *3–4 (D. Conn. June 11, 2014) (noting that "[a] receiver must be given a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant" (quoting *United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 443 (3d Cir. 2005))).

Based on the facts of this case, the Court concludes that the imposition of a litigation injunction is appropriate, consistent with Judge Scanlon's finding.  (R&R 30).  The Second Circuit has noted that "while [litigation] injunctions are to be used sparingly, there are situations in which they are entirely appropriate."  *Byers*, 609 F.3d at 92.  Litigation injunctions "prevent[] small groups of creditors from placing some entities into bankruptcy, thereby removing assets from the receivership estate to the potential detriment of all."  *Id.* at 93.

The Amended Proposed Order contains a list of twenty-two litigations involving the receivership entities or their assets, (*see* Schedule 3 of Am. Proposed Order), and the Monitor

notes that these "pending litigation proceedings, including class action litigation . . . will require potential reserves, and there are limited funds available for these purposes," (Gardemal Decl. ¶ 29). Such litigations threaten to "remov[e] assets from the receivership estate to the potential detriment of all." *Byers*, 609 F.3d at 93. Accordingly, keeping in mind the Second Circuit's caution that such injunctions are to be applied "sparingly," *id.* at 92, the Court nevertheless finds that the facts of this case warrant the imposition of a litigation injunction. *See Morgan*, 2019 WL 2385395, at *1, *12 (imposing a litigation injunction in a securities fraud case involving $80 million in investor funds); *Callahan*, 2 F. Supp. 3d at 439–40 (declining to lift a litigation injunction contained in a receiver order imposed pursuant to a securities fraud action involving a Ponzi scheme); *see also Zacarias*, 945 F.3d at 897, 902–03 (affirming the district court's imposition of a litigation injunction with respect to a receiver's settlement of a $5 billion Ponzi scheme and noting that a court's powers in managing a receivership "can include . . . stays of claims in other courts against the receivership").

The Objectors do not provide sufficient support for their argument that a litigation injunction will run afoul of orders in the Delaware Action. In support of his objections, Schneider provides the Court with copies of the judgments and orders in the Delaware Action, including the order granting summary judgment and the two advancement orders. (*See* Colton Decl. ¶ 10; Final Order Granting Summ. J.; *Fitracks* Order; Judicial Action Form.) Schneider contends that since April 20, 2022, he has been "duly submitting invoices for fees and expenses pursuant to the [*Fitracks* Order]" which "GPB has been reviewing," and that "[t]he procedures set forth in the [*Fitracks* Order] have been working smoothly since April 2022." (Colton Decl.

¶ 11.)  Gentile makes the same arguments as Schneider pursuant to his advancement order from the Delaware Chancery Court.[20]  (Stipulation and Advancement Order.)

Schneider and Gentile do not indicate why their interests will not be protected by the terms of the Amended Proposed Order.  The Amended Proposed Order does not prohibit the payment of Schneider's legal expenses pursuant to the *Fitracks* Order or Gentile's legal expenses pursuant to the Stipulation and Advancement Order because it permits the receiver to dissipate assets by payments ordered by the Court.  (R&R 32; Am. Proposed Order ¶ 6(g) (authorizing payment without regard to a cap and without prior court order for "all other costs and expenses authorized by this Court pursuant to this Order or any other order of this Court").)  The terms of the Amended Proposed Order do not pose any bar to Schneider's and Gentile's rights under their advancement orders, since the receiver is required to comply with his legal obligations, including compliance of the existing orders of other courts.[21]

Accordingly, the Court finds that the objections by Gentile, Schneider, and Ascendant Capital to the imposition of a litigation injunction are without merit.

### e.   The Court adopts the Amended Proposed Order in its entirety

The Objectors also argue that the Court should not adopt paragraph 28 of the Amended Proposed Order, which transfers to the receiver "[a]ny and all attorney-client privilege, work product protection, common interest or joint defense privilege, or other privilege or immunity (collectively, the 'Privileges') of the [r]eceivership [e]ntities" and empowers the receiver with

---

[20]  Neither Schneider nor Gentile presented these documents to Judge Scanlon.

[21]  The Court does not understand the terms of the Amended Proposed Order to enjoin the reimbursement procedures pursuant to which Schneider and Gentile submit invoices and requests for reimbursement under their advancement orders.  The Court clarifies that the reimbursement procedures set forth in the *Fitracks* Order and the Stipulation and Advancement Order are exempted from the litigation injunction.

sole authority "to enforce, waive, assign or release any or all Privileges in the exercise of its

duties."  (Am. Proposed Order ¶ 28 (emphasis omitted); Gentile's Objs. 24–25; Schneider's

Objs. 21–25.)  The Objectors argue that neither Judge Scanlon nor the SEC provided "any basis

for a need to waive GPB's Privileges" and that "waiver authority is unnecessary to preserve

GPB['s] assets, and . . . threatens to impose great expense thereby actually reducing GPB's

assets while also imposing a substantial burden on this Court."  (Gentile's Objs. 24 (emphasis

omitted); *see also* Schneider's Objs. 21–24.)  Schneider also argues that GPB cannot unilaterally

waive a common interest privilege because such a privilege "cannot be waived without the

consent of all parties to the privilege."  (Schneider's Objs. 21–24 (citation omitted).)  In addition,

Schneider argues that if the receiver is empowered to waive GPB's privileges, the Court should

either "impose a condition that no governmental party may obtain access to any materials for

which a privilege has been waived unless they represent in writing to this Court that they will not

use the materials in any enforcement or criminal proceeding," (*id.* at 25), or require the receiver

to "make a motion on notice" if he believes there is a substantial need to waive privilege to fulfill

his duties, (Schneider's Reply 10 (emphasis omitted)).

