UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

                v.                                              **MEMORANDUM & ORDER**
                                                               21-CV-583 (MKB)

GPB CAPITAL HOLDINGS, LLC; ASCENDANT
CAPITAL, LLC; ASCENDANT ALTERNATIVE
STRATEGIES, LLC; DAVID GENTILE; JEFFRY
SCHNEIDER; and JEFFREY LASH,

                            Defendants.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Securities and Exchange Commission (the "SEC") commenced the above-

captioned action on February 4, 2021, against Defendants GPB Capital Holdings, LLC ("GPB"),

Ascendant Capital, LLC ("Ascendant Capital"), Ascendant Alternative Strategies, LLC

("Ascendant Strategies"), David Gentile, Jeffry Schneider, and Jeffrey Lash.[1]  (*See* Compl.,

Docket Entry No. 1.)

---

[1]  The SEC alleged claims (1) against GPB, Ascendant Capital, Ascendant Strategies,
Gentile, and Schneider for violations of the Securities Act, 15 U.S.C. § 77q(a); (2) against
Gentile, Schneider, and Lash for aiding and abetting violations of the Securities Act, 15 U.S.C.
§ 77q(a) as controlling persons pursuant to 15 U.S.C. § 77o(b); (3) against GPB, Ascendant
Capital, Ascendant Strategies, Gentile, and Schneider for violations of the Exchange Act, 15
U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; (4) against Gentile, Schneider, and Lash for aiding
and abetting violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 pursuant to 15 U.S.C.
§ 78t(e); (5) against GPB and Gentile for violations of the Advisers Act, 15 U.S.C. §§ 80b-6(1)
and 80b-6(2); (6) against Gentile for aiding and abetting violations of the Advisers Act, 15
U.S.C. §§ 80b-6(1) and 80b-6(2) pursuant to 15 U.S.C. §§ 80b-9(d) and 80b-9(f); and (7) against
GPB for violations of the Advisers Act, 15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-2, 15
U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-7, 15 U.S.C. § 78l(g), and 15 U.S.C. § 78u-6 and
17 C.F.R. § 240.21F-17(a).  (Compl., Docket Entry No. 1.)  The SEC alleged that Defendants
perpetrated a fraudulent scheme in which they used investor funds to satisfy an 8% annualized

On February 12, 2021, the Court appointed a monitor, Joseph T. Gardemal III (the "Monitor" or the "Receiver"), to oversee GPB.  (Order Appointing Monitor (the "Monitorship Order"), Docket Entry No. 23.)  On April 14, 2021, on consent of the SEC and GPB, the Court amended the Order (the "Amended Monitorship Order").  (Am. Monitorship Order, Docket Entry No. 39.)  On December 7, 2023, the Court entered an order converting the monitorship to a receivership and imposing a litigation injunction, (Order Adopting Report and Recommendations Imposing Receivership ("Receivership Order"), Docket Entry No. 186).  *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 21-CV-583, 2023 WL 8468467 (E.D.N.Y. Dec. 7, 2023).  On December 3, 2024, the Second Circuit affirmed the Court's order converting the monitorship over GPB into a receivership and imposing a litigation injunction.  *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 23-8010, 2024 WL 4945247 (2d Cir. Dec. 3, 2024), *aff'g* 2023 WL 8468467.

On January 17, 2025, the Receiver filed a motion seeking approval of a plan of distribution (the "Distribution Plan") to return funds to GPB investors.  Schneider, Gentile, Ascendant Capital, and Ascendant Strategies objected to the Plan, along with non-parties DJ Partners, LLC ("DJ Partners"), Axiom Capital Management Inc. ("Axiom"), B9 Hyatt Ave Owner Urban Renewal, LLC (formerly known as B9 Hyatt Ave Owner LLC) ("B9"), and Osaic Wealth, Inc. ("Osaic") (collectively, the "Objectors"), objected to the Receiver's Distribution Plan.[2]

---

distribution to investors, while representing to the investors that the distributions represented profits from the companies GPB invested in; failed to deliver audited financial statements; failed to register two funds with the SEC; impeded former employees from communicating with the SEC; and retaliated against a whistleblower.  (*See id.* ¶¶ 1–7.)

    [2] (Receiver's Mot. for Distrib. of Funds ("Receiver's Mot."), Docket Entry No. 228; Receiver's Proposed Plan of Distribution (the "Distribution Plan"), annexed to Receiver's Mot.

For the reasons discussed below, the Court: (1) grants the Receiver's motion for disbursement of funds; (2) finds Osaic's objections to be moot; (3) denies B9's motion to intervene, request for clarification, and motion for relief from the litigation injunction; (4) denies Axiom's motion to intervene and motion for relief from the litigation injunction, and finds Axiom's objections are without merit; (5) finds Gentile, Schneider, and Ascendant Capital's objections to be without merit; and (6) denies DJ Partners' motion to intervene and finds Ascendant Strategies and DJ Partners' objections are without merit.

## I.  Background

### a.  Factual background

GPB is a Delaware limited liability company with a principal place of business in New York, New York, which holds approximately $238,637,198 in assets under management. (Compl. ¶ 21.)  Ascendant Strategies is a Delaware limited liability company with a principal place of business in New York, New York, and since March of 2017, sells interests in GPB Capital limited partnership funds that have been sourced through Ascendant Strategies.  (*Id.* ¶ 23.)  Ascendant Capital is a Delaware limited liability company with a principal place of business in West Lake Hills, Texas, and serves as the placement agent for GPB.  (*Id.* ¶ 22.)

---

as Ex. A, Docket Entry No. 228-1; Decl. of Receiver in Supp. of Receiver's Mot. ("Receiver's Decl."), Docket Entry No. 229; Osaic's Objs. to Receiver's Mot. ("Osaic's Objs."), Docket Entry No. 243; B9's Mot. to Intervene ("B9's Mot."), Docket Entry No. 244; B9's Mem. in Supp. of B9's Mot. ("B9's Mem."), Docket Entry No. 244-8; Receiver's Opp'n to B9's Mot. ("Receiver's Opp'n"), Docket Entry No. 267; B9's Reply in Supp. of B9's Mot. ("B9's Reply"), Docket Entry No. 269; Axiom's Mot. to Intervene ("Axiom's Mot."), Docket Entry No. 247; Axiom's Mem. in Supp. of Axiom's Mot. ("Axiom's Mem."), Docket Entry No. 247-1; Gentile, Schneider & Ascendant Capital's Objs. to Receiver's Mot. ("Defs.' Objs."), Docket Entry No. 248; DJ Partners' Mot. to Intervene ("DJ Partners' Mot."), Docket Entry No. 249; Ascendant Strategies & DJ Partners' Objs. to Receiver's Mot. ("Ascendant Strategies & DJ Partners' Objs."), Docket Entry No 250; Receiver's Reply in Supp. of Receiver's Mot. ("Receiver's Reply"), Docket Entry No. 258; Decl. of Receiver in Further Supp. of Receiver's Mot. ("Receiver's Add'l Decl."), Docket Entry No. 259; Axiom's Reply in Supp. of Axiom's Mem. ("Axiom's Reply"), Docket Entry No. 264.)

Ascendant Capital is a branch office of Ascendant Strategies. (*Id.* ¶ 23.) Gentile and

Schneider's ownership interests in Ascendant Strategies flow through non-party objector and

proposed intervenor DJ Partners, a management consulting business co-owned by Gentile and

Schneider.[3] (Receiver's Reply 6.) Gentile is the founder, owner, and former CEO of GPB.[4]

(Compl. ¶ 24.) Schneider is a minority owner of Ascendant Strategies and the sole owner and

CEO of Ascendant Capital. (*Id.* ¶ 25.) Lash served as managing partner of GPB from 2013 to

early 2018 and was responsible for formulating GPB's automotive retail strategy. (*Id.* ¶ 26.)

Non-party objector and proposed intervenor Axiom is a New York-based company "that

provides asset management, investment banking, capital markets, and research services to its

customers." (Eric Miller Aff. in Supp. of Axiom's Mot. ("Miller Aff.") ¶¶ 12–13, Docket Entry

No. 247-2.) Schneider worked with Axiom as an independent contractor from May of 2013 to

April of 2017, and also "ran Ascendant Capital as an independent branch office" during that

time.[5] (*Id.* ¶¶ 17–18.) Non-party objector and proposed intervenor B9 purchased real property

---

[3] DJ Partners does not explain its relationship to Gentile, Schneider, or any of the parties to this action. The Court accordingly accepts Receiver's description of DJ Partners as true for the purposes of this Memorandum and Order.

[4] On February 5, 2021, Gentile resigned as CEO and sole manager of GPB and appointed Rob Chmiel as interim CEO and sole manager. (Decl. of Monitor in Supp. of SEC's Mot. ("Monitor Decl.") ¶ 10, Docket Entry No. 90.) On July 1, 2021, GPB officially named Chmiel as CEO. (*Id.*)

[5] The Receiver characterizes Axiom as a "New York broker-dealer named as a defendant in multiple actions arising from substantially similar facts." (Receiver's Reply 5.) He alleges that Ascendant Strategies began as a "branch office of Axiom, where Schneider worked as a registered broker-dealer representative." (*Id.*) He further notes that "Axiom allegedly worked hand-in-hand with Ascendant [Strategies] in structuring, overseeing, and selling GPB Capital investments to Investors" and cites two ongoing cases alleging that "fees and commissions paid by Investors, which ultimately made their away to Schneider, Gentile, and others, flowed — at least in part — to Axiom." (*Id.*) Axiom disputes the Receiver's characterization and asserts that Ascendant Strategies "was an independent branch office" and that the two were "separate companies with separate offices, ownership, and operations." (Axiom's Reply 6, 7.) Axiom also

in Newark, New Jersey from MTF Realty, LLC ("MTF Realty") and GPB Cold Storage

Holdings II, LLC ("Cold Storage II").[6]  (B9's Mem. 1.)  Non-party objector Osaic owns the five

broker-dealers that "were involved with the distribution of" shares of several Receivership

Entities.  (Osaic's Objs. 5.)

     The SEC alleged in the Complaint that between April of 2014 and December of 2018,

GPB served as the general partner and/or fund manager in five limited partnership funds:

Automotive Portfolio, Holdings I, Holdings II, Waste Management, and Cold Storage.[7]  (Compl.

---

notes that it has filed motions to dismiss in "several" of the matters in which it is a defendant, and that those motions are stayed.  (*Id.* at 6.)  For the purposes of this Memorandum and Order, the Court need not resolve the extent of Schneider's involvement in Axiom, and notes only that the parties agree that Schneider had a near-simultaneous professional relationship with Axiom, Ascendant Capital, and Ascendant Strategies.

    [6]  On December 5, 2023, B9 sued MTF Realty and Cold Storage II in New York Supreme Court alleging breach of contract of the sale of the New Jersey property (the "New York State Action").  (B9's Mem. 5; *see also* Decl. of Nicholas W. Laird ("Laird Decl.") in Supp. of B9's Mot., Docket Entry No. 244-2; New York State Action Am. Compl., annexed to B9's Mot. as Ex. A, Docket Entry No. 244-3.)  In particular, B9 seeks to resolve the parties' claims to $3.5 million of the sale proceeds that MTF Realty and Cold Storage II transferred to escrow as security for two significant outstanding issues at the New Jersey property.  (B9's Mem. 1.)  B9 argues that the "agreed-upon conditions for release of the [e]scrow [a]mount to B9 came to pass, but [MTF Realty and Cold Storage II] opposed and prevented that release."  (*Id.*)  On January 8, 2025, MTF Realty and Cold Storage II notified the New York Supreme Court of the Court's Receivership Order and asked the court to "effectuate a stay" of the New York State Action because MTF Realty and Cold Storage II "are assets held under the entities covered by the Receivership Order, specifically GPB Cold Storage LP."  (Notice of Receivership and Litigation Injunction, annexed to B9's Mot as Ex. D 2, Docket Entry No. 244-6.)  On January 31, 2025, Justice Margaret Chan stayed the New York State Action "for the limited purpose of permitting [B9] to apply for a ruling . . . regarding whether the [Receivership] Order precludes [the New York State Action] from proceeding while the litigation injunction . . . is in effect."  (Stip. and Am. Order, annexed to B9's Mot as Ex. E 2, Docket Entry No. 244-7.)

    [7]  The Distribution Plan indicates that GPB was the general partner or controlling entity of nine pooled investment vehicles: (1) GPB Capital Holdings, LLC ("GPB Capital"); (2) GPB Holdings, LP ("Holdings"); (3) Holdings II, LP ("Holdings II"); (4) GPB Holdings III, LP ("Holdings III"); (5) APLP; (6) Armada Waste Management (formerly known as GPB Waste Management), LP ("Waste"); (7) Cold Storage; (8) GPB NYC Development, LP ("NYCD"); and

¶ 29.)  GPB marketed its investments exclusively through Ascendant Capital, and Ascendant Strategies promoted the investments to dozens of broker-dealers nationwide.  (*Id.* ¶ 31.)  Investors in the Funds paid significant fees and expenses, including $79 million in management fees to GPB, $26 million in acquisition fees to Ascendant Strategies and another broker-dealer, and $187 million in "selling fees" to Ascendant Capital and other broker-dealers.  (*Id.* ¶ 33.)  To attract investors, GPB promised an 8% per annum distribution as well as additional "special distributions."  (*Id.* ¶¶ 34–35.)  GPB represented that the source of the distributions would be profits from operations of the Funds' portfolio companies.  (*Id.* ¶ 36.)  Starting "as early as August 2015," instead of paying distributions based on operations of the portfolio companies, GPB used investor funds to cover the shortfall between the profits from operations of the Funds' portfolio companies and the amounts needed for the distribution payments.  (*Id.* ¶¶ 41–42.)  The Individual Defendants[8] "manipulated certain of the Funds' financial statements to give the false

---

(9) GPB Automotive Income Fund, Ltd. ("AIF").  (Receiver's Mot. 4.)  The Court accordingly uses the term "Funds" in reference to all nine entities.