### i.   A receiver can waive the privileges of a corporation to perform its enumerated duties, including managing litigation on behalf of a corporation

It is settled law that privileges, such as the attorney-client privilege, work product

privilege, and common interest or joint defense privilege, may be invoked not just by

individuals, but by corporations as well.  *See, e.g.*, *CFTC v. Weintraub*, 471 U.S. 343, 348 (1985)

("[T]he attorney-client privilege attaches to corporations as well as to individuals." (citing

*Upjohn Co. v. United States*, 449 U.S. 383 (1981))); *United States v. Krug*, 868 F.3d 82, 86 (2d

Cir. 2017) ("'The joint defense privilege, more properly identified as the common[-]interest

rule,' is 'an extension of the attorney[-]client privilege.'" (alterations in original) (quoting *United*

*States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989))). "[W]hen control of a corporation passes to new management . . . , the authority to assert and waive the corporation's attorney-client privilege passes as well." *United States v. Quest Diagnostics Inc.*, 734 F.3d 154, 167 (2d Cir. 2013) (quoting *Weintraub*, 471 U.S. at 349). The Supreme Court has "recognized that ordinarily the authority to assert and waive the corporation's privileges 'rests with the corporation's management and is normally exercised by its officers and directors.'" *In re Grand Jury Proc.*, 219 F.3d 175, 183–84 (2d Cir. 2000) (quoting *Weintraub*, 471 U.S. at 348). "The identity of the persons entitled to waive the privilege on behalf of a corporation becomes a considerably more complicated question where . . . the court appoints an outsider — such as a bankruptcy trustee or receiver — to manage the affairs of the corporation." *United States v. Shapiro*, No. 06-CR-357, 2007 WL 2914218, at *4 (S.D.N.Y. Oct. 1, 2007) (citing *Weintraub*, 471 U.S. at 349–56). Courts in this Circuit have held that privilege waivers by receivers are valid "despite the attempts of former corporate officers and directors to shield their corporations' allegedly privileged communications from disclosure." *Id.* at *5; *see also SEC v. Ryan*, 747 F. Supp. 2d 355, 367–68 (N.D.N.Y. 2010) (finding that the attorney-client privilege did not prevent the receiver from obtaining records and information related to the corporation and, even if it did, "the [r]eceiver, as successor manager, would have the power to waive the privilege"); *CFTC v. Standard Forex, Inc.*, 882 F. Supp. 40, 44–45 (E.D.N.Y. 1995) (giving effect to a privilege waiver by a receiver after concluding, over the defendants' objections, that "no prejudice will result from granting the [r]eceiver control over the attorney-client privilege").

The Objectors do not provide legal support for their argument that (1) the power to waive GPB's privileges is "unnecessary to address the alleged basis for the receiver, *i.e.*, to preserve

assets,"[22] (Schneider's Objs. 21; *see also* Gentile's Objs. 24–25; Schneider's Reply 9), and (2) "the only apparent basis for the SEC's request is to achieve a tactical advantage in this case and the companion Criminal Action," (Schneider's Objs. 24–25; *see also* Schneider's Reply 9). Although a court will grant a receiver the power to waive privilege "only if there is some valid reason why the [r]eceiver needs to control [the corporation's] attorney-client privilege," *Standard Forex*, 882 F. Supp. at 43, courts have upheld privilege waivers by receivers who were performing their duties, *Ryan*, 747 F. Supp. 2d at 368 (finding that the receiver would have the power to waive privilege since he "was directed by the [p]reliminary [i]njunction to collect all business records" and "is within his rights to ask[] for these documents and data"); *Shapiro*, 2007 WL 2914218, at *6 & n.5 (rejecting the defendant's argument that the receiver does not have the power to waive privilege since the order appointing the receiver directed him to "preserve the status quo" because, if interpreted literally, "the [r]eceiver would have been unable to act on most of his enumerated powers," thus allowing the defendant and former officers "to 'use the privilege as a shield' to protect themselves from having to disgorge any ill-gotten gains" (emphasis omitted) (citing *Weintraub*, 471 U.S. at 353–54)); *Standard Forex*, 882 F. Supp. at 43 & n.3 (affirming the magistrate judge's order to a corporation's former attorney to turn over privileged pre-litigation files to the corporation's receiver because, *inter alia*, "the broad scope of its order appointing the [r]eceiver evidence[d] an intent to include the attorney-client privilege with it").