[8] On February 4, 2021, Gentile, Schneider, and Lash were publicly charged in a criminal action in the Eastern District of New York (the "Criminal Action").  *See* Indictment, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Feb. 4, 2021).  The indictment alleges, among other things, that Gentile, Schneider, and Lash "together with others, engaged in a scheme to defraud investors and prospective investors" relating to GPB and its Funds.  *See id.*  On July 26, 2023, Lash pleaded guilty to one count of wire fraud.  *See* Order Accepting Guilty Plea, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. July 26, 2023).  Gentile and Schneider proceeded to trial and on June 12, 2024, a jury found them both guilty on all counts.  *See* Minute Entry and Order, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. June 13, 2024); Minute Entry and Order, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Aug. 2, 2024).  On March 11, 2025, Judge Rachel P. Kovner denied Gentile's and Schneider's post-trial motions for acquittal and a new trial, as well as Gentile's motion to dismiss the indictment.  *See* Memorandum and Order, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Mar. 11, 2025); Schneider Motion for Acquittal and for New Trial, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Sept. 13, 2024); Gentile Motion for Acquittal, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Sept. 13, 2024); Gentile Motion to Dismiss the Indictment, *United States v. Gentile*, No. 21-CR-54, (E.D.N.Y. Sept. 13, 2024); Gentile Motion for New Trial, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Sept. 13, 2024).  All three Defendants are awaiting sentencing.

appearance that the income [was being] earned by the Funds" rather than inform investors that the Funds were not performing as projected. (*Id.* ¶ 49.) In addition, Gentile and Schneider engaged in conflicted transactions, including overpaying for acquisitions to inflate their own acquisition fees and otherwise inflating their own compensation without disclosing these conflicted transactions to investors. (*Id.* ¶¶ 71–73, 74.) In addition, the SEC alleged that GPB failed to comply with the applicable regulatory requirements, including by failing to deliver audited financial statements, (*id.* ¶¶ 77–81), failing to register certain of its Funds, (*id.* ¶¶ 82–83), requiring employees to sign termination agreements that restricted their ability to report misconduct at GPB, (*id.* ¶¶ 84–91), and retaliating against whistleblowers, (*id.* ¶¶ 92–111).

### b. Procedural background

On February 12, 2021, the Court appointed the Monitor to oversee GPB, and on April 14, 2021, amended the Monitorship Order. (Monitorship Order; Am. Monitorship Order.) On May 31, 2022, Gentile moved for relief from the Amended Monitorship Order, arguing that the Monitor had completed his work and therefore the scope of his duties should be narrowed.[9] (*See* Gentile's Relief Mem. 6, 25.) In support of his motion, Gentile argued that GPB, its interim management, and the Monitor had "steadfastly blocked" his repeated efforts to assist the company and benefit its investors. (*Id.* at 16.) He argued that he saw "no other option . . . [than] to appoint new managers" in order to "carry out GPB's business plan, instead of merely liquidating assets." (*Id.* at 24.)

On June 13, 2022, the SEC moved for an order to show cause why the monitorship

---

[9] (Gentile's Not. of Mot. for Relief ("Gentile's Relief Mot."), Docket Entry No. 79; Gentile's Mem. in Supp. of Gentile's Relief Mot. ("Gentile's Relief Mem."), Docket Entry No. 80.)

should not be converted into a receivership.[10]  (SEC's Mot.)  The SEC alleged that on or about

May 27, 2022, Gentile advised GPB's CEO and sole manager, Rob Chmiel, that he had

appointed three new managers.  (SEC's Mem. 5.)  Gentile directed GPB's CEO to cooperate

with his newly-installed managers and "seek consensus" with them regarding GPB's future

course.  (*Id.*)  In addition, the SEC alleged that Gentile and the new managers modified GPB's

Operating Agreement[11] so that it provided (1) Gentile and the new managers expanded

information rights; (2) compensation packages for the new managers of up to $400,000 per year;

(3) Gentile with the ability to unilaterally amend the Operating Agreement; (4) mandatory tax

distributions to Gentile; (5) exclusive jurisdiction to the Delaware Chancery Court for all actions

related to the Operating Agreement; and (6) advancement of expenses.  (*Id.*; *see also* Monitor

Decl. ¶ 21.)  The SEC argued that Gentile's "distortion of the factual record" in an effort to gain

control of GPB "require[d] that a receiver be appointed to take exclusive managerial control over

[GPB] and the GPB Funds . . . for the benefit of investors."  (SEC's Mem. 7.)  The SEC also

argued that Gentile's actions constituted a breach of the Amended Monitorship Order and a

separate basis for converting the monitorship to a receivership.  (*See id.* at 5 n.6; SEC's June 2,

2022 Letter 1–2, Docket Entry No. 85.)

By report and recommendation dated July 28, 2023, Magistrate Judge Vera M. Scanlon

recommended that the Court (1) grant the SEC's application to convert the monitorship into a

receivership and impose a litigation injunction and (2) deny Gentile's motion as moot (the

---

[10]  (SEC's Mot. for an Order to Show Cause ("SEC's Mot."), Docket Entry No. 88; SEC's Mem. in Supp. of SEC's Mot. ("SEC's Mem."), Docket Entry No. 89; Gentile's Mem. in Opp'n to SEC's Mot. ("Gentile's Opp'n"), Docket Entry No. 102; SEC's Reply in Supp. of SEC's Mot. ("SEC's Reply"), Docket Entry No. 103.)

[11]  (Limited Liability Company Agreement of GPB Capital Holdings, LLC ("Operating Agreement"), annexed to the Decl. of David Gentile as Ex. A, Docket Entry No. 82-1.)

"R&R").[12]  (R&R 33, Docket Entry No. 157.)  Judge Scanlon explained that Gentile had caused

GPB to breach the Amended Monitorship Order by (1) appointing three new GPB managers and

expanding the number of managers from one to four; (2) amending GPB's Operating Agreement

to provide additional compensation for non-employee managers; and (3) failing to cure his

actions after the SEC notified him that he had violated the terms of the Amended Monitorship

Order.  (Id. at 13–14.)  She further noted that, as a result of Gentile's actions, "GPB is in the

precarious position of operating with three new 'purported' managers and a 'purportedly'

amended [Operating] Agreement, both of which may actively undermine" GPB's efforts to

"address the state in which Mr. Gentile left it and move forward in a manner that is productive to

its investors."  (Id. at 26.)  Judge Scanlon concluded that "[t]he uncertainty of GPB's position is

creating significant consequences, which are damaging its financial health and, by extension, the

finances of its investors" and therefore recommended that the Court convert the monitorship into

a receivership.  (Id. at 26–27, 33.)  On December 7, 2023, the Court adopted the R&R, the

Amended Proposed Receivership Order, and denied Gentile's motion for relief from the

---

[12]  The SEC filed a proposed order that detailed its proposed terms of the receivership (the "Proposed Receivership Order").  (Proposed Receivership Order, annexed to the Decl. of Neal Jacobson as Ex. 1, Docket Entry No. 91-1.)  On August 2, 2023, the SEC filed an amended proposed order in response to Judge Scanlon's order directing the SEC to submit a revised order with minor revisions and clarifications (the "Amended Proposed Receivership Order").  (Am. Proposed Order, annexed to the SEC's Aug. 2, 2023 Letter, Docket Entry No. 161-2.)  On September 8, 2023, Schneider and Ascendant Capital filed an objection to the R&R, and Gentile filed a separate objection.  (See Schneider & Ascendant Capital's Objs. to the R&R ("Schneider's Objs."), Docket Entry No. 167; Gentile's Objs. to the R&R ("Gentile's Objs."), Docket Entry No. 168.)  On September 22, 2023, the SEC and GPB filed responses urging the Court to adopt the R&R.  (See SEC's Resp. to Defs.' Objs. ("SEC's Resp.") 18, Docket Entry No. 170; GPB's Resp. to Defs.' Objs. ("GPB's Resp.") 23, Docket Entry No. 171.)  On September 29, 2023, Gentile, Schneider, and Ascendant Capital filed replies.  (See Gentile's Reply in Supp. of Objs. to the R&R ("Gentile's Reply"), Docket Entry No. 175; Schneider & Ascendant Capital's Reply in Supp. of Objs. to the R&R ("Schneider's Reply"), Docket Entry No. 176.)

Amended Monitorship Order. [13]  (Receivership Order); *GPB Cap. Holdings, LLC*, 2023 WL 8468467.

On December 12, 2023, Gentile, Schneider, and Ascendant Capital filed an order requesting the Court direct Plaintiff to show cause as to why the Court should not stay the Receivership Order pending resolution of their appeal.  (Defs.' Mot. for an Order to Show Cause, Docket Entry No. 189.)  On December 14, 2023, the Court denied the motion, but "grant[ed] a temporary stay so that the parties may seek a stay pending appeal from the Second Circuit." (Order dated Dec. 14, 2023.)  On December 21, 2023, Gentile, Schneider, and Ascendant Capital filed a motion to stay pending their appeal of the Court's Receivership Order, which the Second Circuit granted.  *See* Motion to Stay, *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 23-8010 (2d Cir. Dec. 21, 2023); *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 23-8010 (2d Cir. May 14, 2024) (order granting motion to stay).

---

[13]  In imposing a litigation injunction, the Court exempted "reimbursement procedures pursuant to which Schneider and Gentile submit invoices and requests for reimbursement under their advance orders."  *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 21-CV-583, 2023 WL 8468467, at *16 n.21 (E.D.N.Y. Dec. 7, 2023).

On November 9, 2021, Schneider filed an action in Delaware Chancery Court against GPB and related entities, seeking advancement of legal expenses for the various actions pending against himself, including the criminal prosecution in the Eastern District of New York (the "Delaware Action").  (*See* Schneider's Objs. 4.)  The Delaware Action resulted in an order granting summary judgment, (*see* Final Order Granting Summ. J., annexed to Decl. of Glenn C. Colton ("Colton Decl.") as Ex. A, Docket Entry No. 167-2), and two orders regarding advancement, one of which sets forth specific procedures for the evaluation and then advancement of attorneys' fees and other expenses (the "*Fitracks* Order").  (*See* Schneider's Objs. 4; *Fitracks* Order, annexed to the Colton Decl. as Ex. B, Docket Entry No. 167-3; Judicial Action Form, annexed to the Colton Decl. as Ex. C, Docket Entry No. 167-4.)  On December 20, 2021, Gentile filed a similar action in Delaware Chancery Court, which granted a similar advancement order.  (*See* Stipulation and Advancement Order, annexed to the Decl. of Jonathan R. Jeremias ("Jeremias Decl.") as Ex. 10, Docket Entry No. 168-11.).  In adopting the R&R, the Court clarified that "the reimbursement procedures set forth in the *Fitracks* Order and the Stipulation and Advancement Order are exempted from the litigation injunction."  *GPB Cap. Holdings, LLC*, 2023 WL 8468467, at *16 n.21.

After hearing oral argument on Defendants' motion on November 6, 2024, Oral Argument, *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 23-8010 (2d Cir. Nov. 6, 2024), on December 3, 2024, the Second Circuit affirmed the Court's Receivership Order and lifted the stay, *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 23-8010, 2024 WL 4945247, at *6 (2d Cir. Dec. 3, 2024) (summary order). The Second Circuit explained that the Court's decision to convert the monitorship into a receivership was "well-supported by the record" based on Gentile's uncured violations of the Amended Monitorship Order, including "the imminent risk of dissipation of assets." *Id.* at *5. As the Second Circuit noted, the Amended Monitorship Order provided that "the relief for an uncured violation of the monitorship 'shall' be a receivership." *Id.* at *4. Accordingly, the Second Circuit affirmed the Court's decision "converting the monitorship into a receivership pursuant to the explicit terms of the [Amended Monitorship Order] and its inherent equitable power."[14] *Id.* at *6.

### c.    The Receiver's Distribution Plan

Pursuant to the Receivership Order,[15] the Receiver's Distribution Plan proposes the following: (1) issuing an initial distribution of not more than $400,000,000 of Receivership

---

[14]    On January 21, 2025, Gentile petitioned for a rehearing en banc, which the Second Circuit denied on February 26, 2025. Petition for Rehearing En Banc, *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 23-8010 (2d Cir. Jan. 21, 2025); *Sec. & Exch. Comm'n v. GPB Cap. Holdings, LLC*, No. 23-8010 (2d Cir. Feb. 26, 2025) (order denying petition for panel rehearing).