The Amended Proposed Order authorizes the receiver to, *inter alia*, ascertain the financial condition of the receivership entities and assets, oversee and manage the receivership

---

[22]  The Objectors do not argue that a receiver does not have the power to waive a corporation's privileges, only that such power is unnecessary in this case.

entities and assets, prevent the encumbrance or disposal of the receivership assets, preserve the books, records, and documents of the receivership entities and assets, and manage litigation by and against the receivership entities and assets.  (*See, e.g.*, Am. Proposed Order ¶¶ 2, 6.)  The Amended Proposed Order authorizes the receiver to do more than merely "preserve assets," some of which may require the waiver of GPB's privilege, such as "manag[ing] litigation by and against the [r]eceivership."  (Am. Proposed Order ¶ 2); *see also Shapiro*, 2007 WL 2914218, at *7 ("[I]f the [r]eceiver is to be permitted to pursue litigation on [the corporation's] behalf, there is no reason why he should be unable to exercise his discretion to waive its corporate privileges in connection with that litigation or in other contexts.").

ii.   **GPB can waive its common interest privilege as to its own statements**

"A client who is part of a joint defense arrangement is entitled to waive the privilege for his own statements, and his co-defendants cannot preclude him from doing so."  *United States v. Agnello*, 135 F. Supp. 2d 380, 383 (E.D.N.Y. 2001), *aff'd*, 16 F. App'x 57 (2d Cir. 2001); *see also United States v. Hatfield*, No. 06-CR-550, 2009 WL 3806300, at *12 (E.D.N.Y. Nov. 13, 2009) ("A member of a joint defense agreement can waive the privilege with respect to its own communications, but typically cannot disclose privileged information received from other joint defense agreement members." (first citing *Agnello*, 135 F. Supp. 2d at 383; then citing *United States v. Salvagno*, 306 F. Supp. 2d 258, 273 (N.D.N.Y. 2004); and then citing *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir. 1997))); *Sicurelli v. Jeneric/Pentron Inc.*, No. 03-CV-4934, 2005 WL 8156861, at *3 (E.D.N.Y. June 16, 2005) ("Thus, even if the [c]ourt had found the existence of a common interest work product privilege between plaintiffs and Ivoclar, Ivoclar, as the party that either independently commissioned or created [the documents],

was entitled to waive any privilege it may have over such documents." (citing *Agnello*, 135 F. Supp. 2d at 383)).

Schneider argues that the receiver cannot waive GPB's common interest privilege because "[a] common-interest privilege 'cannot be waived without the consent of all parties to the privilege.'" (Schneider's Objs. 22 (quoting *United States v. Napout*, No. 15-CR-252, 2017 WL 980323, at *2 (E.D.N.Y. Mar. 10, 2017)).)  However, because GPB is the holder of the common interest privilege with respect to its own privileged communications, it is free to exercise or waive its rights as it chooses.  *See Agnello*, 135 F. Supp. 2d at 383 ("All that [the co-defendants] would be entitled to do, to the extent that a joint defense privilege did attach to the conversations, is stop [the privilege waiving defendant] from directly or indirectly revealing the privileged communications of other participants." (first citing 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 188 (2d ed. 1994); and then citing *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d at 922)).  To the extent the receiver seeks to waive privileged conversations of others, the receiver is required to "comply with applicable law in the exercise of such privileges or immunities."  (R&R 33.)  *See, e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 110 (S.D.N.Y. 2017) ("[W]hen two or more clients are jointly represented by a single law firm concerning a matter of common interest, one of them cannot unilaterally waive the privilege that attaches to communications that they jointly made for the purpose of seeking legal advice." (first citing *Lugosch v. Congel*, 219 F.R.D. 220, 238 (N.D.N.Y. 2003); and then citing *Johnson Matthey, Inc. v. Rsch. Corp.*, No. 01-CV-8115, 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002))); *Hatfield*, 2009 WL 3806300, at *12 ("A member of a joint defense agreement . . . typically cannot disclose privileged information received from other joint defense agreement members." (citations omitted)).

The Court finds that GPB consented to appointment of the receiver and the entry of the Amended Proposed Order, including paragraph 28, which empowers the receiver to waive any and all privileges or immunities held by GPB.  (Am. Proposed Order 2 ("[T]he Chief Executive Officer of GPB CH and Highline consents to entry of this Order.").)  Because a receiver can waive a corporation's privileges and GPB consented to the appointment of the receiver, the objections by Gentile, Schneider, and Ascendant Capital to the Amended Proposed Order are without merit.[23]

### III. Conclusion

For the reasons stated above, the Court (1) grants the SEC's motion to convert the monitorship into a receivership and impose a litigation injunction, (2) adopts the Amended Proposed Order, and (3) denies Gentile's motion as moot.

Dated: December 7, 2023
        Brooklyn, New York

SO ORDERED:

                                 _____s/ MKB_____
                                   MARGO K. BRODIE
                                   United States District Judge

---

[23] Because the Court grants the SEC's motion, it does not address the SEC's and GPB's argument that Gentile and Schneider do not have standing to object to the appointment of a receiver.  (*See* SEC's Resp. 2 n.3; GPB's Resp. 1 n.1.)