[15]    The Order Appointing Receiver and Imposing Litigation Injunction directed Receiver to:

> (a) [P]reserve the status quo to enable the Receiver to perform the duties specified hereunder; (b) ascertain the financial condition of the Receivership Entities and Receivership Assets; (c) oversee and manage, consistent with the relevant governing documents and applicable law, the Receivership Entities and Receivership Assets; (d) prevent the encumbrance or disposal of the Receivership Assets contrary to the Receiver's mandate; (e) preserve the books, records,

Assets[16] to investors in (a) APLP; (b) Holdings II; and (c) Cold Storage on a partnership-by-partnership basis in accordance with each Fund's Limited Partnership Agreement (the "Initial Distribution");[17] (2) maintaining $719,000,000 in cash reserves (the "Reserves"); (3) establishing a claims solicitation and resolution procedure for investors and claimholders against the Receivership (the "Claims Resolution Procedures"); and (4) issuing subsequent distributions to the extent that funds are available for that purpose (the "Subsequent Distributions").[18] (Receiver's Mot. 2, 16–17, 27.)  The Receiver "briefed [the Distribution Plan] to the SEC and state agencies [that] have filed similar enforcement actions against GPB."  (*Id.* at 2, 23.)

The Receiver plans to issue disbursements on a partnership-by-partnership basis rather than a pooled or *pro rata* basis.  (*Id.* at 4, 19; *see also* Receiver's Decl. ¶¶ 12–14.)  The Receiver also declined to apply the bankruptcy doctrine of substantive consolidation, or corporate veil-piercing, to the Distribution Plan.  (Receiver's Mot. 20.)  First, the Receiver concluded after a

---

and documents of the Receivership Entities and Receivership Assets; (f) manage litigation by and against the Receivership, the Receivership Entities and the Receivership Assets; (g) propose for Court approval a fair and equitable distribution of the remaining Receivership Assets; and (h) be available to respond to investor inquiries, all as further set forth in this Order.
(Order Appointing Receiver and Imposing Litigation Injunction ("Order Appointing Receiver") 3, Docket Entry No. 187.)

[16]  "Receivership Assets" are the "assets of the Receivership Entities together with all proceeds thereof . . . of whatever kind, wherever situated, or whenever obtained" as defined in the Order Appointing Receiver.  (Order Appointing Receiver 2–3.)  The "Receivership Entities" are listed in the Order Appointing Receiver.  (*See* Receivership Entities, annexed to Order Appointing Receiver as Schedule 1, Docket Entry No 187.)

[17]  Holdings, Waste, and NYCD do not have assets to make distributions as part of the Initial Distribution.  The Receiver plans to make distributions to investors in those Funds "as and when possible, again on a [p]artnership-by-[p]artnership basis."  (Receiver's Mot. 24; *see also* Receiver's Decl. ¶ 11.)

[18]  The Court provides only a summary of the Distribution Plan and additional details relevant to the Court's evaluation of the plan and the objections discussed in section II.b *infra*.

thorough review that GPB "did not commingle assets or operations, or treat the [Funds] on a consolidated basis" and that investors "did not, and could not, view their investments as having been made" on a consolidated basis." (*Id.* at 14; *see also* Receiver's Decl. ¶ 11.) "Each [Fund] operated as its own distinct investment vehicle with unique and generally non-overlapping investment objectives, which formed one of the main points of differentiation between and among the [Funds.]" (Receiver's Mot. 19.) Each Fund was "launched at a different time" and was based on different offering materials, such that a "reasonable [i]nvestor would have understood that an investment in one [Fund] would assume the risks, as well as the benefits, associated only with that specific [Fund's] investment objective." (*Id.*) Second, the Receiver explained that after "a review of historical loan transactions between" the Funds, (*id.* at 12), he concluded that the loans were "consistent with the treatment of the [Funds] as distinct entities, were used for legitimate business purposes such as to support liquidity, were not improperly used across the [Funds], and were not co[m]mingled or otherwise improperly shared among the [Funds]," (*id.* at 16.) Third, the Receiver's review indicated that the Funds' "general ledgers accurately reflected the separate economic activity of each of the [Funds]." (*Id.*) The Receiver thus concluded that pooling "would not be consistent with due process or individual property rights for, nor would it be fair to" APLP, Holdings II, and Cold Storage investors, who make up the majority of the investors in the Funds. (*Id.* at 20.)

The Receiver has identified a number of entities or individuals "who are convicted or accused of various misconduct with regard to the Receivership Entities," and who the Receiver proposes to exclude from the distributions (the "Excluded Parties"). (*Id.* at 38; Receiver's Decl. ¶ 28.) Excluded Parties seeking a distribution "must submit a Proof of Claim to the Receiver, who will review and resolve it just as he would any other Proof of Claim." (Receiver's Reply 4.) The Excluded Parties "will not receive any distributions unless and until it has been determined

by a final, non-appealable order of the Court that such Excluded Parties are entitled to such distributions." (Distribution Plan 40.)

### i. Initial distribution

The Receiver plans to make Initial Distributions within fourteen business days of the Court's approval of the Distribution Plan. (Receiver's Mot. 24; Receiver's Decl. ¶ 16.) The Receiver would provide investors with a Notice of Determination setting forth the amount of the investor's claim, or, if they are not receiving an Initial Distribution, a Notice of Determination stating why. (Receiver's Mot. 25.) The Receiver will have "sole discretion to determine the timing, sequence, and size" of the Initial Distribution, and Excluded Parties will not receive an Initial Distribution. (*Id.*; Receiver's Reply 3–4.)

### ii. Establishing reserves

The Receiver retains the authority to "withhold from amounts distributable to any Claimant, and supplement from time to time, one or more Reserves . . . as the Receiver, in his sole discretion, determines is or may be reasonably necessary" to, for example, "maintain the Receivership Assets and value thereof during the term of the Receivership Estate," "account for certain unresolved contingent liabilities arising from ongoing ancillary actions," "fund litigation," and "pay fees and expenses in respect of the wind-down and termination of the Receivership Entities." (Receiver's Mot. 26; *see also* Receiver's Decl. ¶ 27.) The Receiver "will be required to maintain records of the Reserves, and record and treat all such Reserves as if they were being held in segregated accounts." (Receiver's Mot. 27.) The Receiver "will determine, in his sole discretion, the timing, sequence, and size of the Initial Distribution and Subsequent Distributions. . . the amount of assets that should be held in reserve." (*Id.* at 26–27.)

The Receiver seeks the Court's approval to establish cash reserves in the amount of $719,000,000, and to "determine, in his sole discretion, whether to reduce or eliminate fees

charged to the [Funds] for management and related services and apply any amounts that otherwise would have been paid for such services to distributions and/or the Reserves." (*Id.* at 27.)

### iii. Claims resolution procedures

The Receiver requests that the Court grant the Receiver the "authority to determine the [i]nvestors and amounts payable to each" based on the Funds' records. (*Id.* at 35.) He proposes to send Notices of Determination to all investors receiving Initial Distributions within fourteen days of the Court's approval of the Plan, and also plans to send the "Notice of the Claims Bar Date and other documentation to all Claimants" by that time. (*Id.* at 28.) In addition, the Receiver proposes a Claims Bar Date forty-five days after the Court approves the Plan. (*Id.*) The Receiver also proposes 100 days after the Claims Bar Date as the deadline to resolve investors' claims, and 170 days after the Claims Bar Date as the deadline for the Receiver to file objections to non-investor claims. (*Id.*) Claimants may submit their claims through Epiq Corporate Restructuring, LLC. (*Id.* at 29.) The Receiver and others involved with the administration of the Receivership are exempt from being required to submit a claim, along with investors who do not dispute the amount of their claim as set forth in their Notice of Determination. (*Id.*) Investors who do dispute the amount of their claim are required to submit a claim through Epiq. (*Id.* at 30.) Claimants who do not timely file their claims by the Claims Bar Date are barred from doing so. (*Id.* at 32.) Claimants who dispute the amount or status of their claim may submit a detailed record of their claim to the Receiver, who will review the Claimants' records and the Funds and issue a decision about the claim. (*Id.* at 32–33.) The Receiver may bring any unresolved claims to the Court for further review. (*Id.* at 33.)

The Receiver argues that the Claims Bar Date and the proposed resolution procedures, including the notice procedures, "will assist the Receiver and the Court in identifying and

assessing the nature of the potential Claims against, and liabilities of, the Receivership Estate." (*Id.* at 37.)

### iv.  Subsequent Distributions

The Receiver also seeks approval to make Subsequent Distributions without Court approval from the Receivership Assets, including but not limited to, (1) "cash on hand"; (2) "proceeds from the sale of assets of the Receivership Entities"; and (3) "materialization of Causes of Action, when available Receivership Assets are deemed sufficient by the Receiver after taking necessary reserves into consideration."  (*Id.* at 25; Receiver's Decl. ¶ 18.)  The Receiver will have "sole discretion to determine the timing, sequence, and size" of Subsequent Distributions, and Excluded Parties will not receive Subsequent Distributions unless the Court orders otherwise.  (Receiver's Mot. 26.)

### v.  Receivership litigation

The Receiver will identify and pursue litigation against the Receivership Entities in accordance with his business judgment.  (*Id.* at 40; Receiver's Decl. ¶ 32.)  The Receiver plans to distribute proceeds from litigation based on harm to all Receivership entities to Holdings, Holdings II, APLP, Waste, Cold Storage, and NYCD *pro rata*, and proceeds from litigation based on harm to a specific Fund only to investors of that Fund.  (Receiver's Mot. 41–43; Receiver's Decl. ¶ 33.)  Pursuant to the Order Appointing Receiver, the Receiver has the "sole authority, and is empowered, to enforce, waive, assign, or release any or all Privileges in the exercise of his duties as the Receiver," including "any and all attorney-client privilege, work product protection, common interest or join defense privilege, or other privilege or immunity . . . of the Receivership Entities, the Monitor, [and] the Monitorship."  (*Id.* at 43–44; Order Appointing Receiver 3–9.)

## II.  Discussion

The Court first addresses Axiom's, B9's, and DJ Partners' motions to intervene.  The Court then considers whether the Distribution Plan is fair and reasonable, and concludes by addressing each of the objections to the Distribution Plan.

### a.  The Court denies Axiom's, B9's, and DJ Partners' Motions to Intervene

Axiom seeks to intervene as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure to challenge its designation as an Excluded Party, or, in the alternative, seeks permissive intervention pursuant to Rule 24(b).  (Axiom's Mem. 10, 12.)  First, Axiom argues that it timely filed its motion to intervene because the Court has not approved the Distribution Plan.  (*Id.* at 11.)  Second, Axiom argues that its interest is "substantial" because designating Axiom as an Excluded Party will cause "deep financial and reputational harm."  (*Id.*)  In addition, Axiom argues that it has "an interest in the substantial indemnification amounts" owed by the GPB funds, and "an interest in protecting its rights under the Dealer Agreements."  (*Id.*)  Third, Axiom argues that its interests will be impaired if it is not permitted to intervene "because the Receiver has unilaterally asked this Court to approve a [Distribution Plan] excluding Axiom."  (*Id.*)  Finally, Axiom argues that they will "not be[] adequately represented by the existing parties" because "[n]o party has standing to obtain the indemnification Axiom is owed."  (*Id.* at 12.)  Axiom argues that if the Court denies its motion to intervene as of right that the Court should grant Axiom permissive intervention because "Axiom's involvement will significantly contribute to the 'just and equitable adjudication' of an Excluded Party's rights under the Proposed Distribution Plan."  (*Id.*)

B9 seeks to intervene as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, or, in the alternative permissive intervention pursuant to Rule 24(b).  (B9's Mem. 1, 9.)  B9 argues that they satisfy all four requirements for intervention as of right.  First, B9 argues

that they timely filed their motion to intervene after the Receivership Order went into effect and MTF Realty and Cold Storage II requested a stay of the New York State Action.  (*Id.* at 7–8.)  Second, B9 argues that they have a "substantial interest related to the subject matter of this action" because MTF Realty and Cold Storage II have "incorrectly" taken the position that they are "'Receivership Assets' such that they are entitled to invoke the litigation-stay provision of the Receivership Order."  (*Id.* at 8.)  In addition, B9 argues that MTF Realty and Cold Storage II "have seemingly implied that B9 may need to wait and pursue its claims . . . as some sort of competing creditor *of the Receivership Estate*."  (*Id.*)  They argue that they "therefore ha[ve] a clear interest in confirming that the Receivership Order does not . . . stay the [New York] State Action."  (*Id.*)  Third, B9 contends that "[a]bsent clarification from the Court regarding B9's right to proceed with its claims in the [New York] State Action, [MTF Realty and Cold Storage II] will doubtless maintain that the Receivership Order stayed the [New York] State Action" and that B9 cannot recover the funds that are disputed in the New York State Action.  (*Id.* at 8–9.)  Finally, B9 argues that "no party to this action has any specific interest in B9's recovery" under the sale agreement for the New Jersey property."  B9 contends that if the Court does not grant intervention as of right under Rule 24(a), the Court should allow B9 to permissively intervene "based on the common questions in the [New York] State Action and the Receivership Order."  (*Id.* at 9.)

DJ Partners also seeks to intervene as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure.[19]  (Ascendant Strategies & DJ Partners' Objs. 2.)  DJ Partners argues that because the Distribution Plan designates them as an Excluded Party, the Distribution Plan "seeks to alter and impair DJ Partners['] rights and interests."  (*Id.*)  They also argue that the

---

[19]  DJ Partners does not move in the alternative for permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure.

motion is timely filed prior to the deadline to Object to the Distribution Plan, and that no existing party can formally object to the Distribution Plan on behalf of DJ Partners. (*Id.*)

The Receiver does not "oppose Axiom's right to be heard and raise any valid objections to the [Distribution] Plan." (Receivers Reply 3 n.2.) The Receiver opposes B9's motion to intervene, (Receiver's Opp'n), but does not indicate whether he objects or consents to DJ Partners' motion to intervene.

Rule 24(a) of the Federal Rules of Civil Procedure allows intervention as of right under certain circumstances. It provides in pertinent part that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2); *see also In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 799 (2d Cir. 2022) (quoting Fed. R. Civ. P. 24(a)); *Penn-Star Ins. Co. v. McElhatton*, 818 F. App'x 67, 70 (2d Cir. 2020) (same); *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010) (same). To establish intervention as of right pursuant to Rule 24(a)(2), an intervenor must show that "(1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties." *XL Specialty Ins. Co. v. Lakian*, 632 F. App'x 667, 669 (2d Cir. 2015) (quoting *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n*, 471 F.3d 377, 389 (2d Cir. 2006)); *see also CWCapital Cobalt Vr Ltd. v. U.S. Bank Nat'l Ass'n*, 790 F. App'x 260, 262 (2d Cir. 2019) (quoting *MasterCard Int'l Inc.*, 471 F.3d at 389). "The '[f]ailure to satisfy any one of these [four] requirements is a sufficient ground to deny the

application.'" *Penn-Star Ins. Co.*, 818 F. App'x at 70 (alterations in original) (emphasis omitted) (quoting *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 241 (2d Cir. 2006)); *Harris-Clemons v. Charly Trademarks Ltd.*, 751 F. App'x 83, 85 (2d Cir. 2018) ("If the party fails to satisfy any one of the factors, the application for intervention must be denied." (citing *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996))).

Rule 24(b) of the Federal Rules of Civil Procedure allows a court to exercise its discretion and permit intervention under certain circumstances. It provides in pertinent part that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); *see also Extenet Sys., LLC v. Vill. of Kings Point*, No. 22-1265, 2023 WL 4044076, at *1 (2d Cir. June 16, 2023) ("Rule 24(b) . . . provides that a district court *may* permit an individual to intervene when he asserts 'a claim or defense that shares with the main action a common question of law or fact.'" (quoting Fed. R. Civ. P. 24(b))); *Penn-Star Ins. Co.*, 818 F. App'x at 70 (same); *Griffin v. Sheeran*, 767 F. App'x 129, 133 (2d Cir. 2019) (same); *Floyd v. City of New York*, 770 F.3d 1051, 1057 (2d Cir. 2014) (same). "'In exercising its discretion,' the court must 'consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties,' . . . 'the nature and extent of the intervenors' interests, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" *Citizens Against Casino Gambling in Erie Cnty. v. Hogen*, 417 F. App'x 49, 50 (2d Cir. 2011) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986)). Permissive intervention is wholly within the court's discretion. *See Extenet Sys.*, 2023 WL 4044076, at *2 ("When a district court denies a request for permissive intervention, our review is

'particularly deferential.'" (quoting *AT & T Corp v. Sprint Corp.*, 407 F.3d 560, 561 (2d Cir. 2005))); *Penn-Star Ins. Co.*, 818 F. App'x at 70 ("Rule 24(b) . . . provides for permissive intervention, at the discretion of the court . . . ."); *St. John's Univ., N.Y. v. Bolton*, 450 F. App'x 81, 84 (2d Cir. 2011) ("A district court has broad discretion under Rule 24(b) to determine whether to permit intervention . . . .").

As a general matter, courts are reluctant to grant intervention in SEC enforcement actions. *See Commodity Futures Trading Comm'n v. Alexandre*, No. 22-CV-3822, 2024 WL 622107, at *2 (S.D.N.Y. Feb. 14, 2024) ("Courts are generally 'reluctant to allow private parties to intervene in government enforcement actions' because such intervention imposes undue costs and burdens on the government . . . ." (quoting *Commodity Futures Trading Comm'n v. Efrosman*, No. 05-CV-8422, 2012 WL 2510338, at *4 (S.D.N.Y. June 26, 2012))); *Sec. & Exch. Comm'n v. Callahan*, 193 F. Supp. 3d 177, 206 (E.D.N.Y. 2016) (explaining that government entities bringing enforcement actions "are mandated to act in the interest of maximizing the recovery to all defrauded individuals and . . . are often presumed to be adequately representing the interests of non-party investors"); *Sec. & Exch. Comm'n v. Byers*, No. 08-CV-7104, 2008 WL 5102017, at *1 (S.D.N.Y. Nov. 25, 2008) ("As practical matter, it does not make sense to allow individual victims and creditors to intervene as parties.").

### i.   Axiom and DJ Partners

In addition to the fact that intervention is disfavored in SEC actions, Axiom and DJ Partners have not demonstrated that their interests would be impaired if they do not intervene in this case.[20] Their arguments that denying intervention would impair their interests because they

---

[20] Because the Court finds that Axiom and DJ Partners fail to show that their interests would be impaired if they are not permitted to intervene, the Court need not address the remaining three Rule 24(a) factors for intervention.

cannot "challenge [their] status as an 'Excluded Party'" and that the Distribution Plan deprives them of distributions, (Axiom's Mem. 11; *see also* Ascendant Strategies & DJ Partners' Objs. 3–4), mischaracterizes the Distribution Plan. As the Receiver explains, "being listed as an Excluded Party simply means that a claimant does not receive distributions *automatically*." (Receiver's Reply 9.) Axiom and DJ Partners may "submit a claim [for distributions] to be reviewed by the Receiver, whose decision on the claim would then be subject to judicial review." (*Id.*) Identifying Axiom and DJ Partners as "Excluded Parties" therefore does not cause them "deep financial and reputational harm," (Axiom's Mem. 11), nor does it deprive them of receiving subsequent distributions from the Funds. They are simply excluded from receiving an Initial Distribution and required to submit to the Receiver a claim for the amount they believe they are entitled to receive, as the Distribution Plan requires of nearly all claimants seeking distribution.[21]  (Distribution Plan 20 ("Each Claimant (excluding Exempt Claimants) must properly complete and sign a Proof of Claim Form.")) The Court therefore denies the motions to intervene by Axiom and DJ Partners because they have failed to show that denying intervention would deprive them of an ability to protect their interests. *See Alexandre*, 2024 WL 622107, at *3 (denying intervention in a government enforcement action where the proposed intervenor simply "disagreed with the strategy proposed by the [r]eceiver and adopted by the [c]ourt"); *Sec. & Exch. Comm'n v. Rockford Funding Grp., LLC*, No. 09-CV-10047, 2015 WL 13870312, at *3 (S.D.N.Y. Mar. 16, 2015) (denying intervention because the proposed intervenor could, "[a]s an injured investor, . . . [file] a proof of claim once the proposed distribution plan is approved" and "may pursue his claim pursuant to the distribution plan and claims procedures approved and monitored by this [c]ourt"); *Sec. & Exch. Comm'n v. Illarramendi*, No. 11-CV-78, 2012 WL

---

[21]  The Court addresses Objectors' arguments regarding the Plan's "Excluded Party" designation in further detail below. *See* section II.b.ii.1 *infra*.

5832330, at *2, *4 (D. Conn. Nov. 16, 2012) (denying intervention because the proposed intervenors had "not established why intervention is the only appropriate method" where receiver had established an "open process" for claimants to object to receiver's settlement plan).

The Court also denies Axiom's motion for permissive intervention. Axiom's assertion that its intervention will "significantly contribute" to the "just and equitable adjudication" of Excluded Parties' rights is unsupported. (Axiom's Mem. 12.) As discussed above and in section II.b.ii.1 *infra*, the Distribution Plan does not impair Excluded Parties' rights. The Distribution Plan merely prevents the Excluded Parties from receiving Initial Distributions, but permits them to seek distributions from the Receiver, and the opportunity to seek the Court's review if they are dissatisfied with the Receiver's resolution of their claim for distribution. (Distribution Plan 4, 8, 13.) In addition, even if the Court agreed with Axiom that the Distribution Plan impaired Excluded Parties' rights, Axiom has not demonstrated why the current parties, which are also designated as Excluded Parties, do not adequately represent the rights of Excluded Parties. Axiom has therefore failed to demonstrate either that its intervention will contribute to the "just and equitable adjudication of the legal questions presented" or that its interests are not "adequately represented by other parties." *Sec. & Exch. Comm'n v. Callahan*, 2 F. Supp. 3d 427, 436 (E.D.N.Y. 2014); *see also Authors Guild v. Open AI, Inc.*, 345 F.R.D. 585, 590–91 (S.D.N.Y. 2024) (denying permissive intervention on a similar basis as denial of movant's motion for intervention as of right, including that movant "failed to establish a cognizable interest" and therefore could not establish that their interest would be impaired, and that movant failed to show "that the existing parties would not adequately represent their hypothetical interest"), *appeal dismissed sub nom. Guild v. Tremblay*, No. 24-1007, 2024 WL 4564683 (2d Cir. Oct. 4, 2024), *and Basbanes v. Microsoft Corp.*, No. 24-1014, 2024 WL 4564684 (2d Cir. Oct. 4, 2024); *Extenet Sys.*, 2023 WL 4044076, at *2 (affirming the district court's decision

23

denying permissive intervention where the district court determined that the movant's interests were adequately represented by an existing party); *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, No. 11-CV-99, 2011 WL 2173785, at *5 (D. Vt. June 2, 2011) (denying permissive intervention where the movants interests "[we]re adequately represented" and the movants had "not explained how their [intervention] would avoid duplicating the arguments and evidence presented by existing [d]efendants").  The Court denies Axiom's motion for permissive intervention.

### ii.  B9

B9 also has not demonstrated that their interests will be impaired if they do not intervene in this case.[22]  They argue that denying intervention "would severely prejudice B9's contractual rights and expectations related to the [e]scrow [a]mount and the [New York] State Action" because the stay prevents B9 from "obtain[ing] the [e]scrow [a]mount for the indefinite future (if ever)."  (B9's Mem. 9.)

The injunction only stays the litigation so that the Receiver can focus on administering the Receivership Estate and disbursing funds to defrauded investors and does not prevent B9 from ever accessing the funds.  As B9 recognizes, the MTF Realty and Cold Storage II's transfer of the escrow funds was "irrevocable" and they are "beyond the[ir] possession and control . . . while [they] are in the hands of the escrow agent," (*id.* at 15 (citations omitted)), therefore, while the litigation injunction is in place, the escrow funds remain effectively frozen.  Nothing in the Receivership Order prevents B9 from litigating its claim to the escrow funds after the injunction is lifted.  B9 has thus not persuaded the Court that its interests will be impaired if they do not intervene in this case.  *See Sec. & Exch. Comm'n v. Xia*, No. 21-CV-5350, 2024 WL 964676, at

---

[22]  Because the Court finds that B9 fails to show that their interests would be impaired if they are not permitted to intervene, the Court need not address the remaining three Rule 24(a) factors for intervention.

*11–12 (E.D.N.Y. Mar. 4, 2024) (explaining a non-party demonstrated impairment of its interests because the defendant's mismanagement directly contributed to the "value of the properties . . . significantly depreciat[ing] during the pendency of the litigation," and thus proposed intervenor's "ability to participate in th[e] litigation and protect its interests from further dissipation" would be limited without intervention); *U.S. Sec. & Exch. Comm'n v. Santillo*, 327 F.R.D. 49, 51 (S.D.N.Y. 2018) (denying intervention because the movant's interests would not be impaired where "[a]ny assets the movant may be entitled to have been frozen" because that "freeze [wa]s sufficient to protect the movant's potential judgment during the pendency of the underlying action"). The Court therefore denies B9's motion for intervention as of right.

The Court also declines to grant B9 permissive intervention. First, B9 provided no support for its argument that there are common questions of law or fact between the New York State Action and the Receivership Order. *Illarramendi*, 2012 WL 5832330, at *5 (denying permissive intervention where "[m]ovants ha[d] not identified any questions in common with the underlying SEC enforcement action against [d]efendant"). Second, "[c]oncerns about undue delay and complication resulting from permissive intervention are acute where the [g]overnment, and particularly the SEC, is a party to the underlying action." *Callahan*, 2 F. Supp. 3d at 439 (first alteration in original) (quoting *Sec. & Exch. Comm'ns v. Bear, Stearns & Co. Inc.*, No. 03-CV-2937, 2003 WL 22000340, at *3 (S.D.N.Y. Aug. 25, 2003)). In this case, as the Receiver argues and as the Court discusses in further detail below, *see section* II.b.iii *infra*, granting intervention would interfere with the Receiver's ability to administer the Receivership Estate and would deplete funds available for long-waiting investors. *See Santillo*, 327 F.R.D. at 51–52 (denying permissive intervention because it "would create delay, increase the parties' workload, and add additional issues"); *Callahan*, 2. F. Supp. 3d at 439 (denying intervention where a non-

25

party sought "to exercise its rights to its collateral," but such intervention would disrupt "[r]eceiver's ability to administer the [r]eceivership [e]state and recover assets for the [i]nvestors"); *Illarramendi*, 2012 WL 5832330, at *5 (explaining that, "even where the common questions of law or fact" requirement "for permissive intervention is met, a court has the discretion to deny intervention if it would unduly delay or prejudice the main case" (internal quotation marks omitted)). The Court therefore denies B9's motion for permissive intervention.

> **b. The Distribution Plan is fair and reasonable**

The Court first evaluates the Distribution Plan and then addresses the various objections to the Plan, including objections to Excluded Party designations, the Receiver's authority to waive privileges, rights to advancement costs, and distributions to transferees of GPB. The Court concludes by addressing objections to the litigation injunction and requests for leave from the litigation injunction.

> **i. The Distribution Plan is fair and reasonable**

The Court finds that the Plan is fair and reasonable and accordingly approves the Distribution Plan.

"While 'the power of a securities receiver is not without [its] limits,'" a district court appoints a federal receiver under its equitable discretion "to restore to a defrauded entity or defrauded persons that which was fraudulently diverted from its or their custody and control." *Sec. & Exch. Comm'n v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (first quoting *Eberhard v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008); and then quoting *Sec. & Exch. Comm'n v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005)); *Sec. & Exch. Comm'n v. Varacchi*, No. 17-CV-155, 2021 WL 10361074, at *6 (D. Conn. July 30, 2021) ("Although not specifically set forth in the Securities Act or the Exchange Act, 'the Second Circuit has held that district courts have the power to appoint receivers at the SEC's request to restore to a defrauded entity or defrauded

persons that which was fraudulently diverted from its or their custody and control.'"  (internal quotation marks omitted) (quoting *Callahan*, 193 F. Supp. 3d at 188)).

"District courts possess broad power to remedy violations of federal securities laws." *Eberhard*, 530 F.3d at 131; *Commodity Futures Trading Comm'n v. Alexandre*, No. 22-CV-3822, 2025 WL 252435, at *3 (S.D.N.Y. Jan. 21, 2025) ("In reviewing an equity receiver's proposed method of distributing assets, courts have broad discretion to 'determine how and to whom the money will be distributed.'"  (quoting *Sec. & Exch. Comm'n v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997))); *U.S. Sec. & Exch. Comm'n v. Ahmed*, No. 15-CV-675, 2024 WL 5182669, at *4 (D. Conn. Nov. 27, 2024) ("As the [c]ourt has previously explained, 'once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.'" (internal quotation marks omitted) (quoting *U.S. Sec. & Exch. Comm'n v. Ahmed*, 343 F. Supp. 3d 16, 26 (D. Conn. 2018))).  "[O]nce the district court satisfies itself that the distribution of proceeds" in a disbursement plan "is fair and reasonable, its review is at an end."  *Sec. & Exch. Comm'n v. Amerindo Inv. Advisors*, 639 F. App'x 752, 755 (2d Cir. 2016) (quoting *Sec. & Exch. Comm'n v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991)); *Alexandre*, 2025 WL 252435, at *3 ("The goal is to establish a plan of distribution that is 'fair and reasonable' in light of the specific circumstances of the case."  (quoting *Varacchi*, 2021 WL 10361074, at *6)).  In determining if a proposed plan is fair and reasonable, the court "may defer to the receiver's choices for the plan's details and should give substantial weight to the SEC's views regarding a plan's merits."  *Sec. & Exch. Comm'n v. Amerindo Inv. Advisors Inc.*, No. 05-CV-5231, 2017 WL 3017504, at *2 (S.D.N.Y. July 14, 2017) (citation omitted); *Sec. & Exch. Comm'n v. Byers*, 637 F. Supp. 2d 166, 175 (S.D.N.Y. 2009) (explaining that the "SEC's judgment [of a proposed distribution plan] is entitled to deference from th[e] [c]ourt" and that the court "may give weight to the [r]eceiver's

judgment" of the plan), *aff'd sub nom. Malek*, 397 F. App'x 711, *and Sec. & Exch. Comm'n v. Orgel*, 407 F. App'x 504 (2d Cir. 2010).

First, the SEC and the Receiver support the Distribution Plan, and their judgments are entitled to deference in the Court's evaluation of the plan. *U.S. Sec. & Exch. Comm'n v. Qin*, No. 20-CV-10849, 2024 WL 5183167, at *4 (S.D.N.Y. Dec. 20, 2024) (explaining a receiver's proposed claims procedures are "fair and equitable" because the plan "has the support of both the [r]eceiver and the SEC" and their judgments "may be given weight in crafting a remedy"); *Sec. & Exch. Comm'n v. AR Cap., LLC*, No. 19-CV-6603, 2021 WL 1988084, at *3 (S.D.N.Y. May 18, 2021) (explaining that the court may defer to the receiver's plan and should give substantial weight to the SEC's evaluation of the receiver's plan). Second, the Distribution Plan provides claimants a reasonable opportunity to be heard through the Claims Process or the Court if unresolvable disputes arise, all while prioritizing the efficient distribution of funds to long-waiting investors. *See Qin*, 2024 WL 5183167, at *3–4 (explaining a claims process satisfied due process where receiver proposed to "classify all timely submitted claims from investors," apply a method for determining the investor's distribution, and provide an opportunity for the investor to "resolve any objections to the [r]eceiver's claim determinations"); *Callahan*, 193 F. Supp. 3d at 204–05 (explaining that the "Due Process clause requires that non-party claimants . . . be afforded notice and an opportunity to be heard before a [r]eceiver or a [c]ourt resolves its claims"); *Byers*, 637 F. Supp. 2d at 184 (approving a distribution plan that "provide[s] investors and creditors with adequate notice of their recovery, . . . permit[s] them to discuss the specifics of their claims with the [r]eceiver, and, if the parties cannot resolve the matter, will permit them to make their case before the [c]ourt" because courts have the "authority, in implementing a distribution plan in a receivership case, to use summary proceedings to evaluate claims and claim priority, provided the parties have an opportunity to be heard to argue their claims"). Third, the

28

Court agrees with the Receiver's conclusion that the funds should be distributed on a
partnership-by-partnership basis rather than a *pro rata* basis.  No entity or potential claimant has
objected to that aspect of Distribution Plan, and the Court concludes that partnership-by-
partnership distribution is appropriate in view of the fact that each Fund had its own investment
objectives, that the Funds did not share assets, and that the Receiver has "not encountered any
difficulty in segregating and ascertaining individual assets and liabilities."  (Receiver's Mot. 22.)
*See Sec. & Exch. Comm'n v. Morgan*, No. 19-CV-661, 2020 WL 6536894, at *6 (W.D.N.Y.
Nov. 6, 2020) (approving a distribution plan on a fund-by-fund basis where the investors "had
different relationships with [d]efendants, the terms of their agreements with [d]efendants were
different, and there [was] no evidence before the [c]ourt . . . that their funds were commingled in
a manner supporting a *pro rata* distribution").  *Cf. Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*,
290 F.3d 80, 88–89 (2d Cir. 2002) ("Courts have favored *pro rata* distribution of assets where, as
here, the funds of the defrauded victims were commingled and where victims were similarly
situated with respect to their relationship to the defrauders."); *AR Cap.*, 2021 WL 1988084, at *5
(explaining that distribution on a *pro rata* basis is appropriate where "funds have been
commingled" and the victims were 'similarly situated with respect to their relationship to the
defrauders'" (quoting *Byers*, 637 F. Supp. 2d at 177)).

### ii.  Objections to the Distribution Plan

#### 1.  Excluded Parties

Axiom objects to Receiver's designation of Axiom as an Excluded Party.[23]  Axiom
argues that it is improperly named as an Excluded Party because it was not "convicted or accused

---

[23]  Although the Court denies Axiom's and DJ Partners' motions to intervene, the Court
addresses their objections to the Distribution Plan.  A district court may consider objections to a
distribution plan if the proposed plan will affect the objector's "financial interests such that they

of various misconduct with regard to the" Funds. (Axiom's Mem. 8 (quoting Receiver's Mot. 38).) Axiom contends that "[n]one of the Defendants ever held any interest in Axiom or had the ability to control Axiom." (*Id.*) In addition, Axiom argues that it is not a GPB investor, "does not own any interest in the []Funds, and would not be entitled to any funds from" the Initial or Subsequent Distributions. (*Id.*) Axiom argues that it was not notified of the Distribution Plan or that the Receiver would name Axiom as an Excluded Party, that its exclusion has no factual basis, and that the Distribution Plan provides no mechanism for Axiom to challenge the designation. (*Id.* at 9, 11–12; Axiom's Reply 2–3.) Axiom suggests that "[t]he sole basis for the Receiver's improper designation of Axiom as an Excluded Party appears to be an effort to avoid the GPB Funds' obligation to indemnify Axiom." (Axiom's Mem. 12.) Axiom has several "Dealer Agreements" with various Funds. (*Id.* at 5.) It contends that pursuant to those agreements, GPB must "indemnify and hold harmless [Axiom] from and against any losses, claims, damages or liabilities to which [Axiom] may become subject . . . insofar as such losses . . . arise out of or are based upon an untrue statement or alleged untrue statement of material fact contained in the [Private Placement Memorandum]." (*Id.*) Axiom has requested indemnification from GPB on more than one occasion, beginning in April of 2021, but those requests were either denied or received no response. (*Id.* at 6.)

 Axiom argues that the Distribution Plan is not "fair or reasonable because it violates Axiom's due process rights" since the Receiver did not serve Axiom with the plan or otherwise

---

have a legitimate interest in the method of distribution of the [companies'] remaining assets." *Sec. & Exch. Comm'n v. Morgan*, No. 19-CV-661, 2020 WL 6536894, at *5 (W.D.N.Y. Nov. 6, 2020) (quoting *Sec. & Exch. Comm'n v. Illarramendi*, No. 11-CV-78, 2014 WL 5460816, at *2 n.4 (D. Conn. Oct. 27, 2014), *aff'd sub nom. Sec. & Exch. Comm'n v. Michael Kenwood Cap. Mgmt., LLC*, 630 F. App'x 89 (2d Cir. 2015)). There is no dispute that the Plan affects the financial interests of Axiom and DJ Partners, and the Court accordingly considers their objections.

notify Axiom that they were an Excluded Party. (*Id.* at 13.) In addition, Axiom argues that the Distribution Plan violates Axiom's procedural due process rights because it does not provide an "opportunity for claimants to be heard" to challenge their designation as an Excluded Party. (*Id.* at 14 (citation omitted).) They argue that Axiom's only option is to "accept their status as an Excluded Party, and then send a 'Claim' for indemnification wherein the receiver has complete autonomy to deny such indemnification." (*Id.* at 14.) Submitting a claim would also require Axiom to "effectively waive its right to arbitration under the Dealer Agreements" and would create the possibility that Receiver would "share information with third parties that would otherwise be protected under the Dealer Agreement's confidentiality provisions." (*Id.* at 14–15.) Axiom argues that this "is not a mechanism for Axiom to challenge its Excluded Party status," but requires them to "accept its improper designation as an Excluded Party . . . just to get the indemnity owed." (Axiom's Reply 5.) Axiom therefore requests that the Court modify the Distribution Plan to remove Axiom from the "Excluded Party" list. (Axiom's Mem. 15.)

Gentile, Schneider, and Ascendant Capital argue that the Receiver violated due process by not notifying them that the Distribution Plan would designate them as "Excluded Parties," and therefore deprived them of a "notice and opportunity to be heard" before being excluded, and that Gentile and Schneider are erroneously excluded.[24] (Defs.' Objs. 12.) They argue that the Distribution Plan "falls far short of establishing the minimum due process requirements of notice and an opportunity to be heard and, in fact, contains no procedure at all," but makes the Receiver "sole arbiter" and gives him "unfettered power and discretion to determine whether a person or entity should be deprived of their interest in distributions." (*Id.* at 14.) In addition, they argue that the Receiver has not provided Gentile or Schneider with evidence supporting his decisions to

---

[24] Ascendant Strategies and DJ Partners join Gentile, Schneider, and Ascendant Capital's objections. (Ascendant Strategies & DJ Partners' Objs. 3.)

exclude them, and also prevents Excluded Parties from challenging their designation. (*Id.* at 15.) They further argue that, even if the Receiver had excluded Gentile and Schneider after a proper procedure, their exclusion is nevertheless improper because they "hold substantial personal investments in the GPB Funds and are 'Investors' as defined under the . . . Plan." (*Id.* at 16.) They contend that "[t]here has been no finding of liability in this case," the "verdicts in the criminal case do not establish liability in this case," and that no court has ruled on the SEC's probability of success on the merits." (*Id.* at 17.) They argue that thus, the Receiver improperly excluded Gentile and Schneider based on "general principles of equity" and the bare assertion that those "who are convicted or accused of various misconduct" with regard to the Funds should be barred from distributions. (*Id.*) Gentile, Schneider, and Ascendant Capital argue that the SEC's judgment regarding the Distribution Plan, and specifically the privilege, advancement, and due process issues they raise, should not be afforded deference under *Loper Bright Enterprises v. Raimondo*. (*Id.* at 18–19 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).) Gentile, Schneider, and Ascendant Capital therefore request that the Court amend the Distribution Plan by "establishing a fair and adequate process by which persons may be deemed 'Excluded Parties' consistent with the Due Process clause and not denying [Gentile, Schneider, and Ascendant Capital] (or any other party deemed 'Excluded') their property rights without such due process" and requiring "sufficient amounts [to] be withheld in reserve to cover [Gentile and Schneider's] distributions." (*Id.* at 1–2, 18 (citation omitted).)

Ascendant Strategies and DJ Partners argue that the Receiver has no evidentiary basis for designating them as "Excluded Parties." (Ascendant Strategies & DJ Partners' Objs. 3.) First, they argue that the Receiver failed to notify them about their designation as Excluded Parties. (*Id.*) Second, they argue that the "Receiver has failed to offer any evidence or explanation for why [Ascendant Strategies] and DJ Partners should be designated as 'Excluded Parties.'" (*Id.*)

They note that, although Gentile and Schneider own Ascendant Strategies and DJ Partners, they were not parties in the criminal action against Gentile and Schneider, and have not been found liable in this case.  (*Id.*)  Third, they argue that the Receiver "offers no argument or explanation for why the independent corporate forms of [Ascendant Strategies] and DJ Partners should be disregarded."  (*Id.* at 3–4.)  Ascendant Strategies and DJ Partners therefore request that the Court "order the Receiver to revise the [Distribution] Plan to address the issues raised herein and in Gentile, Schneider, and [Ascendant Capital's] Limited Objection."  (*Id.* at 4.)  Specifically, they ask the Court to "remove [Ascendant Strategies] and DJ Partners' designation as Excluded Parties, and allow them to fully participate in distributions as Investors," or, "at the very least . . . notice and an opportunity to be heard by this Court before excluding them, and that sufficient amounts will be withheld in reserve to cover their distributions in the interim."  (*Id.*)

The Receiver argues that the Excluded Parties list is properly "limited to individuals or entities that are alleged to have engaged in the underlying fraud or their affiliates."  (Receiver's Reply 2.)  He argues that "[n]either the Court nor the Receiver has made any final factual determinations about the Excluded Parties or decided whether they are entitled to receive distributions under the [Distribution] Plan."  (*Id.*)  The Receiver argues that "[i]n his business judgment, . . . and in light of the jury verdicts in the criminal trial, the Receiver believes it would be inappropriate and contrary to the interests of the Receivership Estate to distribute funds to the Excluded Parties as part of an Initial Distribution without additional investigation, fact-finding, and process."  (*Id.* at 6.)  He further argues that it would not be fair "to hold up all payments" to investors until fact-finding involving the Excluded Parties is complete.  (*Id.*)  The Receiver contends that Excluded Parties "simply must engage in an additional and entirely reasonable process in order to establish their entitlement to any distributions."  (*Id.* at 2.)  The Receiver confirms that "the funds earmarked for the Excluded Parties are set aside and reserved for in

accordance with the [Distribution] Plan." (*Id.*) He contends "[t]his is fully consistent with Due Process" because "[a]ll of the Objectors plainly have notice that they were named as Excluded Parties, and all retain the right [to] be heard by this Court and to seek distributions from the Receivership Estate." (*Id.* at 9.)

Objectors have not demonstrated that their designation as Excluded Parties violates their Due Process rights. The Second Circuit has explained that "[s]o long as the district court is satisfied that, 'in the aggregate, the [distribution] plan is equitable and reasonable,' the SEC may engage in the 'kind of line-drawing [that] inevitably leaves out some potential claimants." *Off. Comm. of Unsecured Creditors of WorldCom., Inc. v. Sec. & Exch. Comm'n*, 467 F.3d 73, 82–83 (2d Cir. 2006) (third alteration in original) (quoting *Wang*, 994 F.2d at 88). The Court has already concluded that the Distribution Plan is fair and reasonable, and further finds that it is entirely appropriate for the Receiver to prioritize making "payments to clearly innocent victims" in the Initial Distribution, and requiring further fact-finding and processing before making distributions to "GPB entit[ies] or [entities that are] alleged to have participated in the alleged fraudulent scheme." (Receiver's Reply 4, 6.) As the Receiver explains, and as the Court discussed above, the Excluded Party designation does not deprive Objectors of distributions, nor does it deprive them of notice and an opportunity to be heard. The Distribution Plan only requires Excluded Parties to "submit a Proof of Claim to the Receiver, who will review and resolve it just as he would any other Proof of Claim," including the option to "seek review by this Court" if they are "dissatisfied with the Receiver's resolution of their claim." (*Id.* at 4, 9.) The Receiver has also explained that he has "earmarked" funds for the Objectors' claims. (*Id.* at 2.) The Distribution Plan therefore does not deprive Objectors of any distributions to which they are entitled and satisfies due process by providing an opportunity for Excluded Parties to contest the Receiver's rejection of their claims. *See Illarramendi*, 2014 WL 5460816, at *2 (explaining

that the receiver's plan satisfied due process because objector may utilize the "claims administration process," including "the opportunity to seek judicial review of his objection to the [r]eceiver's denial of his claim," and receiver had reserved the "maximum potential value" of receiver's claim); *Byers*, 637 F. Supp. 2d at 184 ("It is well-settled that a [d]istrict [c]ourt has the authority, in implementing a distribution plan in a receivership case, to use summary proceedings to evaluate claims and claim priority, provided the parties have an opportunity to be heard to argue their claims." (quoting *Sec. & Exch. Comm'n v. Elliott*, 953 F.2d 1560, 1567 (11th Cir. 1992))).

In addition, other district courts in this circuit have approved distribution plans excluding parties who were involved or potentially involved in defrauding investors, as Objectors were in this case. (Receiver's Reply 4 ("Excluded Parties . . . [are each] a GPB entity or [are] alleged to have participated in the alleged fraudulent scheme and is a defendant in at least one suit focusing on the same alleged scheme.").) *AR Cap.*, 2021 WL 1988084, at *6, *9 (approving a distribution plan that barred "excluded parties," including defendants and other entities related to defendants, from receiving distributions); *Sec. & Exch. Comm'n v. CR Intrinsic Invs., LLC*, 164 F. Supp. 3d 433, 436, 438 (S.D.N.Y. 2016) (approving a distribution plan that excluded, among other entities, affiliates of defendants who "were directly involved in the conduct detailed in the [c]omplaint").

The Court accordingly finds that the objections to the Excluded Party designation by Axiom, Gentile, Schneider, Ascendant Capital, Ascendant Strategies, and DJ Partners are without merit and therefore declines to revise the Excluded Parties list.

## 2. Privileges

Gentile, Schneider, and Ascendant Capital argue that the Distribution Plan "contravenes the applicable law of privilege," and "fails to account for [Gentile, Schneider, and Ascendant

Capital's] privileges that GPB and now the Receiver[] ha[ve] no right to waive unilaterally." (Defs.' Objs 3.)  They argue that "there are both common-interest and joint-client relationships that give [Objectors] privilege rights over documents and communications in GPB's possession — which are now in the Receiver's possession" but over which Gentile, Schneider, and Ascendant Capital retain privilege.  (*Id.* at 5.)  Gentile, Schneider, and Ascendant Capital note that, in the Receivership Order, the Court explained that "[t]o the extent the [R]eceiver seeks to waive privileged conversations of others, [the R]eceiver is required to 'comply with applicable law in the exercise of such privileges or immunities.'"  (*Id.* at 5–6 (quoting *GPB Cap. Holdings*, 2023 WL 8468467, at *18).)  They argue that the Distribution Plan contains a provision giving him the "*sole* authority" to "enforce, waive, assign or release any or all Privileges in the exercise of his duties as Receiver."  (*Id.* at 6 (quoting Receiver's Mem. 50).)  Gentile, Schneider, and Ascendant Capital argue that the Receiver's privilege provision is "at odds with both governing law and the Court's Order requiring compliance with the laws of privilege — an Order which was upheld by the Second Circuit."  (*Id.*)  Gentile, Schneider, and Ascendant Capital therefore request that the Court amend the Distribution Plan by "requiring a workable mechanism ensuring timely advance notice to holders of individual and joint privileges and [an] opportunity to object to avoid unilateral and improper waivers of privileges."  (*Id.* at 1 (citation omitted).)

The Receiver argues that "there is no dispute" about privileged information because the Receiver "has reaffirmed to Gentile and Schneider that the Receiver's right to waive privilege applies only to privileges held by the Receivership Entities and does not extend to any privileges held by Gentile or Schneider individually."  (Receiver's Reply 3.)  The Receiver notes that none of the Objectors are Receivership Entities, and the Receivership Order only authorizes the Receiver to waive privileges or immunities of the Receivership Entities, the Monitor, and the Monitorship.  (*Id.* at 7–8.)  The Receiver also explains that he has informed Gentile, Schneider,

and Ascendant Strategies that "he does not interpret either the [Distribution] Plan or the Receivership Order to authorize the Receiver to waive privileges belonging to Gentile, Schneider, or Ascendant" Strategies. (*Id.* at 8 (citation omitted).) He also informed Gentile and Schneider via email that if he "decides to share with third parties documents that could include information as to which a personal legal privilege would exist . . . the Receiver will agree to (i) provide . . . advance notice of such intent, and (ii) cooperate . . . in good faith concerning appropriate steps" to protect Gentile and Schneider's privilege. (*Id.* at 8 (citation omitted).) The Receiver argues that "set[ting] up a one-size-fits-all process for a possible review of privileged documents in the event that a dispute over privilege someday arises . . . threatens to needlessly run up even more litigation costs." (*Id.* at 3.)

The Court is not persuaded by Objectors' arguments that the Distribution Plan contravenes applicable privilege laws. First, the Distribution Plan, by its terms, only transfers to the Receiver "attorney-client privilege, work product protection, common interest or joint defense privilege, or other privilege or immunity . . . of the Receivership Entities, the Monitor, the Monitorship." (Distribution Plan 39.) As the Receiver has explained, neither the Distribution Plan nor the Receivership Order transfers any of Gentile, Schneider, or Ascendant Capital's privileges to the Receiver. (Receiver's Reply 20.) Second, the Receiver confirmed that his authority to waive privileges "applies only to privileges held by the Receivership Entities and does not extend to any privileges held by Gentile or Schneider individually." (*Id.* at 3.) As the Court previously explained in detail in the Receivership Order, *GPB Cap. Holdings*, 2023 WL 8468467, at *17–19, it is settled law that receivers have the power to waive attorney-client privileges of the entities they manage. *See Sec. & Exch. Comm'n v. Ryan*, 747 F. Supp. 2d 355, 367 (N.D.N.Y. 2010) (explaining that "[a]s the successor in interest, and as a matter of law" the receiver "controls the attorney-client privilege" for the receivership entity); *United States v.*

*Shapiro*, No. 06-CR-357, 2007 WL 2914218, at *7 (S.D.N.Y. Oct. 1, 2007) ("[I]f the [r]eceiver is to be permitted to pursue litigation on [the receivership entity's] behalf, there is no reason why he should be unable to exercise his discretion to waive its corporate privileges in connection with that litigation or in other contexts."); *Commodity Futures Trading Comm'n v. Standard Forex, Inc.*, 882 F. Supp. 40, 44–45 (E.D.N.Y. 1995) (explaining that "there is no prejudice that would ensue by granting to the [r]eceiver the right to control the [receivership entity's] attorney-client privilege" and "there is no chilling effect . . . since the attorney-client privilege of [the receivership entity] remain[s] in the hands of its management, the [r]eceiver here").  Finally, because the Receiver holds GPB's common interest privilege with respect to its own privileged statements, the Receiver is free to assert or waive that privilege as he chooses.  *See United States v. Hatfield*, No. 06-CR-550, 2009 WL 3806300, at *12 (E.D.N.Y. Nov. 13, 2009) ("A member of a joint defense agreement can waive the privilege with respect to its own communications, but typically cannot disclose privileged information received from other joint defense agreement members."  (first citing *United States v. Agnello*, 135 F. Supp. 2d 380, 383 (E.D.N.Y. 2001), *aff'd*, 16 F. App'x 57 (2d Cir. 2001); then citing *United States v. Salvagno*, 306 F. Supp. 2d 258, 273 (N.D.N.Y. 2004); and then citing *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir. 1997))); *Agnello*, 135 F. Supp. 2d at 383 ("A client who is part of a joint defense arrangement is entitled to waive the privilege for his own statements, and his co-defendants cannot preclude him from doing so.").  While nothing in the Distribution Plan or the Receiver's filings indicates that the Receiver seeks to contravene applicable privilege laws, the Court reiterates that to the extent the Receiver seeks to waive privileged communications of Gentile, Schneider, or the rights of certain others, he is required to "comply with the applicable law in the exercise of such privileges or immunities."  *GPB Cap. Holdings*, 2023 WL 8468467, at *18 (citations omitted).

The Court accordingly finds Gentile, Schneider, and Ascendant Capital's objections to the Distribution Plan's privilege provision are without merit and therefore declines to modify the Distribution Plan with regard to the Receiver's authority to exercise or waive privileges of the Receivership Entities, Monitor, or Monitorship.

### 3. Advancement costs

Gentile and Schneider argue that the Distribution Plan is "unnecessarily ambiguous regarding the approval of advancement and indemnification costs" in "violation of this Court's Order, the law of the case doctrine, []the orders of the Delaware Chancery Court, and the Full Faith and Credit Clause of the United States Constitution" as well as their Sixth Amendment rights "with respect to their continuing criminal case. (Defs.' Objs. 7–8, 11.) Specifically, they note that the Distribution Plan provides the Receiver with the authority to, "in his sole discretion," determine distributions of Reserves, including "advancement costs." (*Id.* at 11 (emphasis omitted).) They argue that the Distribution Plan "effectively end-run[s]" the Receivership Order's guarantee that it "would not impact [Gentile or Schneider's] [advancement] rights pursuant to the Delaware Orders," and that the Receiver "*is required to comply with his legal obligations, including compliance of the existing orders of other courts.*" (*Id.* at 9–10, 11–12.) They argue that the Receiver has waived any challenges to the Receivership Order because the Second Circuit affirmed it. (*Id.* at 10.) Gentile and Schneider acknowledge that the Receiver is "currently taking the position that the [Distribution] Plan does not address advancement or indemnification," but seek explicit clarification from the Court that the Distribution Plan does not impact their advancement rights. (*Id.* at 10–11.) They therefore request that the Court amend the Distribution Plan by "requiring that the Receiver . . . 'comply with his legal obligations' . . . with respect to advancement and indemnification costs" and "requiring the Receiver to maintain a sufficient reserve to meet legal obligations including the

previously ordered advancement and indemnification obligations." (*Id.* at 1–2, 18 (citation omitted).)

The Receiver argues that the Distribution Plan does not "undermine the Objectors' rights to advancement and indemnification of defense costs." (Receiver's Reply 2.) The Receiver explains that "[t]o the extent that the [Distribution] Plan has any bearing at all on advancement or indemnification, it is simply to confirm that the Receiver will continue to authorize the advancement of appropriate defense costs . . . subject to the right to recoup such costs." (*Id.* at 14.) He also argues that Objectors' advancement costs should not be Priority Claims. (*Id.* at 2.) In support, he argues that Delaware law "expressly provides that advancement claims are *not* to be treated as priority claims," and that "the [Distribution] Plan already includes a substantial reserve fund from which the Receiver may pay . . . claims for advancement and indemnification." (*Id.*) In addition, the Receiver explains that "nothing in this Court's Receivership Order, or in the Delaware" opinions or the Sixth Amendment "requires that 'Advancement Costs' be treated as 'Priority Claims' over claims of other unsecured creditors." (*Id.* at 12–13.) The Receiver also notes that GPB has approved and advanced nearly $75 million to Gentile and Schneider for their litigation costs and Gentile and Schneider "should not have 'Priority Claimant' status over other unsecured creditors, especially when those creditors include the very investors whom a jury has found, beyond a reasonable doubt, they defrauded." (*Id.* at 7, 13.) The Receiver further argues that using his discretion to determine the amount of Reserves is "entirely consistent with the Receivership Order," and that the $719 million he plans to hold in reserve for ongoing expenses, including advancement costs, renders "any suggestion by

[Objectors] that the reserves are not sufficient . . . meritless."[25]  (*Id.* at 14.)  In addition, the Receiver argues that he does not object to the Receivership Order and thus did not have an objection to "waive."  (*Id.* at 15.)

The Court is not persuaded that the Distribution Plan undermines Gentile's or Schneider's rights to advancement costs.  In the Receivership Order, the Court explicitly stated that it did not "pose any bar to Schneider's and Gentile's rights under their advancement orders, since the [R]eceiver is required to comply with his legal obligations, including compliance of the existing orders of other courts."  *GPB Cap. Holdings*, 2023 WL 8468467, at *16.  The Court further clarified that the Receivership Order did not "enjoin the reimbursement procedures pursuant to which Schneider and Gentile submit invoices and requests for reimbursement under their advance orders."  (*Id.* at *16 n.21.)  The Receiver stated that "is in agreement with the terms of the Receivership Order" including the provision "allowing for the Receiver to approve advancement payments without further order from this Court."  (Receiver's Reply 15.)  The Receiver has confirmed that he "will continue to authorize the advancement of appropriate defense costs" for Gentile and Schneider, (*id.* at 14), and that he has "propose[d] to initially hold $719 million in reserve to pay for ongoing expenses, including advancements costs," (*id.*)  There

---

[25]  The Receiver also argues that, to the extent that Gentile and Schneider believe the Receivership Order requires that disputes about advancement must be litigated in Delaware, "that belief is misguided" and that the Court should "exercise continuing jurisdiction over any future litigated disputes between the Receiver and Gentile or Schneider concerning their claims for advancement."  (Receiver's Reply 17.)  No Objector argued that disputes over advancement costs should be litigated in Delaware, and the Court's Order Appointing the Receiver clearly stated that the Court retains "exclusive jurisdiction over any action filed against the Receiver . . . based on acts or omissions committed in their representative capacities."  (Order Appointing Receiver ¶ 37.)  There is therefore no dispute that the Court retains jurisdiction to resolve any disputes regarding either Gentile's or Schneider's advancement costs.

is therefore no dispute that the Receiver intends to and is required by the Receivership Order to continue paying Gentile and Schneider's advancement costs.[26]  (*Id.* at 15.)

The Court accordingly finds that Gentile and Schneider's objections to the Distribution Plan's provisions regarding advancement costs are without merit.

### 4.  Distributions to transferees

Osaic argues that the Distribution Plan is not "fair and equitable" because the Receiver did not explicitly include parties that have received shares in the Funds via transfers or assignments from other GPB investors (the "Transferees") in the Initial or Subsequent Distributions.  (Osaic's Objs. 2, 5.)  Osaic owns five Broker-Dealers that were involved with distributing shares of APLP and Holdings II.  (*Id.* at 5.)  Osaic argues that, "[a]s a direct result of actions by the [Objectors]," Osaic has engaged in nearly one hundred FINRA arbitrations filed by defrauded GPB investors.  (*Id.*)  In some of the FINRA settlements, the Broker-Dealers "were obligated to and agreed to purchase the [GPB investors'] respective outstanding GPB Shares."  (*Id.* at 5–6.)  They currently hold APLP shares with a net capital contribution value of $8,070,000 and Holdings II shares with a net capital contribution value of $5,406,000.  (*Id.* at 6.)  Osaic informed then-Monitor of the transfer of the APLP shares to Osaic as early as May of 2022.  (*Id.*)  Osaic argues that they are "Investors" as defined in the Distribution Plan because each of the Broker-Dealers "owns a 100% interest in Shares of either APLP or Holdings II through the respective" share transfers resulting from FINRA arbitration settlements.  (*Id.* at 8.)  Osaic thus argues that there is no reason that the Receiver should not include the Broker-Dealers

---

[26]  Because the Court concludes that the Distribution Plan does not impair, delay, or otherwise affect Gentile's and Schneider's right to advancements costs, the Court need not address their request that the Court "direct the Receiver to revise the [Distribution] Plan to adequately protect Mr. Gentile and Mr. Schneider's rights by classifying their Advancement Costs as Priority Claims and expressly providing their entitlement thereto."  (Defs.' Objs. 12.)

in the Initial Distribution of funds to APLP and Holdings II investors, (*id.* at 7), but the Distribution Plan as proposed would exclude Osaic and Broker-Dealers from the Initial Distribution because the Distribution Plan "does not take into account any assignment or transfer . . . of the Shares," (*id.* at 4). Osaic requests that the Court not approve the Distribution Plan unless it (1) acknowledges the Share Transfers to Broker-Dealers; (2) provides for the right of Broker-Dealers to participate in the Initial and Subsequent Distributions; and (3) confirm that the payments Broker-Dealers made for the Share Transfers will not reduce the distribution to the Broker-Dealers. (*Id.* at 5.)

The Receiver explains that he conferred with Osaic regarding their objections and that there is no remaining dispute with Osaic regarding transferred or assigned shares of GPB. (Receiver's Reply 21.) The parties agreed to a procedure for Transferees that have been assigned GPB shares from a GPB investor to work with the Receiver to identify their shares and receive distributions as the Receiver deems appropriate, and to raise disputes about the ownership or distribution of any assigned shares to the Court. (*Id.* at 21–22.)

The Court concludes that there is no dispute regarding Transferees' ability to receive Initial or Subsequent Distributions and accordingly finds Osaic's objections to be moot.

### iii. Relief from the litigation injunction

Axiom requests that the Court lift the litigation injunction and permit Axiom to pursue its indemnification claims against the Funds in arbitration. (Axiom's Mem. 15.) Axiom argues that pursuing its claims in arbitration "will not substantially upset the [Distribution Plan] because the Receiver set up reserves for this very purpose." (*Id.*) They argue that they will "suffer a substantial injury" if they cannot proceed to arbitration because the Distribution Plan "grants the Receiver unchecked authority to avoid its obligations to Axiom." (*Id.* at 16.) Axiom notes that the Receiver "does not dispute that Axiom is owed indemnity," and that they will be harmed by

submitting to the Distribution Plan's claims process because it would force Axiom to "waive its right to arbitration under the Dealer Agreements" and "share confidential information with the Receiver that is protected under the Dealer Agreements." (Axiom's Reply 8–9.) They contend that the Receiver's "attempt to avoid the GPB Funds' indemnity obligations through a summary proceeding without notice is a repudiation of such obligations." (*Id.* at 9.)

B9 requests that the Court clarify that the Receivership Order "does not stay, enjoin, or otherwise impact" the New York State Action, or, in the alternative, requests that the Court lift the litigation injunction and permit B9 to continue pursuing its New York State Action. (B9's Mem. 17.) First, B9 argues MTF Realty and Cold Storage II "are not among the entities within the scope of the Receivership Order and are not subject to the litigation stay and related terms governing the Receivership Entities." (*Id.* at 11; B9's Reply 2.) They note that neither MTF Realty nor Cold Storage II are Receivership Entities, and the Order Appointing Receiver defines "'Receivership Entities' to include *only* the twenty specifically enumerated entities" listed in the Order Appointing Receiver. (B9's Mem. 11.) B9 also argues that MTF Realty and Cold Storage II are not "Receivership Assets," and that "[n]o party to the [New York] State Action seeks to obtain, attach, or otherwise litigate any assets owned by any Receivership Entity, so no Receivership Assets are at issue, and no litigation stay or other requirement from this Court applies to the [New York] State Action." (*Id.* 12–16; *see also* B9'a Reply 2–4.) Second, B9 argues the Court should alternatively lift the litigation injunction. B9 argues that "a continued stay will prejudice B9's interests by leaving the [e]scrow [a]mount indefinitely in limbo" and that the Receiver has no interest in the escrow amount. (B9's Reply 9.) They argue a continued stay "would not further any purposes of the Receivership" because the resolution of the New York State Action would merely permit B9 to "obtain amounts presently held by the [e]scrow [a]gent for B9's benefit." (B9's Mem. 17–18.) According to B9, even if MTF Realty and Cold

Storage II prevail in the New York State Action and the Receiver "secure[s] or control[s] any hypothetical *released* escrow amounts," the Receiver "cannot presently confirm, obtain, or distribute those amounts, which remain with the [e]scrow [a]gent and cannot be released while the [New York] State Action is ongoing." (*Id.* at 18–19.)  Accordingly, B9 argues that "[i]nterests in judicial economy therefore support allowing the [New York] State Action to go forward." (*Id.* at 19.)  B9 also argues that the "potential burdens of litigation [on the Receiver] alone" do not justify enjoining the New York State Action.  (B9's Reply 5.)  In addition, B9 argues that staying the New York State Action would "exceed[] the Court's authority" because the New York State Action "involves no Receivership Entities or present assets of those entities." (B9's Mem. 18.)  B9 argues that courts have lifted injunctions at similar stages of receivership estate administration, (B9's Reply 9), and that B9 has established a colorable claim to justify lifting the receivership stay by demonstrating a "clearly articulated right to the [e]scrow [a]mount based on the occurrence of express contractual conditions," (*id.*)

The Receiver argues that Axiom's request that the Court allow Axiom to pursue its indemnification claims are procedurally improper and unnecessary because the Distribution Plan adequately addresses indemnification.  (Receiver's Reply 18–20.)  He argues that Axiom's request is procedurally improper because they have not filed a motion for leave from the litigation injunction as required by the Receivership Order.  (*Id.* at 18.)  The Receiver reiterates that the Distribution Plan is "not intended to address procedures for . . . indemnification one way or the other." (*Id.* at 14.)  The Receiver also argues that based on the preliminary information in Axiom's motion, "it is not apparent that its claim for indemnification is one that involves the kind of urgency that would warrant lifting the litigation injunction at this early stage of the Receivership." (*Id.* at 19.)

The Receiver also opposes B9's request that the Court confirm the New York State

Action is not subject to the litigation injunction and deny B9's motion in the alternative for leave from the injunction.[27]  (Receiver's Opp'n.)  First, the Receiver argues that the "broad sweep of the Receivership Order" bars the New York State Action because it "threatens to remove assets from the [R]eceivership [E]state to the potential detriment of all."  (Id. at 7 (quotation marks, brackets, and citations omitted).)  He notes that "the legal fees required to litigate the [New York State] Action . . . will affect the amount of funds available for distribution" because the fees will be paid from the Receivership Estate.  (Id. at 5.)  The "claims in the [New York State] Action are contested by both sides" and the case "is in the early stages of discovery," so there is "substantial legal spend ahead that will all be drawn from the Receivership Estate."  (Id. at 2.)  In addition, the Receiver argues that "the facts surrounding the [New York State] Action, the defendants named therein, and the parties' course of dealing underline just how inextricably intertwined the [New York State] Action is with the Receivership Estate."  (Id. at 5.)  The Receiver notes that Cold Storage II is a wholly-owned subsidiary of Cold Storage and MTF Realty is a majority-owned indirect subsidiary of Cold Storage, a Receivership Entity, (id. at 7), the Receiver approved the sale of the New Jersey property when he was Monitor, (id. at 6), the CEO of GPB Capital, Chmiel, signed the sale agreement after it was negotiated by a Receivership Entity, (id.), and the proceeds from the sale of the New Jersey property were transferred to the Receivership Estate, (id.).  The Receiver also argues that litigating the New York State Action would "draw the Receiver's attention away from his primary goal of timely compensating investors" and

---

[27]  The Receiver requests that the Court either amend the Order Appointing Receiver to "add the defendants in the [New York State] Action to the list of Receivership Entities" or add the New York State Action to the non-exhaustive list of enjoined litigation involving the Receivership Entities and Receivership Assets.  (Receiver's Opp'n 7.)  B9 opposes the Receiver's proposed amendment to the Order Appointing Receiver.  (B9's Reply 7.)  The Court declines to amend the Receivership Order because it finds that the New York State Action is subject to the litigation injunction as written and declines to lift the stay.

"disrupt the orderly distribution process set forth in the . . . Distribution Plan." (*Id.* at 6, 8.)

Second, the Receiver argues that there is no basis to lift the litigation injunction so that the New

York State Action can proceed. (*Id.* at 8.) He argues that leaving the stay in place against the

New York State Action "would further the purpose of the Receivership by preserving investor

assets" and that "simply having to wait to seek compensation . . . is insufficient to justify lifting

the stay when doing so will upend the process of distributing assets to thousands of wronged

investors." (*Id.* at 9.) In addition, the "Receiver is still administering and seeking to maximize

funds that may be available for distribution to investors," and "[p]ermitting B9's litigation to

proceed at this juncture would needlessly distract from the Receiver's core mission." (*Id.* at 10.)

The Receiver also notes that "all of the funds required to pay for . . . [the New York State

Action] will be drawn from the Receivership Estate." (*Id.* at 11.)

    In deciding whether to lift a litigation injunction imposed by a district court in

receivership proceedings, courts in the Second Circuit use the three-part test from *Securities and

Exchange Commission v. Wencke*. 742 F.2d 1230, 1231 (9th Cir. 1984); *see United States v. Elk

Assocs. Funding Corp.*, No. 13-CV-1326, 2020 WL 6581948, at *3 (E.D.N.Y. Nov. 10, 2020)

("'When analyzing a motion to lift a litigation stay imposed by a receivership court,' courts in

this Circuit 'utilize a three-part test articulated by the Ninth Circuit in . . . *Wencke*.'" (quoting

*United States v. JHW Greentree Cap., L.P.*, No. 12-CV-116, 2014 WL 1669261, at *2 (D. Conn.

Feb. 10, 2014))). The *Wencke* test "requires the district court to balance the interests of the

Receiver and the moving party." *Greentree*, 2014 WL 1669261, at *2 (citation omitted). The

court considers: "(1) whether refusing to lift the stay genuinely preserves the status quo or

whether the moving party will suffer substantial injury if not permitted to proceed; (2) the time in

the course of the receivership at which the motion for relief from the stay is made; and (3) the

merit of the moving party's underlying claim." *Sec. & Exch. Comm'n v. Ahmed*, No. 15-CV-

675, 2022 WL 7508962, at *2 (D. Conn. Oct. 13, 2022) (quoting *Sec. & Exch. Comm'n v. Illarramendi*, No. 11-CV-78, 2012 WL 234016, at *4 (D. Conn. Jan. 25, 2012)); *Callahan*, 2 F. Supp. 3d at 437 (quoting *Wencke*, 742 F.2d at 1231) (same); *Sec. & Exch. Comm'n v. Byers*, 592 F. Supp. 2d 532, 536–37 (quoting *Wencke*, 742 F.2d at 1231) (same), *aff'd*, 609 F.3d 87 (2d Cir. 2010).  The burden is on the moving party to demonstrate that the *Wencke* factors weigh in favor of lifting the stay.  *Callahan*, 2 F. Supp. 3d at 437 (quoting *Illarramendi*, 2012 WL 234016, at *4).

## 1.  Axiom

Even assuming Axiom's motion for leave is procedurally proper, the Court declines to lift the litigation injunction for Axiom to pursue its indemnification claims in arbitration.  First, Axiom has not shown that it will suffer substantial injury as a result of the injunction.  Axiom argues that the Distribution Plan "grants the Receiver unchecked authority to avoid its obligations to Axiom."  (Axiom's Mem. 15.)  However, the Receiver has explained that "[t]o the extent that the [Distribution] Plan has any bearing at all on advancement or indemnification, it is simply to confirm that the Receiver will continue to authorize the advancement of appropriate defense costs" and that the Distribution Plan "expressly states that the Receiver is setting aside reserves to address various expenses, including but not limited to reserves to pay for 'indemnification and advancement costs.'"  (Receiver's Reply 14–15 (quoting Distribution Plan 17–18).)  The Receiver is not attempting to "avoid the GPB Fund's indemnity obligations," (Axiom's Reply 9), but specifically acknowledges the likelihood of authorizing indemnification costs in the future.  Thus, the Receiver has not denied Axiom's indemnification claim, (Receiver's Reply 20), and a mere delay in Axiom being indemnified is insufficient to satisfy the substantial harm factor.  *Greentree*, 2014 WL 16619261, at *4 ("Absent any specific indication in the record that harm to the [m]ovants is substantial and constitutes more than simply a delay in

48

collecting on a monetary judgment, the [c]ourt cannot conclude that this factor favors the [m]ovants."). Second, the timing of Axiom's motion weighs against lifting the injunction. The litigation injunction has only been in place since December 3, 2024, when the Second Circuit lifted its stay on the Court's Receivership Order. *GPB Cap. Holdings*, 2024 WL 4945247, at *6. Lifting a litigation stay after only a few months is disfavored "given the possible disruption of the receiver's duties." *Byers*, 592 F. Supp. 2d at 537; *Callahan*, 2 F. Supp. 3d at 440 (explaining that the second *Wencke* factor weighs against lifting the litigation injunction where it had "only been in place for one year and five months" and, "[g]iven the complicated nature of th[e] case . . . it d[id] not appear unreasonable to the [c]ourt that the [r]eceiver's investigation [was] still ongoing"). Third, the Court does not have sufficient information about the merits of Axiom's claim, but even if Axiom's claim was strong, the first two *Wencke* factors weigh against lifting the injunction. *Elk Assocs.*, 2020 WL 6581948, at *5 ("However, even meritorious claims may not tip the scales in favor of lifting a litigation stay where the first and second prongs of the *Wencke*[] inquiry favor the receiver." (quoting *United States v. JHW Greentree Cap., L.P.*, No. 12-CV-116, 2014 WL 12756827, at *8 (D. Conn. May 16, 2014))). The Court therefore denies Axiom's motion for relief from the litigation injunction.

### 2. B9

The Court finds that B9 is subject to the litigation injunction and declines to lift the litigation injunction so that the New York State Action may proceed. First, the Receiver has demonstrated that MTF Realty and Cold Storage II are sufficiently intertwined with Receivership Entities and the Receivership Estate to subject the New York State Action to the litigation injunction. The Order Appointing the Receiver enjoined "civil legal proceedings of any nature" involving "the Receivership Estate" or the "Receivership Entities or any Receivership Assets, wherever located." (Order Appointing Receiver ¶ 18.) As noted above, the Receiver approved

the sale of the New Jersey property, the sale was negotiated by a Receivership Entity, GPB's CEO executed the sale, and the profits from the sale were included in the Receivership Estate. (Decl. of Joseph T. Gardemal III ("Gardemal B9 Decl.") ¶¶ 4–8, annexed to Receiver's Opp'n, Docket Entry No. 267-1.)  It is uncontested that MTF Realty and Cold Storage II are subsidiaries of Cold Storage, a Receivership Entity.[28]  (Receiver's Opp'n 5.)  In addition, the "legal fees borne by MTF Realty and [Cold Storage II]. . . have been and would be drawn from the Receivership Estate."  (Gardemal B9 Decl ¶ 10.)  The New York State Action therefore "involves" the Receivership Estate, Receivership Entities, and Receivership Assets, and the New York State Action is properly subject to the litigation injunction.  Second, the Court declines to lift the stay for the New York State Action to proceed.  As discussed above, B9 will not suffer substantial injury if the New York State Action is stayed.  The disputed escrow amount will remain frozen until the litigation injunction is lifted, and a delay in resolving which party is entitled to the escrow amount is insufficient to demonstrate a substantial harm.  *Greentree*, 2014 WL 1669261, at *4 ("Absent any specific indication in the record that harm to the [m]ovants is substantial and constitutes more than simply a delay in collecting on a monetary judgment, the [c]ourt cannot conclude that this factor favors the [m]ovants.").  The Court also finds that lifting the stay would not preserve the status quo because it would distract the Receiver from administering the Receivership Estate and drain the funds from which investors could recover. *Callahan*, 2 F. Supp. 3d at 439–40 (explaining that leaving the stay in place maintained the status

---

[28]  B9 stated that they "lack[ed] knowledge" about whether "a Receivership Entity is a direct or indirect member" of either MTF Realty or Cold Storage II.  (B9's Mem. 13.)  The Receiver explained that Cold Storage II is a "wholly owned subsidiary of GPB Cold Storage, LP, a Receivership Entity" and MTF Realty "is a majority-owned (approximately 83%) indirect subsidiary of GPB Cold Storage, LP, a Receivership Entity."  (Receiver's Opp'n 5.)  B9 did not dispute or address Receiver's characterization of MTF Realty and Cold Storage II's ownership. The Court will therefore assume for purposes of B9's motion that it is uncontested that MTF Realty and Cold Storage II are subsidiaries of Cold Storage.

quo because lifting it would permit the movant to recover funds "at the expense of . . . the [i]nvestors"); *Illarramendi*, 2012 WL 5832330, at *2 (declining to lift an anti-litigation stay because movant did not explain how their lawsuit "would not distract the [r]eceiver from his duties of recovering assets for the [r]eceivership [e]state"). B9 mischaracterizes district court decisions in arguing that the courts in *Sec. & Exch. Comm'n v. One Equity Corp.*, No. 08-CV-667, 2010 WL 4878993 (S.D. Ohio Nov. 23, 2010), and *United States v. JHW Greentree Cap., L.P.*, No. 12-CV-116, 2014 WL 12756827 (D. Conn. May 16, 2014), lifted litigation injunctions "under very similar facts." (B9's Reply 9.) In *One Equity Corp.*, the court granted the movant's second motion for leave from the receivership litigation injunction only after denying their first motion for leave because the "receivership was in its early stages" and "the [r]eceiver needed additional time to identify receivership assets and to investigate and resolve relevant issues pertaining thereto." 2010 WL 4878993, at *7. The district court denied the movant's first motion to lift the litigation injunction seven months into the receiver's tenure. *Id.* at *1–2 (explaining that the court appointed receiver on July 17, 2008, and denied movant's first request to lift the litigation injunction on February 17 and 19, 2009). Similarly, in *Greentree Capital*, the court lifted a litigation injunction for a receivership that had been in place for "more than twenty-six months" and had reached its "midpoint" where the court was poised to "establish[] summary disposition proceedings." 2014 WL 12756827, at *7. In this case, the Receivership and litigation injunction have only been in place since December 3, 2024. The Receiver is still working "to organize, understand, and marshal the entities under its control," *id.*, and the timing of B9's motion weighs against lifting the injunction. *Callahan*, 2 F. Supp. 3d at 440 (explaining that the second *Wencke* factor weighs against lifting the litigation injunction where it had "only been in place for one year and five months" and, "[g]iven the complicated nature of th[e] case . . . it d[id] not appear unreasonable to the [c]ourt that the [r]eceiver's investigation [was] still

51

ongoing"); *Illarramendi*, 2012 WL 234016, at *6 (explaining that the second *Wencke* factor weighed against lifting the litigation stay where the receivership "had been in place for about six months" and therefore the receiver's need "to organize and understand the financial transactions among all the [r]eceivership entities, as well as assess the claims filed" outweighed the movant's "need to proceed with its claims"); *Byers*, 592 F. Supp. 2d at 537 (concluding that the timing factor weighed against lifting the litigation injunction where receiver had "only just begun to investigate the full extent of the fraudulent scheme"). The Court therefore denies B9's motion for relief from the litigation injunction.  *Callahan*, 2 F. Supp. 3d at 440 (explaining that the court need not "explore the merits of [movant's] underlying claim" because "the first two of the *Wencke* factors weight heavily against modifying" the anti-litigation injunction (citing *Byers*, 592 F. Supp. 2d at 537)).

## III.  Conclusion

For the foregoing reasons, the Court: (1) grants the Receiver's motion for disbursement of funds; (2) finds Osaic's objections to be moot; (3) denies B9's motion to intervene, request for clarification, and motion for relief from the litigation injunction; (4) denies Axiom's motion to intervene and motion for relief from the litigation injunction, and finds Axiom's objections are without merit; (5) finds Gentile, Schneider, and Ascendant Capital's objections to be without merit; and (6) denies DJ Partners' motion to intervene and finds Ascendant Strategies and DJ Partners' objections are without merit.

The Court authorizes the Receiver to commence distributions as set forth in the Distribution Plan at any time after the entry of this Memorandum and Order.  The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this

Order, as well as other matters for which this Court retains jurisdiction as specified in the

Receivership Order and the Distribution Plan.

Dated:  April 8, 2025
            Brooklyn, New York

                                          SO ORDERED:


                                          _____s/ MKB_____
                                          MARGO K. BRODIE
                                          United States District Judge